ORIGINAL

FILED

2010 JAN 26  PM 1: 51

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

1  COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
2  FRANK J. JANECEK, JR. (156306)
   CHRISTOPHER COLLINS (189093)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  frankj@csgrr.com
   chrisc@csgrr.com
6
   COHN LIFLAND PEARLMAN
7    HERRMANN & KNOPF LLP
   PETER S. PEARLMAN
8  Park 80 Plaza West-One
   Saddle Brook, NJ  07663
9  Telephone:  201/845-9600
   201/845-9423 (fax)
10
   LYNCH LAW FIRM, P.C.                    ZIMMERMAN REED, P.L.L.P.
11 PAUL I. PERKINS                         J. GORDON RUDD, JR.
   45 Eisenhower Drive, Suite 300          DAVID M. CIALKOWSKI
12 Paramus, NJ  07652                      651 Nicollet Mall, Suite 501
   Telephone:  800/656-9529                Minneapolis, MN  55402
13 888/271-9726 (fax)                      Telephone:  612/341-0400
                                           612/341-0844 (fax)
14 Attorneys for Plaintiffs

15              UNITED STATES DISTRICT COURT

16            SOUTHERN DISTRICT OF CALIFORNIA

17 AMANDA HERMAN d/b/a CREATING      )  No. 10 CV 0195 JAH      JMA
   WELLNESS CHIROPRACTIC CENTER,     )
18 CYNTHIA GIBSON d/b/a TELEPHONE    )  CLASS ACTION
   JACKS, LISA FEELEY d/b/a ALL BAY  )
19 LOCKSMITH and JEFFREY P. ORDWAY   )  COMPLAINT FOR VIOLATION OF
   d/b/a EARTHWERKS UNLIMITED,       )  CALIFORNIA BUSINESS AND
20 Individually and on Behalf of All Others )  PROFESSIONS CODE §§17200, ET SEQ.,
   Similarly Situated,               )  AND 17500, ET SEQ.; UNJUST
21                                    )  ENRICHMENT; FRAUD; AND
                   Plaintiffs,        )  NEGLIGENT MISREPRESENTATION
22                                    )
           vs.                        )
23                                    )
   YELLOWPAGES.COM, LLC,              )
24                                    )
                   Defendant.         )
25 _____ )  DEMAND FOR JURY TRIAL

26

27

28

1    Plaintiffs Amanda Herman d/b/a Creating Wellness Chiropractic Center, maintaining her

2  principal place of business in Mahtomedi, Minnesota; Cynthia Gibson d/b/a Telephone Jacks,

3  maintaining her principal place of business in Oceanside, California; Lisa Feeley d/b/a All Bay

4  Locksmith, maintaining her principal place of business in Old Town Pinole, California; and Jeffrey

5  P. Ordway d/b/a Earthwerks Unlimited, maintaining his principal place of business in Flat Rock

6  Michigan (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by

7  and through counsel, complain of the defendant, Yellowpages.com, LLC ("Defendant"), as follows:

8                        **SUMMARY OF THE COMPLAINT**

9    1.    This is a class action lawsuit against Yellowpages.com arising out of its deceptive and

10  fraudulent business practices inflicted upon Plaintiffs and a class consisting of all persons or entities

11  in the United States that allegedly contracted with Defendant for advertising services from and after

12  May 1, 2005 (the "Class").  The members of the Class are referred to herein as the "Class Members."

13    2.    According to Defendant's website (www.yellowpages.com/about (last visited January

14  25, 2010)), it operates an online advertising service and is a

15         wholly owned subsidiary of AT&T. . . . [Yellowpages.com] is uniquely able to offer
        searchable directory listings. . . .   [Yellowpages.com is an] online source for
16        comprehensive national and local business information.

17            The [Yellowpages.com] distribution network provides exposure to more than
         100 million monthly consumer business searches.  Consumers can locate merchants,
18        search White Pages directories, research products and services, obtain maps and
         directions, and plan entertainment, leisure and travel activities.
19
      3.    Defendant is in the business of soliciting advertising from individual and business
20
  consumers and displaying that advertising on the Internet for the general public to search.
21
  Additionally, Defendant states that it provides services to its customers, including Class Members,
22
  by driving Internet traffic to their Yellowpages.com ad and/or website.  Among other things,
23
  Yellowpages.com follows the same format as the Yellow Pages telephone directories that are
24
  distributed throughout the United States, except that the advertising appears on the Internet.
25
  Yellowpages.com can be searched by a member of the general public on a nationwide or specific
26
  geographic basis by industry, product, or service.
27

28

- 1 -

4.     Class Members are solicited by Defendant in two basic modes: in person by a salesperson who comes to the Class Member's residence or business ("Premise Sales"); or on the phone by a telephone solicitor on behalf of Yellowpages.com ("Telephone Sales").

5.     Notwithstanding the method of solicitation, the prospective Class Members are subjected to the same misrepresentations, omissions and deceptive methods of sale. The approach uniformly utilized by Defendant's Salespeople (the "Salesperson" or "Salespeople") is contained in a scripted sales presentation (the "Scripted Presentation").  As the misconduct alleged is the same regardless of, and the facts are unaffected by, the mode of solicitation, this Complaint, in general, does not distinguish between Premise Sales and Telephone Sales.

6.     Defendant's Salespeople offer two types of services:

(a)     Defendant represents that it provides the number one online yellow pages search engine and thus, any Class Member who purchases a listing within the Yellowpages.com site automatically receives a high amount of exposure.  Moreover, the Salespeople represent that Defendant has developed "partnerships" with major online search engines like Google.com, Yahoo.com, MSN.com, and others and, as a result, Class Members will be featured prominently in the results of searches run on those search engines.  Defendant's Salespeople represent further that because of the "partnerships," it is cheaper to advertise with Yellowpages.com than directly with those major search engines.

(b)     Yellowpages.com also features several types of advertising products in which the Class Members can enroll, including, but not limited to:

(i)     *The YPClicks! Program or Yellowpages.com Guaranteed Clicks Program*.  This is a program wherein Class Members are guaranteed to receive a certain number of Clicks[1] on their Yellowpages.com ad or website during a specific period of time.  For example, a Class Member might sign up for 1200 Clicks over the period of a year.

_____

[1]     A "Click" is when a member of the general public, searching the Internet, clicks on a link or logo that takes that person to a specific site on the Internet.  In this case, the logo or link takes the person to the Class Member's Yellowpages.com ad or website.

1    (ii)    ***The Pay-Per-Call Program***.  This is a program wherein the Class

2  Member is charged a fee only when someone calls from a special phone number listed on the Class

3  Member's ad.

4    (iii)    ***The Purchase of a Tile Position***.  This program assures the Class

5  Member his or her ad will be featured in a box advertisement (a "Tile") at the top of a list of results

6  displayed when a member of the public searches the Yellowpages.com site only for goods and

7  services in the Class Members' designated geographic area.

8    7.    In selling these programs to the Class Members, Defendant engages in misleading,

9  fraudulent and unconscionable business practices, including, but not limited to the following:

10    (a)    The Salespeople state that by advertising with Yellowpages.com the Class

11  Member will benefit from featured prominence in major online search engines.  As discussed below,

12  the Class Members' ads are not featured as represented by the Salespeople, and Defendant has no

13  reasonable basis to believe they will be;

14    (b)    Defendant's representations that Yellowpages.com has "partnerships," or

15  "strategic alliances" with major search engines is false.  Further, Defendant omits to state it does not

16  invest sufficient time, effort or expertise in the Class Member's advertising campaign or website to

17  make the campaign effective, and thus the Class Member pays for an ineffective service that does

18  not perform as the Salespeople represent.

19    (c)    The Class Members are not provided with the Terms and Conditions of the

20  sales contract until after they have either signed an order form or recorded their oral assent to

21  purchase over the phone.  Defendant uses this alleged assent to assert that the Class Member is

22  bound to a contract even though the Terms and Conditions subsequently disclosed to Class Members

23  differ materially from what they are shown and/or told.

24    8.    As part of the Yellowpages.com sales training, all Salespeople must memorize the

25  Scripted Presentation and employ a particular methodology when selling Yellowpages.com products.

26  The Scripted Presentation, and other methods utilized by the Salespeople, are inherently misleading,

27  fraudulent and deceptive; consequently, upon conclusion of the Salesperson's presentation, Class

28  Members believe they are going to receive particular benefits on certain terms when there is no

1   reasonable basis for the Salesperson to assert that the benefits will be achieved, and the terms are

2   materially different than what is represented.

3        9.    In fact, both the outcome and terms differ materially from what is represented. A

4   Class Member who realizes he or she is not getting the services represented by the Salesperson is

5   unable to cancel the contract with Yellowpages.com. When the Salesperson and manager are unable

6   to deflect a Class Member's complaints and the Class Member declines to pay, he or she is subjected

7   to an aggressive collections process to enforce payment.  The common mantra of the collections

8   department is that everyone must pay (sooner rather than later) or their credit will be damaged.

9   Utilizing this approach, Yellowpages.com has experienced significant growth in the last three (3)

10  years.

11  **JURISDICTION AND VENUE**

12       10.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.

13  §1332(d) (the Class Action Fairness Act).

14       11.    Venue is proper in this Court because plaintiff Cynthia Gibson is a resident of

15  Oceanside, California, and because at all times relevant, Defendant maintained offices and did

16  business in this judicial district and many of the acts and practices complained of were created,

17  orchestrated and/or directed from within this district.

18  **BACKGROUND AND NATURE OF THE DECEPTIVE PRACTICE**

19  **Brief History and Rapid Growth of Yellowpages.com**

20       12.    In November of 2004, SBC and BellSouth entered into a partnership to create a joint

21  venture to acquire the online directory publisher then known as www.yellowpages.com.  SBC and

22  BellSouth then combined the SBC site, the Bell South directory site and the Yellowpages.com site

23  that was purchased to create the present Yellowpages.com website.

24       13.    In April of 2005, Defendant announced a program wherein consumers would be

25  guaranteed a certain number of Clicks to their website or ad for a given period of time: "The new

26  search engine product eliminates the need for businesses to learn and navigate multiple search

27  engines, search methods and submission standards to advertise strategically on the Internet. It also

28  reduces risk by enabling advertisers to purchase a specified number of clicks for a flat fee." AT&T

1  Press Release, dated April 28, 2005, available at http://www.att.com/gen/press-
2  room?pid=4800&cdvn=news&newsarticleid=21656 (last visited January 7, 2010).  At the time of
3  this announcement, Defendant was offering two services to the public: (1) a listing service on
4  Yellowpages.com; and (2) "strategic" listings within search engines on the Internet.

5      14.    In early 2006, Defendant assembled a team of sales professionals from the telecom
6  industry and crafted the Scripted Presentation.

7      15.    The first city in which this Scripted Presentation was tested was Philadelphia,
8  Pennsylvania. It proved to be quite successful in generating revenue.  In late summer of 2006, the
9  sales team was split and sent to New York and Baltimore in order to capitalize on the success
10  experienced in Philadelphia.

11      16.    In December of 2006, AT&T and BellSouth were merged to create the present
12  AT&T. As part of this process, Defendant became a wholly owned subsidiary of AT&T.

13      17.    The model that had been conceived in Philadelphia also proved successful in securing
14  business in New York and Baltimore, and a training center was set up just outside Philadelphia to
15  train the Yellowpages.com Salespeople in the Scripted Presentation.

16  **Training the Salespeople**

17      18.    The Salespeople are highly trained and are indoctrinated by Defendant's sales trainers
18  to hard-sell Yellowpages.com products.

19      19.    The Salespeople attend sales training facilities where they receive a two-week
20  intensive ad sales course.  Salespeople are scrutinized on every aspect of the sales presentation. They
21  are evaluated as to: (1) the approach taken with the prospective Class Member (the customer);
22  (2) the ability to do discovery and fact-finding with the prospective Class Member; (3) the actual
23  presentation and recommendation; (4) how the Salesperson performs in closing the deal; and (5) how
24  the Salesperson handles Class Member objections.  The extensive training ensures the Salespeople
25  do not deviate from the Scripted Presentation and instructed methodology.

26      20.    Every Salesperson must memorize the Scripted Presentation in order to receive a
27  sales position with Yellowpages.com. They are given additional tools to sell the Yellowpages.com
28  advertising products in the form of anecdotes, stories and mottos.

- 5 -

21.   When a Salesperson completes the required training he or she returns to the local office to begin selling ads.

22.   The Salespeople have sales quotas they must meet to retain their jobs.   Upon information and belief, the present attrition rate for Salespeople is over 50%.

**The Actual Sales Presentation**

23.   The sales presentation is governed by the Scripted Presentation.

24.   The Scripted Presentation includes the following:

(a)   Initially, the Salesperson greets the customer and states:

Good Morning, [Class Member].  I want to thank you for taking the time to meet with me today . . . when we spoke on the phone you indicated that you were looking to grow your business and that guaranteed traffic to your website could benefit you and help you to meet your business goals.

(The language regarding an actual meeting is modified for a telephone sale.)  Thus, the theme that Defendant offers guarantees in conjunction with its advertising products is introduced at the inception.

(b)   Next, the Salesperson states: "I have worked with many other [people in Class Member's business such as chiropractors, locksmiths, landscapers, telephone maintenance people, etc.] in the past, and have helped them to meet their business goals." The Salesperson is told to say this whether or not he or she has had any experience selling Yellowpages.com products to individuals or entities within the Class Member's particular line of business.

(c)   The Salesperson then asks questions about the Class Member's business – Defendant calls this the Needs Assessment Analysis (the "Needs Assessment").  The questions include:

(i)   "How did you get involved in [Class Member's] business?"

(ii)   "How long have you been in business?"

(iii)   "Which side [of Class Member's Business is the Class Member] looking to grow?"

(iv)   "What other type of work do you do?"

- 6 -

1         (v)     "What is the average job worth?"  (This is meant to elicit the gross

2    revenue per job performed by the Class Member.)

3         (vi)     "How much work do you do in a week?"

4         (vii)     "How much more work could you do in a week?"

5         (viii)     "How far will you travel?" or "Where do you pull your clients from?"

6         (ix)     "If 10 people locally searching online for [Class Member's Business]

7    saw your website [or ad], how many do you think would do business with you?"

8         (d)     This Needs Assessment is later utilized by the Salesperson to sell Defendant's

9    products.  At this point, the Salesperson repeats to the Class Member all of the information the Class

10   Member has told him/her.

11        (e)     The Class Member is then told "[Yellowpages.com has] partnerships with

12   most of the major search engines such as Google, Yahoo, Dogpile and many more . . . . We offer

13   services to build traffic to your website on both searches."  The phrase "both searches" refers to the

14   searches generated by the general public on the major search engines like Yahoo or Google and the

15   searches performed on the Yellowpages.com website.

16        (f)     The Salesperson then represents: "Yellowpages.com is the #1 online yellow

17   pages in the Country. We connect buyers with sellers by [enabling members of the general public to

18   search] a specific category in a geographic area."

19        (g)     The Salesperson then shows the Class Member a spreadsheet that the

20   Salesperson represents shows how many searches were conducted on Yellowpages.com for the Class

21   Member's particular products or services in the Class Member's geographic area.  This data is

22   generated from an internal system at Yellowpages.com called Samurai.   However, that

23   representation is false and the data is inherently misleading, because Samurai derives its data not

24   from Yellowpages.com alone, but includes searches conducted on major online search engines like

25   Google and Yahoo.   Thus, the amount of traffic which is represented to come from the

26   Yellowpages.com website is materially overstated.

27

28

(h)     The Salesperson uses this data to convince the Class Member that by purchasing a prominent position or a position at the top of the Yellowpages.com heading the Class Member will receive significant exposure.

(i)     The Salesperson then attempts to sell a Guaranteed Clicks package to the Class Member: "We offer a guaranteed number of Clicks to your website per month on Google, Yahoo, Dogpile and many other search engines . . . ." As discussed above, the YPClicks! or Yellowpages.com Guaranteed Clicks program states that the Class Member will receive a guaranteed number of Clicks on his or her ad or website within a specific period of time (usually a year).

(j)     Yellowpages.com has another program called the "Pay-Per-Call Program" wherein a Class Member only pays for the calls that the Class Member receives. In the Scripted Presentation, the Pay-Per-Call Program is often offered to the Class Member when the Class Member is reluctant to purchase the other programs offered by the Salesperson.

(k)     The Class Member is assured that Yellowpages.com can "build traffic to [the Class Member's] website when someone is searching in their local area for the services you offer." Because it is obviously so important, the idea that the Class Member will receive Clicks from "local" and "targeted" traffic is stressed over and over by the Salesperson.  That concept is false, however, since, in reality, a significant number of the Clicks received do not come from the local or targeted area and there is no reason for Defendant to believe they will.

(l)     The Class Member is subjected to hard sell techniques to agree to buy one of the programs Defendant offers. The Salesperson states: "When people go to the Internet looking for the services you offer, Yellowpages.com is going to make sure you are represented based on your needs. . . . [W]e are going to make sure you are one of the Premier [Class Member's business] in [Class Member's area] . . . . We are going to place you at the top of the [Class Member's category] heading with a Tile. . . . We are also going to make you one of the top 6 listings under each heading with a priority local listing."

(m)     The Salesperson again stresses that Clicks will be local and qualified: "When people are searching for your services on Google, Yahoo, Dogpile, Metacrawler, WebCrawler, Alta

1   Vista and all the web, we are going to offer locally targeted, qualified traffic to your website. We are

2   going to guarantee [number of Clicks] to [Class Member's website] in the next 12 months."

3           (n)     If the Class Member seems unsure, the Salesperson will perform a "Return on

4   Investment" analysis (the "ROI Analysis") as part of the Scripted Presentation.

5           (o)     In the ROI Analysis, the Salesperson takes the information obtained in the

6   Needs Assessment and utilizes it to estimate gross revenue the Class Member purportedly will derive

7   by purchasing Yellowpages.com advertising products.

8           (p)     The ROI Analysis is often utilized in the context of the YPClicks! or

9   Guaranteed Clicks Program and is presented in this manner: First, the number of Clicks the

10   Salesperson is attempting to sell on an annual basis to the Class Member is divided by 12 – this

11   gives the Class Member an average number of Clicks per month received by the Class Member; so if

12   a Salesperson is attempting to sell a package containing 2400 Clicks per year, the Salesperson will

13   tell the Class Member the average number of Clicks she will receive will be around 200 a month.

14           (q)     Then the Salesperson applies what is referred to as the Click-to-convert ratio

15   to the monthly average Clicks. This ratio is based on the scripted question: "If 10 people locally

16   searching online for [Class Members' business or profession] saw your website, how many do you

17   think would do business with you?" The answer given by the Class Member becomes the Click-to-

18   convert ratio for that particular Class Member. In other words, if the Class Member responds that 2

19   people out of 10 would do business with him/her if they Clicked on his/her ad or website, the

20   Salesperson will use a 20% Click-to-convert ratio. There is no legitimate basis for that ratio,

21   however. In fact, even phrasing the question in that fashion is materially misleading, since it

22   presumes an average Click-to-convert ratio of at least one in ten when in fact the average rate is only

23   a tiny fraction of that, and Defendant knows that to be the case.

24           (r)     Armed with what is already a materially false premise, the Salesperson then

25   estimates the actual number of people that purportedly will do business with the prospective Class

26   Member. So if the average number of Clicks per month is 200 and the Class Member supposedly can

27   convert 20% to new business, the Salesperson reasons the Class Member will have 40 new

28   customers a month.

1      (s)     The Salesperson then multiplies the purported number of new customers by

2 the equally unsupported gross revenue generated per job (the amount each job purportedly "is

3 worth"). So if the Class Member has speculated the average job, sale, or client was worth $1000, the

4 Salesperson states, "is it fair to say that the Click package could bring you a return on investment of

5 [$40,000] a month?"

6      (t)     The Salesperson then attempts to sell a Class Member a package that costs

7 something less than the amount arrived at through the monthly ROI Analysis.

8      (u)     This approach to sales is illusory, misleading, and deceptive. The Salesperson

9 has constructed in the mind of the Class Member a knowingly false expectation of what the Class

10 Member will receive in monthly revenue as a result of advertising with Yellowpages.com.

11 **The Yellowpages.com Products**

12     25.     The Salespeople represent that Yellowpages.com is the number one online yellow

13 pages search engine and this "new search engine product *eliminates the need for businesses to learn*

14 *and navigate multiple search engines, search methods, and submission standards to advertise*

15 *strategically on the Internet.*"    AT&T Press Release, dated April 28, 2005, available at

16 http://www.att.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21656 (last visited

17 January 7, 2010) (emphasis added).   Thus, the Class Member is told that if listed within the

18 Yellowpages.com site, he or she automatically receives the benefit of a listing in a website that is

19 heavily searched by the general public looking for goods and services.  Moreover, Defendant

20 represents it has developed "partnerships" with major online search engines like Google.com,

21 Yahoo.com, and MSN.com, etc. and, as a result, Yellowpages.com "makes sure" that when a

22 member of the general public is searching major Internet search engines for goods and services

23 similar to that of the Class Member in the Class Member's geographic area, the Class Member's ad

24 will be featured. In addition, the Salesperson states that, as a result of the "partnerships," the Class

25 Members actually receive lower prices for being featured in those major online searches than they

26 would if they were to advertise directly with those search engines. The Salespeople stress that

27 Yellowpages.com has the technology to ensure that the Class Member's ad or website will appear in

28 local and targeted searches.

26.   Yellowpages.com features several types of advertising products in which the Class Members can enroll, including, but not limited to:

(a)   **The YPClicks! Program**.  The YPClicks! Program represents that a Class Member will receive a requisite amount of "Clicks" within a period of one year.  The Class Member pays for this service on a monthly basis.  If the Class Member does not receive the number of Clicks for which he or she has contracted, the Salesperson tells the Class Member his or her contract will be extended until he or she receives the requisite number of Clicks.  However, Defendant does not extend the contract free of charge and the Class Member must continue paying the regular monthly charge.  Thus, the Class Member is provided the "benefit" of being able to pay once again for something they did not get the first time they paid for it in the hope they may get it the second time.  The Salesperson stresses that the Clicks will come from "local" and "targeted" traffic since, obviously, a Click on the website of a plumber in Cleveland, Ohio by a consumer in Phoenix, Arizona is hardly useful.

(b)   **The Pay-Per-Call Program**.  The premise of the Pay-Per-Call program is that a Class Member pays only when someone calls a special phone number listed on the Class Member's website or ad.  The contracts for this program are computed on an annual basis with fees charged on a per call basis.  Unfortunately for the Class Member, if he or she receives a phone call, via his or her Yellowpages.com special phone number and that call has nothing to do with purchasing products or services from the Class Member, or if the call is made from someone out of the Class Member's geographic area, the Class Member is still responsible for paying for that phone call.

(c)   **The Purchase of a Tile Position**.  This program purportedly allows the Class Member's ad to be featured at the top of the list of results displayed when a member of the public searches the Yellowpages.com site only for goods and services in the Class Member's geographic area (the top billing is referred to as a "Tile Position").

(d)   **Bells and Whistles**.  Class Members who do not purchase Tile Positions are told uniformly that to be featured prominently on the Yellowpages.com website, they must purchase other "bells and whistles" as they are referred to by the Salespeople.  Some of those items include:

- 11 -

1   (a) displays of the Class Member's business logo; (b) a package that includes links to the Class

2   Member's website; and (c) other distinguishing items such as directions, testimonials, etc.

3        27.    The misleading Scripted Presentation in tandem with unconscionable and deceptive

4   business practices in the sale and implementation of the product has earned Yellowpages.com

5   substantial revenues at the expense of the Class Members.

6   **THE DECEPTIVE PRACTICE EXPOSED**

7   **The Faulty Search Engine Product and the Internet Search Engine Irrelevancy**

8        28.    Defendant's representation that by advertising with Defendant, Class Members will

9   receive premium placement in the "sponsored" listings on major search engines like Google and

10   Yahoo is false and misleading.

11        29.    The Salespeople stress that Defendant's search engine product will eliminate the need

12   for the Class Member to learn and navigate multiple search engines, search methods and submission

13   standards to advertise strategically on the Internet.  As such, the Class Member is led to believe

14   Defendant will ensure that the Class Member's ad or website will be featured in searches performed

15   by members of the public that are local to the Class Member and that the search within which the

16   Class Member is found will be relevant to the Class Member's business.  The Salesperson states

17   further that Defendant has developed "partnerships" with the major Internet search engines and, as

18   such, the Class Member will receive the opportunity to advertise with the major Internet search

19   engines, but that it is actually cheaper for the Class Member to advertise with Defendant.

20        30.    Most major Internet search providers like Google use an "auction" process whereby a

21   member of the public seeking to appear in searches in the "sponsored" section or be featured

22   prominently can actually bid on search words (*i.e.* "attorney," "plumber" or "interior design").  A

23   member of the public bids on specific "ad words" by setting a price that the person is willing to pay

24   to appear in a sponsored listing position.  A sponsored listing position on Google or Yahoo appears

25   as an ad above and/or to the right of the regular search results (also called the organic search results).

26   They are highlighted so that the public may find them more easily.  The Internet search engine

27   industry exists in a dynamic atmosphere.  As such, the words upon which the public bid can vary in

28   price and value on a daily basis.

31.     The words upon which a member of the public must bid will change on a constant basis and will need consistent attention and care to remain relevant and appear in the "sponsored" listings section on Google, Yahoo, etc. or appear in prominent places.  Therefore, certain words and combinations of words will become more or less relevant (and, therefore, costly) depending on how many people are bidding on the particular words, how often those bids are being made, and how many times the general public searches for these particular ad words.  As such, the value of ad words can change and alter on an almost daily if not hourly basis (for example, some words or word combinations may have little value (or relevancy) until a particular time or event like "September 11").  Defendant professes that it will keep pace with this dynamic atmosphere on a constant basis and provide the Class Member a customized solution.

32.     In reality, this does not happen. Defendant lacks the requisite staff or the staff is unable to deliver on the promises made by Defendant.  Thus, the representations made by the Salespeople as to Defendant's ability to perform this part of the agreement are false and misleading.

33.     In addition and contrary to what the Class Member is told as part of the Scripted Presentation, there is and can be no assurance the Class Member's ad:

        (a)     will be featured prominently in searches (in some cases the Class Member's ad may be rotated in conjunction with other Yellowpages.com customer ads in the prominent positions, thus substantially reducing the Class Member's exposure);

        (b)     will appear in the proper geographic area;

        (c)     will appears in the proper category; or

        (d)     will appear in searches in the categories requested.

34.     To the extent the Class Member needs technical support (*i.e.*, for the Search Engine Product) or to help with their website or ad, there is little, if any, technical support.  Defendant has a practice of putting ads and websites together in a rushed and hurried manner, and the Class Member is often unable to make changes, corrections or edits.  In short, Defendant lacks the capacity or the will to deliver on its representations that the Class Member's ad will appear in the relevant strategic positions within major online search engines.

**The Search Engine Product – Yellowpages.com Internal Searches/Tile Positions**

35.     At the beginning of the presentation, the Salesperson shows the Class Member a spreadsheet that is represented to demonstrate the number of searches conducted by the general public on Yellowpages.com, for a particular product or service offered by the Class Member within the Class Member's geographic area on a monthly basis.

36.     In fact, the number of searches on the spreadsheet does not come from Yellowpages.com alone, but from other major search engines as well. As a result, the representation that the number of searches shown on the spreadsheet is demonstrative of the results which can be expected by a Class Member advertising on Yellowpages.com is false and misleading.

37.     As such, and in conjunction with the Scripted Presentation, the Class Member is given a false expectation of the outcome that will be achieved. The Yellowpages.com Salespeople use inflated and/or misleading search data in order to convince the Class Member that they will receive unrealistic returns as a result of their investment in Defendant's advertising services.

38.     Despite Defendant's representation to the contrary, Yellowpages.com is not a major online search engine. It is not listed in the top search engines by Internet analysts. (*See*, for example, http://searchenginewatch.com/2156221 (last visited January 7, 2010)). Thus, the expectation created by the Salesperson that Yellowpages.com is a major online search engine is false.

39.     The Class Members are told if they purchase certain extra "Bells and Whistles," they will be assured of premium placement within Yellowpages.com. Such statements are false and misleading. As people conducting online searches often do not read beyond the first two pages of the search results, if any significant number of people in the Class Member's profession and geographic location buy the same "bells and whistles," the Class Member cannot be assured of – and almost certainly will not receive – premium placement on most searches.

40.     In the Scripted Presentation, the Class Member is told there are a limited number of Tile Positions for each profession in each geographic area and if his or her ad appears in one of the Tile Positions, the Class Member is assured of more traffic on his or her website. The Class Member is told that purchasing a Tile Position will ensure the Class Member is "one of the premiere [Class

1  Members' business] in the [Class Members area]" when a member of the public searches the

2  Yellowpages.com site and that such a purchase will ensure the Class Member a "top six" position.

3       41.    However, the Class Member often does not appear in a Tile Position, or in the top six

4  positions, despite the purchase of a Tile Position.

5  **The YPClicks! or Guaranteed Clicks Program**

6       42.    Salespeople tell Class Members that by buying the YPClicks! or Guaranteed Clicks

7  Program, the Class Member will be receiving Clicks from "locally targeted, qualified traffic to [the

8  Class Member's] website." However, Clicks received by the Class Member are often neither local

9  nor targeted. Thus, the representation of local and targeted traffic is false.

10       43.    The Salespeople omit to tell Class Members that a significant number of the Clicks

11  will come from random and completely irrelevant sources and cannot reasonably be expected to

12  result in business to the Class Member. Accordingly, the Class Member is misled into believing that

13  all Clicks or phone calls will come from relevant sources seeking the Class Member's products or

14  services, but that is not the case.

15       44.    The Class Member learns, too late, that he or she rarely, if ever, receives the amount

16  of business upon which the Salesperson had built their expectations based upon the Scripted

17  Presentation and the ROI Analysis; the Clicks attributed to the Class Member are frequently not

18  relevant to the Class Member (and certainly much less relevant than represented by the Salesperson).

19       45.    Frequently, the Class Member's ad appears on sites where the placement makes the

20  link to the Class Member's ad or webpage irrelevant or highly unlikely to generate business for the

21  Class Member.

22  **The ROI Analysis Fraud**

23       46.    As part of the Scripted Presentation, the Class Member is asked, "If 10 people locally

24  searching online for [Class Member's business] saw your website, how many do you think would do

25  business with you." Sometimes the Salespeople will alter this question and ask "If 20 people . . . ."

26  Based upon the Class Member's answer, the Salesperson will compute the estimated return stated by

27  the Class Member on a percentage basis.

28

47.   The Salesperson then estimates the amount of new customers that the Class Member can expect to receive.  This can be done in several ways:

(a)   If the Class Member is considering the YPClicks! or Guaranteed Clicks program, the Salesperson will multiply the average Clicks per month by the percentage the Class Member has estimated (*e.g.*, if a Class Member says they can convert 1 out 10 Clicks to new customers, and the Class Member is looking to purchase a 1200 Clicks package –100 a month, the Salesperson will tell the Class Member they can expect 10 new customers a month (10% x 100 Clicks).  The Salesperson then computes the number of new customers the Class Member can expect by the average revenue generated by the Class Member's average job and computes the additional revenue the Class Member will receive.

(b)   If a Class Member is not purchasing the YPClicks! Program or Guaranteed Clicks or the Pay-Per-Call program and only wants to utilize the Yellowpages.com Search Engine Product, a different formula is used. In all events, however, the data utilized by the Salesperson from the Samurai system is not accurate and creates a false expectation of a return in the mind of the Class Member, because that data is retrieved from a number of Internet search engines and not merely Yellowpages.com as represented.  Thus, when a Salesperson represents, based upon the data from the Samurai system, that a Class Member can expect to receive a particular response to an advertisement on Yellowpages.com, that is a misrepresentation, since that system measures responses to a number of major search engines collectively and not merely to Yellowpages.com.

48.   Not only is the methodology used to compute new customers by the Salespeople misleading, the ROI Analysis is false and misleading for the following additional reasons, among others:

(a)   The statistical suppositions are based upon a false premise.  Where the Class Member is asked, "If [for example] 10 people locally searching online for [Class Member's business] saw your website, how many do you think would do business with you," there is no answer that the Class Member can reasonably be expected to give that will not end up giving the Class Member an unrealistically high expectation of the business that will be generated.  This is because, even if a Class Member responds that they could convert 1 out of 10 (a 10% conversion

1   rate), that number is already 10 times the national average.  The national average for the "Click to

2   conversion rate" for a website or ad is approximately 1%.  Accordingly, unless the Class Member

3   chooses a fraction of one – not one of the options given him or her – he or she is led to believe

4   Defendant is going to increase business at least ten times what reasonably can be expected.  Thus,

5   the question is designed to create a false expectation on the part of the Class Member.

6          (b)    Where a Class Member purchases only the Search Engine Product, they will

7   have an unrealistic expectation of new customers, as the Class Member is led to believe there are

8   more searches for that Class Member's product or service in the Class Member's area than in fact

9   there are because of the misrepresentation that the number of searches represented in the statistics

10  given came from that area.  The Class Member thus pays to be listed at the top of the search results,

11  believing there are many more people searching that area for the Class Member's product than, in

12  fact, there are.

13      49.    As a result, the Class Member is given an unrealistic expectation of the amount of

14  business the Class Member will receive by advertising on Yellowpages.com.

15  **The Terms and Conditions Are Not Provided to the**
    **Class Member Prior to Allegedly Assenting to the Contract**

16

17      50.    The Class Member is not provided with the Terms and Conditions that accompany

18  the sales contract until after the Class Member hears the Scripted Presentation and signs an order

19  form or orally agrees over the phone to purchase advertising services from Yellowpages.com (the

20  "Alleged Assent").

21      51.    After the Class Member gives the Alleged Assent, Defendant sends two documents to

22  the Class Member, though not necessarily at the same time: (i) the Contract for Internet Yellow

23  Pages.com Advertising (the "Order"); and (ii) the Terms and Conditions for Internet Advertising

24  ("Terms and Conditions").  In some cases, the Class Member will actually sign the Order form in the

25  presence of the Salesperson, but the Class Member is not presented with the Terms and Conditions

26  of that Order at that time.  While Defendant contends both documents form part of a binding

27  contract, the Class Member is not able to review the Terms and Conditions until after they are

28  tricked into entering into what Defendant asserts is a binding agreement.

- 17 -

52.     The Order usually is presented to the Class Member in electronic format.  It contains items specific to the transaction such as the date, Salesperson, and the products ordered by the Class Member.

53.     In addition, the Order states:

This contract consists of and is governed by this Insertion Order pages, any additional Insertion Order attached hereto and in the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference.  By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge that Yellowpages.com's reliance upon your acceptance of them.  (An additional copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING may be accessed through www.yellowpages.com; however the version applicable to this contract shall be the latest dated version as of the date of your signature.)  You agree that you give authority to bind the individual or company purchasing this advertising in all respects to this contract and the incorporated terms and conditions.

54.     This clause is not shown to the Class Member before the Order is executed.  If the Class Member has been solicited by a Telephone Sales representative the Class Member does not receive anything in writing until after he or she has recorded an Alleged Assent to what Defendant describes as the consummation of the transaction.  If the sales presentation is done by a Premise Salesperson, the Class Member signs a small screen (akin to what one signs for a UPS or FedEx delivery) or Clicks "OK" on the Salesperson's PDA.  At no point does the Class Member have the ability to review the Terms and Conditions prior to giving what Defendant later asserts as the Class Member's assent to the contract.

55.     The Order given to one of the Plaintiffs is attached hereto is Exhibit "A."

56.     The Terms and Conditions, a copy of which is attached to Exhibit "B," contains the following material terms:

(a)     The section entitled "Scope" states that as between the Terms and Conditions and the Order, the Order controls.

(b)     The Terms and Conditions contain material terms as to acceptance, automatic renewal, and termination:

The term of the Agreement commences on the date of execution by [the Class Members] (either in writing or by electronic signature, including recorded oral acceptance of this Agreement of an Order presented by us and shall (subject to our

right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances specified in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order for the initial Term specified in the Order.  Unless otherwise provided in the Order and except as provided below in these Ts&Cs, upon expiration of the Initial Term, the term of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least thirty days before expiration of the Initial Term. . . . Unless otherwise provided in the Order, either your [sic] or we may terminate the Renewal Term, with or without cause. . . .   Neither of us may terminate this Agreement during the Initial Term [first year] . . . .  If you choose to have your Advertising Products removed from any site and/or our services discontinued prior to the end of the Initial Term or Renewal Term . . . you shall notify us in writing and the unpaid balance for the entire Initial Term or Renewal Term will become immediately due and owing.

(c)     The Rates and Payments section contains material terms with respect to Defendant's ability to alter pricing, the billing cycle, the rates for renewal, the right to collect attorneys' fees, and late fees. The clause also provides that Defendant can bill a Class Member "for Advertising Products for which no rate is specified in the Order" at the "standard rate" (although there is no statement of what a standard rate is and how it is computed);

(d)     Unless the Class Member terminates the agreement at the end of the initial term, Defendant can renew it at its "standard rates" (although, again, the Terms and Conditions neither define what a standard rate is nor provide any calculus upon which one can determine that rate);

(e)     If payment is not received by the due date, Defendant can suspend all products being serviced on behalf of the Class Member;

(f)     Defendant reserves to itself the right to charge late fees at a "standard rate" or the maximum rate permitted by law (again, no explanation is given of the standard rate);

(g)     The Class Member is made responsible for any attorneys' fees and costs Defendant incurs in collecting any unpaid amounts;

(h)     The section entitled "Custom Domain Registration/Ownership of Work Product" contains previously unrevealed material terms as to the ownership of the information within the Class Member's ad or website:

(i)     Where the Class Member has ordered advertising products that include hosting or operation of a website – and where the Class Member does not already own the domain

1  name that the website will host – Defendant will purchase the website on behalf of the Class

2  Member or the Class Member may transfer the domain name to Defendant's server;

3          (ii)      Defendant may disable any hosted websites if payment is missed, and

4  it will not release the domain name until the Class Member has paid all of Defendant's bills;

5          (iii)     If Defendant purchases the domain name on behalf of the Class

6  Member, Defendant, and not the Class Member, is said to own the domain name (although in

7  practice, even where Defendant does not purchase the domain name, Defendant has retained

8  ownership of the domain name);

9          (iv)     If the Class Member does not provide transfer instructions to

10  Defendant upon the termination of the Agreement, Defendant retains the right to allow the domain

11  name registration to lapse or allow Defendant to retain ownership; and

12          (v)      The Class Member is said to consent to the recording of all telephone

13  conversations.

14          (i)     The Class Member allegedly can only sue the Defendant in New York. This

15  condition applies even if the Class Member lives in California, Washington, or Alaska.

16      57.    The Order requires that the Class Member provide a written signature before the

17  Terms and Conditions take effect.  The Order requires that payment in full be received prior to the

18  fulfillment of the products listed therein.

19      58.    The Class Member does not learn the actual monetary consideration required by

20  Defendant until the Class Member receives a fax purporting to state that a contract is already in

21  place.

22      59.    The Class Member never receives a written statement explaining precisely where the

23  ads will appear.

24  **The Conclusion of the Transaction**

25      60.    Consistently throughout this experience, the Class Member will be given one set of

26  expectations prior to the Alleged Assent to the Order, but learns, too late, that: (i) Defendant cannot

27  and/or will not – and in fact does not – deliver upon the representations made by the Salesperson;

28

1 and (ii) the Terms and Conditions received by the Class Member vary materially from what the

2 Class Member was shown, told and expected.

3    61.    When the Class Member objects to paying for what he or she is not getting, he or she

4 is turned over to the collections department which:

5    (a)    does not have the ability or authority to resolve the Class Member's

6 complaint;

7    (b)    does not have the authority to rescind contracts; and

8    (c)    is instructed to tell the Class Member he/she must pay or their credit will be

9 ruined.

10    62.    If payment is not made, the Class Member's account is sent to a law firm for further

11 collection procedures.  From start to finish, the Class Member is deceived by fraudulent sales

12 practices, is relegated to a contract governed by Terms and Conditions of which the Class Member

13 had no knowledge; learns that the representations made were false and that the lack of customer

14 service and technical support makes the very foundations upon which the purported contract stood

15 misleading; has not received what was represented; is turned over to an unrelenting collections

16 department whose mantra is "destroy credit"; and finally, is sued.

17                                        **PARTIES**

18 **Defendant**

19    63.    Defendant Yellowpages.com is a wholly owned subsidiary of AT&T and an online

20 source for national and local business information.  Yellowpages.com is headquartered in Glendale,

21 California.

22 **Plaintiff Amanda Herman d/b/a Creating Wellness Chiropractic Center**

23    64.    Creating Wellness Chiropractic Center ("CWCC") is a sole proprietorship owned and

24 operated by Dr. Amanda Herman ("Herman"), a Doctor of Chiropractic Medicine.

25    65.    In September of 2008, Herman was contacted by a Salesperson named Jay Holder

26 ("Holder").  Holder stated he wanted to meet with Herman to discuss how Yellowpages.com could

27 increase CWCC's business.

28

66.    Holder came to Herman's office on September 15, 2008, accompanied by his sales manager, Maureen Spray ("Spray"), who asked Herman a series of questions about Herman's business, including the average amount of revenue Herman earned for each patient; the number of patients Herman saw in a week; and the number of patients Herman could see in a week.

67.    Herman told Spray $500 was a good estimate of the average revenue per patient.

68.    Spray then showed Herman a spreadsheet that purportedly exhibited the number of searches for chiropractors in Herman's area on Yellowpages.com. Spray stated that she had worked with other chiropractors in Herman's area as well.

69.    Spray represented that if CWCC were listed in the "sponsored links" section within the Yellowpages.com search results, Herman would be guaranteed additional business.[2] Spray based this upon the representation that when people search Yellowpage.com for a product or service, they most often choose someone in the sponsored links to contact. Spray told Herman CWCC would appear in this section if Herman bought a Tile Position.

70.    Spray then told Herman about a program called YPClicks! or Guaranteed Clicks. Spray stated YPClicks! was a program wherein the advertiser was guaranteed a certain amount of Clicks to their website during their contract period and that different professions were doing very well with this program. Spray told Herman that plumbers were receiving excellent results with 50%-60% of the Clicks received turning into phone calls for business, and that many people in Herman's profession were profiting from the Guaranteed Clicks program.

71.    Spray then asked Herman how many phone calls, out of 10, Herman could turn into paying clients. After some discussion, Spray suggested they estimate what she described as a low number, suggesting 1 out of 10 or 10%.

---

[2]    "Sponsored links" are those ads that appear prominently (often in bold blue) above and to the right of the search results when a member of the general public conducts a search upon a major search engines like Google, Yahoo, Bing, MSN, etc.

72.     Spray went through the scripted ROI Analysis for a guaranteed 2400 clicks per year (200 clicks a month) program, convincing Herman the $530 a month fee would be well worth it, paying for itself.

73.     At a second meeting on September 16, 2008, with Herman's husband present, Spray presented Defendant's products and services in an identical manner.

74.     Herman declined to commit, so a third meeting was held on September 17, 2008 in which Herman impressed upon Spray that Herman was only interested in the program if Spray could assure her that CWCC would be advertised only in area codes that were delineated, in advance, by Herman.

75.     Spray assured Herman the Clicks received by the CWCC website would be from "local" and "targeted" areas. Spray represented this was possible because Defendant could track the IP addresses of the general public and, as such, could ensure that CWCC would be advertised only in designated areas. Herman then supplied Spray with the specific zip codes within which Herman wanted CWCC to appear.

76.     Spray repeated to Herman that Defendant had a special relationship with Google which enabled Defendant to utilize Google's ad word features, and because Defendant received a discount it would be cheaper for Herman to advertise with Defendant and utilize the "ad words" feature in Yellowpages.com than to advertise directly with Google.

77.     Finally, after affirming the zip codes within which she wanted to advertise, and receiving Spray's assurances that CWCC would appear as a "sponsored" link in Google searches, Herman agreed to sign up.

78.     At approximately 1:00 pm, on September 17, 2008, Herman signed an electronic instrument akin to one which would be signed for a UPS or FedEx delivery. Spray represented that by signing the instrument, Herman had signed up for the program that was discussed between her and Spray. There were no terms of Herman's Order visible on the instrument where Herman signed, and she was not given the Terms and Conditions to review.

79.     The Terms and Conditions were sent via email later the same evening. They contained many clauses that were not discussed.

- 23 -

80.   Herman found she was not receiving any phone calls at all as a result of the services she purchased from Defendant. Based upon Spray's "low estimate," Herman was expecting CWCC would receive at least enough money from the advertising to cover the cost of the Yellowpages.com advertising program.

81.   Frustrated the program was not working, Herman called Defendant and asked for a report that would describe from what geographic area and which addresses within the Internet the Clicks to the CWCC website were being generated. Neither Holder nor Spray could offer any solution to Herman's problem and they were unable to give her the requested report. Finally, on December 14, 2008, Herman received a "traffic report" for the month of November. The traffic report did not provide the information for which Herman had asked, however. It simply told her the number of Clicks she received and from which search engine the Clicks emanated. It did not provide any information regarding the geographic breakdown of the activity which was, from the beginning, crucial to Herman.

82.   Eventually Herman realized her website was Google analytics enabled. This means that Herman could use a Google program that would analyze how many Clicks Herman's website received and from where those Clicks emanated.

83.   Ten percent of all the Clicks generated had come from outside the United States; only 32% of the Clicks from the United States were from Minnesota, the state in which CWCC is located; and less than 20% of the Clicks came from zip codes that had been chosen by Herman.

84.   When Herman told customer service she was not going to pay her bill, she was told if she did not pay, she would be turned over to collections.

85.   Eventually, CWCC was turned over to a collection agency. Each collection representative with whom Herman spoke informed her that they would have a manager call Herman to discuss the situation; no manager ever called.

86.   Eventually, Herman was contacted by a law firm seeking to collect the debt on behalf of Defendant.

**Plaintiff Cynthia Gibson d/b/a Telephone Jacks**

87. Telephone Jacks is a sole proprietorship owned by plaintiff Cynthia Gibson ("Gibson"). It is in the business of providing telecommunications/data service. On January 9, 2009, Gibson received a phone call from Christopher Gentry ("Gentry"), a Salesperson seeking to sell online advertising to Telephone Jacks.

88. During the call, Gentry ran through the Scripted Presentation with Gibson. He told Gibson what he represented to be the many advantages of advertising online with Defendant. Among other things, Gentry represented there were a large number of searches for telecommunications/data service providers in Telephone Jacks's area, that Yellowpages.com was the No. 1 online yellow pages, and that by advertising with Yellowpages.com, Gibson would receive additional business. Gentry then told Gibson the purported number of searches in the area for the services that Telephone Jacks provides.

89. Gentry asked how many calls out of 10 it took Gibson to gain one customer. After some discussion, Gentry convinced Gibson she could convert one out of six calls to a new Telephone Jacks customer.

90. Gentry asked Gibson the average revenue Telephone Jacks received for each job it performed; Gibson responded it was approximately $85.00.

91. Gentry then told Gibson that by purchasing Defendant's services, Telephone Jacks would receive "at least 6 jobs a month." Gentry purported to base this statement upon the premise that by advertising with Yellowpages.com and appearing at the top of the search results within Yellowpages.com, Telephone Jacks could be assured of receiving at least 36 calls a month, arriving at this number by examining the purported number of searches in Telephone Jacks' area for similar services and computing an average percentage return amount.

92. Gentry concluded that if Gibson purchased a Yellowpages.com ad, Gibson would receive an extra $510 a month (6 jobs per month multiplied by the average revenue per job of $85). Gibson had two subsequent discussions with Gentry wherein Gentry repeated and reaffirmed what he had stated. Relying upon Gentry's representations, Gibson agreed to advertise with Defendant.

93.     Gibson agreed to purchase one of the "bells and whistles" offered called the "click-through option" in which a person who saw Telephone Jacks' ad on Yellowpages.com could click a link that would take that person to the Telephone Jacks' website. This added option was represented to help the Telephone Jacks ad feature more prominently in Yellowpages.com searches.

94.     Though Gibson agreed eventually to the services, she never received an Order or any Terms and Conditions.

95.     After several months of being listed with Yellowpages.com, Telephone Jacks received exactly zero phone calls. When Gentry was unresponsive to Gibson's calls, she contacted Gentry's district and general manager, also with no success.

96.     Eventually, Gibson's contract came to an end. Gibson never received the services promised, but she paid the bills received from Defendant.

**Plaintiff Lisa Feeley d/b/a All Bay Locksmith**

97.     All Bay Locksmith ("All Bay") is in the business of providing locksmith services to the San Francisco Bay area. It is a sole proprietorship owned and operated by Lisa Feeley ("Feeley"). In April 2009, All Bay was contacted by a representative offering Defendant's products and services. Shortly thereafter, a Salesperson ("Bruce") came to All Bay's place of business and met with Feeley.

98.     Bruce told Feeley about the advantages of Yellowpages.com and presented a spreadsheet that purported to delineate the number of searches conducted on Yellowpages.com from persons in All Bay's geographic area for locksmiths.

99.     Bruce stated that because Yellowpages.com is the No. 1 online search engine, Feeley's business would increase just by purchasing an ad on Yellowpages.com.

100.    Bruce told Feeley that Defendant would conduct the requisite "key words" campaign to ensure a large amount of traffic to the All Bay website. Bruce stated that Defendant had the technical capability to make sure that the links to All Bay's website figured prominently in Google, Yahoo, and other major search engine searches.

101.    Based upon the representations made by Bruce, Feeley decided to purchase the Yellowpages.com website hosting service, including an ad on Yellowpages.com.

102.   After Feeley agreed to purchase the services, Bruce presented Feeley with a small device upon which Feeley was told to sign in order to receive the services represented by Defendant. Feeley was never presented with the Order or the Terms and Conditions, and to this day, has never received either of them.

103.   Feeley soon learned that Bruce had misrepresented Defendant's products and services. Contrary to what Bruce had represented, All Bay was not receiving the represented amount of traffic to its website; All Bay did not appear prominently in any of the major Internet search engines; All Bay's ad did not appear prominently within the Yellowpages.com searches for locksmiths, in fact, All Bay was not listed at all on the Yellowpages.com website; and to make matters worse, All Bay was charged more than had been agreed upon.  The failure of Defendant to provide a copy of the contract has impaired Feeley's ability to dispute the overcharge.  Though Feeley requested the Order and Terms and Conditions, Defendant has never responded to her request.

104.   In a purported attempt at reconciliation, Bruce returned to All Bay in July and attempted to up-sell All Bay on Internet advertising: Bruce said by purchasing more, Feeley would get what she wanted (and what she was already paying for).

105.   When Feeley refused and remained adamant, Bruce agreed to cancel All Bay's service and stop the charges.  However, the service never was cancelled, and Defendant continued to charge All Bay for services.  When Feeley refused to pay, All Bay's website was turned off and Defendant has purported to retain ownership of the URL despite the fact that All Bay owns the rights to allbaylocksmith.com until 2017.

106.   All Bay has made numerous efforts to resolve the matter without success, and All Bay has been turned over to a collection agency.

**Plaintiff Jeffrey P. Ordway d/b/a Earthwerks Unlimited**

107.   Jeffrey P. Ordway ("Ordway") is the owner/president of Earthwerks Unlimited ("Earthwerks"), a sole proprietorship which performs large scale industrial landscaping.

108.   In or about April 2008, Ordway received a phone call from a Yellowpages.com representative named Darnell Ingram ("Ingram") seeking to sell Ordway advertising in Yellowpages.com.

109.   Ingram stated that Yellowpages.com had a program called the Pay-Per-Call Program which would place an AT&T phone number in Earthwerks' Yellowpages.com advertisements, and calls placed to that phone number would forward automatically to his cell phone.   Ingram represented that the calls Earthwerks would receive would come from "local" and "targeted" members of the public; Earthwerks would be responsible to pay for only for those calls it received; and that Earthwerks would not be billed for calls with a duration of less than twelve (12) seconds.

110.   Ingram told Ordway Earthwerks would receive a Yellowpages.com Activity Report (the "Daily Activity Report") via email which would give Ordway a summary of the phone calls received each day. The Daily Activity Report would include the date, time and duration of the calls; the customer phone number; whether the call had been answered; and the amount charged for each call.

111.   Ordway was informed that as a part of the Pay-Per-Call Program, he would receive two advertisements: one in the Yellow Book and one on Yellowpages.com and that his Yellowpages.com advertisement would appear on the Yellowpages.com website when a search was conducted for landscapers in Earthwerks' geographic location.

112.   Ingram pressured Ordway to sign up immediately, because, ostensibly, the Yellow Book was being sent to the printer very soon, and for Ordway's advertisement to be included in the book, he would need to purchase the ad immediately.

113.   In order that the Earthwerks' advertisement appear in the new edition of the Yellow Book, and based on the representations made, Ordway agreed to make the purchase.

114.   Ingram told Ordway that in order to enroll Earthwerks in the Pay-Per-Call program, Ingram would need to record Ordway's verbal consent to various terms.  Ingram stated he would read the terms to Ordway over the phone, would record Ordway's affirmative responses to each statement, and if Ordway did not consent, Earthwerks' advertisement would have to wait for next year's Yellow Book.

115.    Ordway agreed to proceed, Ingram read a few terms, and Ordway answered yes at Ingram's prompting.

116.    Ordway was not presented with anything showing what he had ordered.  Further, Ordway did not receive a copy of the Terms and Conditions until several weeks after the conversation. Almost none of the Terms and Conditions were read or otherwise disclosed to Ordway prior to his verbal consent.

117.    Ingram stated that Defendant would draft Earthwerks' Yellow Pages advertisements from a previously published Earthwerks advertisement found in a magazine and that once Ordway received the draft of his Yellowpages.com advertisement, he would be able to make changes prior to publication online.

118.    Contrary to this representation, Ordway was never shown the Yellowpages.com ad before it appeared on Yellowpages.com.

119.    After seeing his ad online, Ordway received an email from Defendant which included two attachments.  The attachments were the proposed sample of both of Earthwerks' advertisements.

120.    Ordway sent an email to Ingram requesting changes in the advertisements.

121.    Apparently unaware the ads were already running, Ingram stated that the changes Ordway requested would be implemented and the advertisements would not run until the changes were made.

122.    After signing up, the vast majority of calls received as a result of the Yellowpages.com advertisement were not from members of a "local" or "targeted" public seeking landscapers, but from people either outside of the area specified by Ordway (sometimes from people two or three states away) or people requesting services Ordway did not perform, such as grass cutting. This would not have happened if Ordway's ad had been correct when posted.

123.    Sometimes when Ordway was unable to answer the phone, he would look on his caller ID and return the call to the person who had called him.  Often, the person who answered the phone number that Ordway had dialed informed Ordway that they had never called him.

124.    When Ordway brought these calls to Ingram's attention, Ingram informed him that it was a "weird situation" and this was the first time Yellowpages.com had heard of a problem of this

1   nature.  Ingram stated that these calls "are not to [be] worried about" and that AT&T "could fix

2   those."

3       125.    However, the problem persisted and Ordway called a technical support number and

4   spoke to a Yellowpages.com technician from Sacramento, California, who told Ordway that the

5   reason he had been receiving these calls was that the toll free number AT&T had given him, and

6   placed in his advertisement, was currently in use by another business.  The technician informed

7   Ordway that he had seen this happen frequently and he would correct the problem.  The technician

8   also told Ordway that he had "zeroed" Ordway's account as Ordway had been assigned the

9   problematic toll free number and that Ordway would not be charged for the calls he had received.

10      126.    Ordway later received a call from a woman who identified herself as a program

11  manager.  The program manager informed Ordway that Earthwerks had received a total of

12  approximately twenty (20) calls, and, of those calls, the program manager claimed that Ordway had

13  answered nine (9).  The program manager stated Ordway would be charged for all calls.  When

14  Ordway protested this decision from AT&T, the program manager hung up on him.

15      127.    Eventually, after two (2) months of complaints, Ordway was sent a Daily Activity

16  Report.  He learned, from reviewing his Daily Activity Report, he was being billed even for calls he

17  was not answering.  This was contrary to what had been represented by Ingram.

18      128.    The Daily Activity Report contained the following language never previously

19  disclosed to Ordway:

20          In general, please remember that you will be billed for: (i) any answered call
            lasting 12 seconds or longer and (ii) any call which remains unanswered for 18
21          seconds or more.

22  Had Ordway known this, he would not have signed up for the Pay-Per-Call advertising program.

23  Ordway repeatedly sent emails to Ingram who claimed that the Yellowpages.com technical staff

24  would work to address the numerous problems with his account.

25      129.    Despite the promises from Ingram, Ordway did not receive an acceptable resolution,

26  and on June 28, 2009, Ordway sent an email to Ingram "demand[ing] immediate cancellation of

27  ALL my contracts."

28

- 30 -

130.   At various times after Ordway demanded the cancellation of his contract, he emailed Defendant advising it that not only was he still receiving phone calls, but the phone calls continued to be the same irrelevant calls about which he had complained previously.

131.   On July 15, 2009, Ordway sent an email to Sharon Duffy, the area sales manager, requesting his contract be cancelled.

132.   Ordway was completely misled in his purchase of Yellowpages.com advertising services. In addition, the product Ordway received was not what was represented to him. When he requested the cancellation, Ordway's requests were ignored.

## CLASS ACTION ALLEGATIONS

133.   Plaintiffs bring this action on behalf of a class consisting of all persons or entities in the United States that allegedly contracted with Defendant for advertising services from and after May 1, 2005 (the "Class"). Excluded from the Class are Defendant, and any person and any entity which controls or is controlled by or is under common control with Defendant.

134.   Plaintiffs seek certification under Fed. R. Civ. P. 23.

135.   The Class is composed of thousands of persons dispersed throughout the United States, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

136.   The Class is ascertainable, is cohesive, and maintains a sufficient community of interest, since the rights of each member of the Class were violated in a similar fashion based upon, among other things, Defendant's use of a uniform Scripted Presentation and misrepresentations and omissions common to all Class members. Further, the equitable relief sought will be common to the Class.

137.   The victimized consumers can be identified in the databases maintained by Defendant.   More specifically, Defendant maintains databases that contain the following information: (1) the name of each consumer "enrolled" in a Yellowpages.com advertising program via a written contract or order; and (2) the address of each such individual.

138.   Thus the Class Members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

- 31 -

139.  Plaintiffs will fairly and adequately protect the members of the Class as Plaintiffs' claims are not antagonistic to the claims of the other members of the Class and Plaintiffs.

140.  Plaintiffs have retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

141.  A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the damages suffered by individual Class Members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation.  The expense and burden posed by such individual litigation makes it impossible for the Class Members to individually redress the wrong done to them; neither would such an individual case be adequate to ensure that such practices cease to harm others.  There will be no difficulty in the management of this action as a class action.

142.  Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which are unique to any individual member of the Class.  Among such common questions of law and fact are the following:

(a)  whether there is a valid contract between Defendant and the Class Members where the Order and/or Terms and Conditions are not provided to the Class Members until after they purportedly have given their assent to the Order;

(b)  if a contract exists, whether Defendant's conduct constitutes a breach of that contract;

(c)  whether the Scripted Presentation contains material misrepresentations or omissions;

(d)  whether Defendant has a right to collect these alleged debts from the Class Members;

(e)  whether Defendant has a strategic partnership with major search engines that enables Defendant to employ strategic advertising as represented in the Scripted Presentation;

(f)  whether Defendant actually performs the technical functions represented by it and whether the functions performed are in accordance with the industry standards;

(g)     whether Defendant's conduct constitutes an unconscionable commercial practice;

(h)     whether Defendant's conduct violates the consumer protection laws pled herein;

(i)     whether Defendant's conduct constitutes an unjust enrichment;

(j)     whether Defendant's conduct constitutes negligent misrepresentation; and

(k)     whether injunctive relief is appropriate.

143.    Common questions predominate over any questions which may affect individual members of the Class.

144.    In addition, Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

**Unlawful, Fraudulent and Unfair Business Acts and Practices in Violation of California Business and Professions Code §§17200, *et seq.* on Behalf of Plaintiffs and the Class**

145.    Plaintiffs reallege and incorporate all of the preceding paragraphs herein by reference.

146.    California Business and Professions Code §§17200, *et seq.*, prohibits acts of unfair competition which means and includes any "unlawful . . . business act or practice."

147.    California Bus. & Prof. Code §§17200, *et seq.*, also prohibits acts of unfair competition which shall mean and include any "unfair or fraudulent business acts or practice." As more fully described above, Defendant's artifice to defraud the Class Members into purchasing services based upon unrealistic expectations and then Defendant's inability to provide the requisite customer and technical support for said services render the representations made by the Salespeople false, as set forth above, and constitute unfair business acts or practices within the meaning of Cal. Bus. & Prof. Code §§17200, *et seq.*, in that the justification for Defendant's conduct is outweighed by the gravity of the consequences to Plaintiffs and the other members of the Class.

1       148.   Defendant's acts as described above had (and have) a tendency to deceive Plaintiffs

2 and the other Class Members, constituting a fraudulent business act or practice.  Such conduct is

3 ongoing and continues to this date.

4       149.   As a result of the conduct described above, Defendant has been (and will be) unjustly

5 enriched.  Specifically, Defendant has been unjustly enriched by the receipt of its ill-gotten gains

6 from the money Plaintiffs and the Class Members paid to Defendants for services that were never

7 provided.

8       150.   Plaintiffs reserve the right to allege other violations of law which constitute unlawful

9 business acts or practices.  Such conduct is ongoing and continues to this date.

10     151.   Plaintiffs and the Class Members are, therefore, entitled to the relief available under

11 Cal. Bus. & Prof. Code §§17200, *et seq.*, as detailed below.

## COUNT II

### Untrue or Misleading Advertising in Violation of California Business and Professions Code §§17500, *et seq.* on Behalf of Plaintiffs and the Class)

152.   Plaintiffs reallege and incorporate all of the preceding paragraphs herein by reference.

153.   California Bus. & Prof. Code §17500 provides that:

> It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property . . . to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . .

154.   As a result of the foregoing claims made by Defendant through its advertising practices and promotional materials, which Defendant either knew or by the exercise of reasonable care should have known were neither true nor accurate, and as a further result of Defendant's failure to disclose the material facts alleged herein, Defendant has engaged in untrue and misleading advertising, constituting a violation of Cal. Bus. & Prof. Code §§17500, *et seq*.  Such conduct is ongoing and continues to this date.

155.   Plaintiffs and the Class members are, therefore, entitled to the relief available under Cal. Bus. & Prof. Code §§17500, *et seq.*, as detailed below.

**COUNT III**

**For Unjust Enrichment on Behalf of Plaintiffs and the Class**

156.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs herein by reference.

157.    Defendant has received, and continues to receive, a benefit at the expense of Plaintiffs and members of the Class.

158.    Defendant has fraudulently and/or deceptively charged and collected money from Plaintiffs and members of the Class for services and products which it did not reasonably expect it would deliver and which it did not deliver.  Accordingly, Defendant has received benefits which it has unjustly retained at the expense of Plaintiffs and members of the Class.

159.    As a direct and proximate result of Defendant's unlawful acts and conduct, Plaintiffs and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendant, and are therefore entitled to restoration of their monies.

**COUNT IV**

**For Fraud and Deceit on Behalf of Plaintiffs and the Class**

160.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs herein by reference.

161.    As stated above in detail, Defendant has employed artifices to defraud, mislead and trick the Class Members into allegedly entering into an allegedly "binding" contract, including, but not limited to, the following:

(a)    The Samurai data which Defendant presents to Class Members purporting to represent the number of searches the public is making on Yellowpages.com for the Class Member's business or profession within the Class Member's geographic area is misleading, because, among other things, the information is derived from numerous websites and not merely Yellowpages.com and thus inflates the amount of exposure which the Class member can expect when advertising on Yellowpages.com;

(b)    Defendant's representation that the Class Members will receive and pay for a specific number of "local" and "targeted" Clicks on their website or advertisement is false in that the

- 35 -

1   clicks are neither local nor targeted and the fee Class Members pay is absorbed largely by calls

2   which are from without the relevant geographic area of their business or from persons seeking

3   businesses of a nature different than that designated by the Class Member;

4           (c)     The Defendant's representation that Yellowpages.com has "strategic

5   alliances" or "partnerships" with major online search engines such as Google.com, Yahoo.com,

6   MSN.com and others and that, as a result, Class Members will receive featured or premiere

7   placement within those sites and individually managed advertising word campaigns from

8   Yellowpages.com, but at a cheaper price, is false;

9           (d)     Defendant's representation that it is a major online search engine and that,

10   therefore, a Class Member who purchases advertisements on the Yellowpages.com website will

11   receive a high level of exposure commensurate with that on a major online search engine is false;

12           (e)     Defendant's representation that Class Members will not be charged for calls

13   with a duration of 12 seconds or less on the Pay-Per-Call Program is false;

14           (f)     Defendant's representation that the purchaser of a Tile Position will be

15   featured in a box at the top of sponsored listings on results displayed in the Class Member's

16   geographic area is false as, even if it does occur, it will occur infrequently and does not and cannot

17   do so as a routine matter;

18           (g)     The Terms and Conditions which Defendant contends form part of the

19   contract between it and the Class Member and which contain material terms are withheld from the

20   Class Member until after he or she commits to be bound by the agreement;

21           (h)     When a Class Members seeks to cancel or modify his or her agreement when

22   presented with Terms and Conditions containing material deviations from and additions to the terms

23   represented and shown to them or when a Class Member becomes aware Defendant cannot and/or

24   will not comply with the terms of its undertakings and seeks to assert his or her rights with respect

25   thereto, Defendant undertakes heavy handed abusive collection efforts characterized by threats of

26   destruction of the Class Member's credit and law suits;

27           (i)     Defendant's ROI Analysis is fraudulent and misleading in that, among other

28   things, the Click-to-convert ratio is premised upon the concept, created by Defendant, that the ratio

1  will be at least one in ten when there is no basis for such an assumption and in fact historic and

2  generally attainable ratios are substantially below that; the ratios estimated by the Class Member are

3  done on the spot and, thus, inherently unreliable; the ratios are computed upon an implied

4  representation that the Clicks will come from people in a relevant geographic area searching for the

5  type of business or service which the Class Member provides when those representations are false;

6  and the dollars which Class members estimate to be generated by the contacts are gross dollars of

7  revenue which Defendant then conflates with profit to demonstrate that the cost of the advertising is

8  justified;

9          (j)     Defendant's representation that it has the ability to assure highly placed,

10  featured listings in the results of searches in major search engines such as Google, Yahoo, and the

11  like is false and untrue;

12          (k)     Defendant's representation that it has adequate technical capabilities,

13  including support staff to create, change and correct advertisements and websites for Class Members

14  is false;

15          (l)     Defendant omitted to tell Class Members they will be charged for calls even

16  when those calls are from people outside the relevant geographic area and/or are looking for goods

17  or services other than those the Class Member advertises; and

18          (m)     Defendant misrepresented that the purchase of bells and whistles will assure

19  the Class Member premium placement in Yellowpages.com's website, when that is not and cannot

20  be the case.

21       162.    The Scripted Presentation is designed to create a false expectation of results in the

22  Class Member's mind. Regardless of what program, product or item the Class Member purchases

23  from the Salesperson, the Yellowpages.com advertising apparatus does not perform as represented in

24  the Scripted Presentation.

25       163.    Defendant knows the representations made are false and is aware of the material

26  omissions and intends that Plaintiffs and the other Class Members will rely on the misrepresentations

27  and will be unaware of the facts omitted.

28

164.   Plaintiffs and the other Class Members are unaware of the falsity of the misrepresentations and rely upon the truthfulness thereof and are unaware of the material facts omitted.

165.   The Class Members have been damaged as a proximate result of Defendant's misrepresentation, omissions and fraudulent scheme.

## COUNT V

### For Negligent Misrepresentation on Behalf of Plaintiffs and the Class

166.   Plaintiffs hereby reallege and incorporate all of the preceding paragraphs herein by reference.

167.   In making representations to Plaintiffs and members of the Class described herein, Defendant misrepresented material facts and failed to disclose material facts as set forth above. Such failure, if not deliberate and reckless, is then negligent and careless.

168.   Plaintiffs and the other Class Members have been damaged as a direct and proximate result of Defendant's misconduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant on behalf of themselves and the Class as follows:

A.   An order certifying that this action may be maintained as a class action;

B.   Compensatory damages in an amount to be proven at trial;

C.   Equitable and injunctive relief as permitted by law or equity, including the rescission of all contracts that fall within the purview of the Class Member's complaint;

D.   Equitable relief in the form of an injunction preventing Yellowpages.com's deceptive practice to continue into the future;

E.   Awarding the Class Members punitive damages;

F.   Awarding the Class Members reasonable counsel fees, filing fees, cost of investigation, and costs of this lawsuit pursuant to statutory and/or common law;

G.   Pre and post-judgment interest; and

H.   Such other and further relief as the Court may deem necessary or appropriate.

1

**JURY DEMAND**

2          Plaintiffs demand a trial by jury.

3   DATED: January __, 2010                    COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
4                                               FRANK J. JANECEK, JR.
                                                CHRISTOPHER COLLINS
5

6

7                                               FRANK J. JANECEK, JR.

8                                               655 West Broadway, Suite 1900
                                                San Diego, CA 92101
9                                               Telephone: 619/231-1058
                                                619/231-7423 (fax)

10

11                                              COHN LIFLAND PEARLMAN
                                                 HERRMANN & KNOPF LLP
12                                              PETER S. PEARLMAN
                                                Park 80 Plaza West-One
13                                              Saddle Brook, NJ 07663
                                                Telephone: 201/845-9600
                                                201/845-9423 (fax)

14

15                                              LYNCH LAW FIRM, P.C.
                                                PAUL I. PERKINS
16                                              45 Eisenhower Drive, Suite 300
                                                Paramus, NJ 07652
17                                              Telephone: 800/656-9529
                                                888/271-9726 (fax)

18                                              ZIMMERMAN REED, P.L.L.P.
                                                J. GORDON RUDD, JR.
19                                              DAVID M. CIALKOWSKI
                                                651 Nicollet Mall, Suite 501
20                                              Minneapolis, MN 55402
                                                Telephone: 612/341-0400
21                                              612/341-0844 (fax)

22                                              Attorneys for Plaintiffs

23   S:\CptDraft\Consumer\CPT Yellowpages.com.doc

24

25

26

27

28

**YELLOWPAGES.COM**
TC.4/14/2008

**Contract for Internet YellowPages.com Advertising**

Page _____ of _____
IO.5/02/2008

## Billing Information

| | |
|---|---|
| Customer ID | |
| Company Name | Creating Wellness Chiropractic Center |
| Billing Name | Amanda Herman |
| Billing Address | |
| City, State, Zip | ) |
| Contact Name | Amanda Herman |
| Contact Phone # | |
| E-mail | |
| Billing Preference | **Credit Card** |
| Check Box if Applicable ☐ | Payment in full is required prior to fulfillment of the products in this order |
| Card Number | |
| Card Type | Visa        Exp: |
| Name on Card | |

## Sales Office Information

| | |
|---|---|
| Contract Date | 9/17/2008 |
| Sales Representative | Jay Howard |
| Sales/Seller ID | 11713P41 |
| Sales Manager | Maureen Spray |
| Sales Manager ID | 10774P41 |
| Sales Office | Premise - Minneapolis |
| Sales Office Phone # | (612) 605-6215 |
| Sales Rep E-mail | jhoward@yellowpages.com |
| Contract Type | **New** |
| Sales Lead Origin | **Prospect** |
| Director Approval | |
| Sales Mgr Approval | |
| Receive Date/Time | |

## Detail of Advertising

| Item: | Term | AF Code | Geography | Heading/Category | Discount Code | Monthly Rate |
|---|---|---|---|---|---|---|
| YPC2040 | 12 months | YMNSMZ | MSP Metro | 2040 Guaranteed Clicks/Year | | 530 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| Monthly Amount | $ | 530.00 |
| Additional Items (products page) | $ | - |
| **Total Monthly** | $ | 530.00 |
| **TOTAL Annual** | $6,360.00 | |
| Balance Due | | |

**Notes:**

This contract consists of and is governed by this Insertion Order, any additional Insertion Order pages attached hereto and the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference. By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text in this document, and (3) that you acknowledge Yellowpages.com's reliance upon your acceptance of them. (An additional copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING may be accessed through www.yellowpages.com; however, the version of applicable to this contract shall be the latest dated version as of the date of your signature.) You agree that you have authority to bind the individual or company purchasing this advertising in all respects to this contract and the incorporated terms and conditions.

I acknowledge that I have full authority to sign for and bind the party identified as "Customer" to this contract.

| Customer Name | Amanda Herman | Signature | *Amanda Herman* | Time | 9/17/08 12:56 PM |
|---|---|---|---|---|---|

# EXHIBIT A

Updated 08/11/2008

1 of 5

| YELLOWPAGES.COM | **Contract for Internet YellowPages.com Advertising Additional Products** | | | | Page | of |
|---|---|---|---|---|---|---|
| | | | | Detail of Advertising | | |
| Item: | Term | AF Code | Geography | Heading/Category | Discount Code | Monthly Rate |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | Monthly Amount | $    - |
| | | | | **Total Monthly** | $    - |
| | | | | **TOTAL Annual** | $    - |

This contract consists of and is governed by this Insertion Order, any additional Insertion Order pages attached hereto and the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference. By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge Yellowpages.com's reliance upon your acceptance of them. (An additional copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING may be accessed through www.yellowpages.com; however, the version of applicable to this contract shall be the latest dated version as of the date of your signature.)  You agree that you have authority to bind the individual or company purchasing this advertising in all respects to this contract and the incorporated terms and conditions.

Updated 08/11/2008
2 of 5

## TERMS AND CONDITIONS FOR INTERNET ADVERTISING

**1. Scope.** This is a contract (referred to herein as this "Agreement") between YELLOWPAGES.COM LLC (hereinafter referred to as "us", "we" and "our") and the customer ("you" and "your") identified on the first page of this document (the "Order") for us to fulfill your order for our Advertising Products identified on the Order. This Agreement consists of the Order and these Terms and Conditions for Internet Advertising (these "Ts&Cs"). Except as otherwise expressly provided in these Ts&Cs, in the event of any conflict between the terms of the Order and of these Ts&Cs, the Order shall control.

**2. Term.** The term of this Agreement commences on the date of execution by you (either in writing or by electronic signature, including recorded oral acceptance of this Agreement of an Order presented by us and shall (subject to our right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances specified in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order for the Initial Term specified in the Order. Unless otherwise provided in the Order and except as provided below in these Ts&Cs, upon expiration of the Initial Term, the term of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least thirty days before expiration of the Initial Term. All services provided during the Renewal Term will be subject to the then-current Terms and Conditions, pricing and other terms for Internet Advertising available on our Web site (such then current Ts&Cs being referred to herein as this Agreement). The Renewal Term will continue from expiration of the Initial Term until termination pursuant to this Agreement. Unless otherwise provided in the Order, either your or we may terminate the Renewal Term, with or without cause, upon thirty days' prior written notice to the other. Neither of us may terminate this Agreement during the Initial Term, provided that we may terminate this Agreement at any time upon notice to you if you breach this Agreement. If you choose to have your Advertising Products removed from any site and/or our services discontinued prior to the end of the Initial Term or Renewal Term, as the case may be, you shall notify us in writing and the unpaid balance for the entire Initial Term or Renewal Term will become immediately due and owing.

**3. Third Parties.** You represent and acknowledge that you are entering into this Agreement to obtain the Advertising Products for your own benefit and not for the benefit or on behalf of any third party, including, but not limited to, any of your shareholders, partners, owners, employees, agents or affiliates. However, each of our distribution or fulfillment vendors or internet search engines on which we place your advertising (each, a "Distribution Site") is an intended third-party beneficiary of your obligations hereunder that relate to Advertising Products and may independently enforce each obligation directly against you.

**4. Rates and Payment.** Unless otherwise provided in the Order, we will bill you during our first applicable billing cycle after we fulfill your order for Advertising Products and will continue to bill you during each applicable billing cycle thereafter during the term of this Agreement. The billing cycle will be thirty (30) days unless otherwise provided in the Order. We will bill you for Advertising Products for which no rate is specified in the Order at our standard rates for such Advertising Products at the time that we provide such Advertising Products. Any rates specified in the Order will apply during the Initial Term only. Unless you or we terminate this Agreement at the end of the Initial Term, you will be invoiced for each billing cycle of the Renewal Term at our standard rates during such billing cycle for such Advertising Products. Such standard rates may be higher than the rates set forth on the Order. Payments are due on the due date specified on the invoice or, if no payment date is specified, then thirty days after the date of the invoice. We may remove, or (in the case of Advertising Products placed on Distribution Sites) cause to be removed, your Advertising Products and suspend our services hereunder if payment is not received by the due date. Your prompt payment suspend our services hereunder if payment is not received by the due date. Your prompt payment of any costs that we incur to suspend services or remove or cause removal of Advertising Products, or to reserve services or replace or cause replacement of Advertising Products, will be a condition to our resumption of services and the replacement of Advertising Product. You acknowledge that no such suspension or removal will extend the term of this Agreement and, therefore, that it will reduce the aggregate time that we fulfill your order. We may charge late payment fees that will accrue at our then-current standard rates or, if lower, the maximum rate permitted under applicable law. You agree to pay any attorneys' fees and costs that our agents or we incur in collecting any unpaid amount. You will pay any sales, use or other local, state, federal, foreign or other taxes or governmental fees arising out of or in connection with this Agreement, other than taxes based on our net income.

**5. Denial of Credit.** If your application for business credit is denied, you have the right to a written statement of the specific reasons for the denial. To obtain the statement, you must contact us within 60 days from the date you are notified of our decision and we will send you a written statement of reasons for the denial within 30 days of receiving your request for the statement. Notice: The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter in a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is Federal Trade Commission, Equal Credit Opportunity, Washington, DC 20510.

**6. Custom Domain Registration/Ownership of Work Product.** If the Advertising Product you have ordered involves the hosting or operation of a Web site, the Universal Resource Locator ("URL") therefore must be registered in our name with a domain registrar of our choosing so we may manage the domain while we host or operate the Web site. If you do not have a URL, we will procure a URL and will pay the applicable domain name registration fees to the registrar and maintain ownership. We cannot guarantee that any URLs and/or domain names you request for your Web site will be available for your use. If none of your requested URLs are available, we will contact you and request alternatives. If you already own the registration for the desired URL, you must transfer the URL to us with a domain registrar of your choosing. If the URL cannot be transferred or you fail to undertake the action we request to cause the transfer, then, in our discretion, we may (but are not obligated to) choose a URL or domain name on your behalf. Upon termination of this Agreement or in the event you are in breach of this Agreement, any Web sites hosted or operated under this Agreement may be disabled, in our sole discretion. We will invoice you for all fees payable in connection with the transfer to you of any URL registered in our name that is related to your Web site if you notify us in writing within thirty (30) days after termination or expiration of this Agreement that you desire such transfer. We will then promptly transfer such URL to you if you timely pay such invoice. If you fail to notify us that you desire such transfer within such thirty (30) day period or fail timely to pay such invoice, then you waive all rights in or with respect to such URL, and you acknowledge that we may allow the registration for such URL to lapse, may retain and use such URL, or may transfer such URL to a third party, without restriction.

**7. Performance Based Advertising Products.** We or our vendor will fulfill your performance based Advertising Product including, but not limited to, YPclicks! or YPcalls!. For YPclicks!, internet search engines determined by us, which may include affiliated or syndicated search engine network partners, will provide the contracted number of clicks. We may change search engines from time to time in our sole discretion. You agree that all placements on search engines shall conclusively be deemed to have been approved by you. We or our vendor will continue to fulfill your Advertising Product for the contracted number of clicks, calls, search or other actions (an "Action") or until your budget is exhausted. If the applicable number of Actions has not been delivered or disputed Actions have been credited by us in our sole discretion or your budget has not been exhausted during the Initial Term, we will continue to fulfill your Advertising Product at no additional charge until the applicable number of Actions has been delivered or your budget has been exhausted. Although we will invoice you in twelve installments for the contract amount, we do not guarantee that the Actions will be fulfilled within that timeframe or otherwise during the term of this Agreement. We cannot provide you with (1) the names of the search engines and/or search engine networks to which your advertisements will be submitted and/or (2) the URL and IP address from which clicks or other Actions are made. Our only obligation is that the number of Actions identified in the Order will be provided. We do not guarantee that any clicks (1) will be from potential customers for you and/or (2) will be of any benefit or value to you. You acknowledge that the clicks may be: from adult sites, from search-sounding URLs, from sites potentially offensive to you, the result of prohibited or improper purposes, and the result of spiders, robots and other automated or mechanical means. We will send or make available periodic reports from us or Distribution Sites regarding the number of Actions we deliver. You agree that such reports and the counts contained therein shall be the conclusive, definitive measurements of our performance, and that they shall determine your related obligations for all purposes of this Agreement. No other measurements or usage statistics from any source whatsoever shall be accepted by us or have any applicability to our obligations or your rights under this Agreement. Notwithstanding anything to the contrary in Section 2 of these Ts&Cs, upon fulfillment of your performance based Advertising Product, we will terminate your performance based program unless you and we agree to renew it. If you cancel your performance based Advertising Product or disable your Web site or otherwise impair our ability to complete the Actions, we will invoice you for the remaining months of the Initial Term or retain the amount of any remaining budget as an early termination charge. We have no liability for any Actions you dispute. However, in our sole discretion, we may issue you a credit for additional Actions to be delivered.

**8. Prohibitions, Content and Intellectual Property Rights.** The transmission of any unsolicited commercial e-mail messages through our services is strictly prohibited without the prior consent of the recipient. You acknowledge that neither we nor the Distribution Sites generate the content upon a site where your Advertising Product may be fulfilled and that neither we nor the Distribution Sites are responsible for such content. You acknowledge that it is not possible to avoid placing your advertisements on web sites that display adult content, have adult-oriented domain names, or that are primarily intended as gambling sites, you acknowledge that it is not possible to avoid all such placements, and that we shall in no event have any liability to you of any type or nature as a result of any such placement or any other such placement that may be offensive to you. We or any Distribution Site may refuse, remove and/or terminate Advertising Products and our services due to any content that we or a Distribution Site deem for any reason (a) may subject us, a Distribution Site or another party to liability, (b) includes obscene, profane, sexual, violent or other inappropriate content, or (c) is otherwise unacceptable in our or the Distribution Site's sole discretion; provided that we have no obligation to review your advertisements and shall have no liability related to the content thereof. If this occurs, you will remain responsible for payment of all amounts to be invoiced for the then-current term and will not be entitled to any refund or abatement or any extension of the term of this Agreement. Furthermore, you are making the following representations and both we and each Distribution Site are relying upon them: (a) that you are authorized to advertise and display the requested business, product or service, (b) you are a business, not a consumer, (c) that the content of any advertisement is truthful and not misleading, (d) that you are in compliance with all laws and licensing requirements relating in any manner to the goods or services displayed or to your advertisement, and (e) that you have the right to use and publish any requested name, address, trade name, trademark, service mark, picture, likeness, reproduction, endorsement, copyrighted or copyrightable item or other content and that such use complies with all applicable laws, license agreements and other obligations. Without limiting any of our other rights or remedies, you agree to notify us immediately in writing at any time that you discover or suspect that any of these representations is not true and correct in all respects. You assume sole responsibility for the protection of any copyrights, trademarks, service marks, trade names and other intellectual property owned wholly or partially by you or which you are authorized to use or display. If we receive notice or documentation demonstrating that another person or entity contests your right to use or display a name, trademark, service mark or other content, we may reject or discontinue the Advertising Products and our services without liability to you until such time you have resolved that dispute with the other party to our satisfaction. As to Advertising Products we create for you, whether in whole or in part, and any derivative work that we create from your content, you acknowledge that we are an author and assign to us all rights in and to any independently copyrightable contribution you might have made to the advertising. You further acknowledge that we retain all right, title and interest, including the copyright, in such Advertising Products and that neither you nor we intend for such advertising to constitute a joint work. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon, publicly display, publicly perform and otherwise use any trademark, service mark, graphics, text or other content you provide to us in connection with our performance of our obligations under this Agreement. Upon termination of this Agreement, we are not obligated to return any of these works to you. Immediately in writing at any time that you discover or suspect that any of these representations is not true and correct in all respects. You assume sole responsibility for the protection of any copyrights, trademarks, service marks, trade names and other intellectual property owned wholly or partially by you or which you are authorized to use or display. If we receive notice or documentation demonstrating that another person or entity contests your right to use or display a name, trademark, service mark or other content, we may reject or discontinue the Advertising Products and our services without liability to you until such time you have resolved that dispute with the other party to our satisfaction. As to Advertising Products we create for you, whether in whole or in part, and any derivative work that we create from your content, you acknowledge that we are an author and assign to us all rights in and to any independently copyrightable contribution you might have made to the advertising. You further acknowledge that we retain all right, title and interest, including the copyright, in such Advertising Products and that neither you nor we intend for such advertising to constitute a joint work. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon, publicly display, publicly perform and otherwise use any trademark, service mark, graphics, text or other content you provide to us in connection with our performance of our obligations under this Agreement. Upon termination of this Agreement, we are not obligated to return any of these works to you.

# EXHIBIT B

Updated 08/11/2008

**9. Design of Our Sites, Advertising Products, Statistics and Interruption of Our Services.** We and the Distribution Sites may redesign or modify the organization, structure and/or "look-and-feel" of our respective Web sites, Advertising Products, and published set of headings and directories at any time and without notice; we may discontinue or add Distribution Sites at any time in our sole discretion. Although we assign each Advertising Product an internally generated point value and/or seniority date, such assignment is internal to us and does not confer any rights to you. We or any Distribution Site may position your advertisement on any page within the appropriate sites, in any position upon such page, in any sequence and in association with any classified heading or keyword(s) we or any Distribution Site deems appropriate unless otherwise specifically noted in the Order. Unless expressly provided on the Order, neither any Distribution Site nor we make any representation or warranty with respect to traffic or usage statistics regarding Actions on our site or on any Distribution Site or the levels of impressions, cost per click, or click-through rates or the quality or conversion rate for any advertisement. An "impression" means each occurrence of a display of an advertisement. Neither any Distribution Site nor we will have any liability to you and you will remain responsible for all moneys owed to us should there be an interruption in our Web site or any third party site or other interruption in our services hereunder for any period of time, although we may, in our sole discretion, issue credits or extend the term of this Agreement in the event of interruptions lasting several days or longer.

**10. Disclaimer of Warranties.** EXCEPT AS EXPRESSLY PROVIDED IN THE ORDER, NEITHER WE NOR ANY DISTRIBUTION SITE MAKES ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES TO YOU OF ANY KIND, EITHER EXPRESSED OR IMPLIED (INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NONINFRINGEMENT OR OTHER WARRANTIES ARISING BY USAGE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE), REGARDING THE FUNCTIONALITY, PERFORMANCE OR RESULTS OF THE ADVERTISEMENTS OR ADVERTISING PRODUCTS, LINKED SITES, ANY SITE WE MAY CREATE FOR YOU, OR OTHERWISE UNDER OR RELATED TO THIS AGREEMENT.

**11. Assignment.** You may not resell, assign, transfer or delegate any of your rights, duties or obligations without our prior written consent, which we may grant or withhold in the exercise of our absolute and sole discretion; in the event we give such consent, the assignee must, without any reservation, assume all of your rights, duties and obligations. Any attempt to resell, assign, transfer or delegate such rights, duties or obligations without our prior written consent shall constitute a breach of this Agreement and shall be of no force or effect. We shall have the right to subcontract performance of our obligations hereunder or to assign or otherwise transfer this Agreement or any of our rights, obligations or duties hereunder to any person or entity at any time.

**12. Notices.** All of our notices, demands and other communications must be in writing and will be deemed to have been given (a) if mailed by certified mail, postage prepaid, (b) if delivered by overnight courier, (c) if sent by facsimile transmission and such transmission is confirmed as received, or (d) if sent by electronic mail, and such message is confirmed as received, in each case to the address, fax number or email address specified on the Order for the recipient of such notice. All of your notices, demands and other communications must be in writing and will be deemed to have been given (a) if mailed by certified mail, postage prepaid or if delivered by overnight courier, to our address as shown on our Web site.

**13. Liability.** NEITHER WE NOR ANY DISTRIBUTION SITE NOR ANY OF OUR OTHER VENDORS SHALL HAVE ANY LIABILITY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE ADVERTISING PRODUCTS FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOSS OF PROFIT, LOSS OF INCOME OR REVENUE, LOSS OF GOODWILL, THE REJECTION OR REMOVAL OF ANY ADVERTISING CONTENT, ANY DELAY IN DISPLAYING OR OUR FAILURE TO DISPLAY CONTENT, OR OUR FAILURE TO PERFORM SERVICES. WITHOUT LIMITING THE PROVISIONS OF SECTION 13, IN NO EVENT SHALL OUR LIABILITY FOR MONETARY DAMAGES EXCEED THE AMOUNT YOU HAVE ACTUALLY PAID TO US FOR THE ADVERTISING PRODUCTS OR OTHER SERVICES WITH RESPECT TO WHICH SUCH LIABILITY AROSE. You acknowledge and agree that the provisions of this Agreement that limit liability, disclaim warranties, or exclude consequential damages or other damages or remedies are essential terms of this Agreement and are fundamental to the parties' understanding regarding allocation of risk. Accordingly, such provisions shall be severable and independent of any other provisions of this Agreement and shall be enforced regardless of any breach hereof or other occurrence or condition relating in any way to this Agreement or the Advertising Products. Without limiting the generality of the foregoing, YOU AGREE THAT ALL LIMITATIONS OF LIABILITY, DISCLAIMERS OF WARRANTIES, AND EXCLUSIONS OF CONSEQUENTIAL DAMAGES OR OTHER DAMAGES OR REMEDIES SHALL REMAIN FULLY VALID, EFFECTIVE AND ENFORCEABLE IN ACCORDANCE WITH THEIR RESPECTIVE TERMS, EVEN UNDER CIRCUMSTANCES THAT CAUSE ANY EXCLUSIVE REMEDY UNDER THIS AGREEMENT TO FAIL OF ITS ESSENTIAL PURPOSE. The limitations contained in this Section 13 apply regardless of the form of action, including actions in contract, tort (including negligence), and strict liability.

**14. Exclusive Remedies.** If we breach our obligation hereunder to fulfill any Advertising Product or breach any other obligation hereunder, we will make commercially reasonable efforts to fulfill such Advertising Product at a later date on the same or substitute site or internet search engine or otherwise reasonably to cure such breach. THE FOREGOING CONSTITUTES OUR SOLE OBLIGATION AND YOUR SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH BY US OF THIS AGREEMENT (EITHER DIRECTLY OR THROUGH A FAILURE OF PERFORMANCE BY ANY DISTRIBUTION SITE).

**15. Force Majeure.** In no event shall we or any Distribution Site have liability or be deemed to be in breach hereof for any failure or delay of performance resulting from any governmental action, fire, flood, insurrection, earthquake, power failure, network failure, riot, explosion, embargo, strikes (whether legal or illegal), terrorist act, labor or material shortage, transportation interruption of any kind or work slowdown or any other condition not reasonably within our control. Your payment obligations shall continue during any event of force majeure.

**16. Indemnification.** You agree to indemnify us and the Distribution Sites and hold us and the Distribution Site harmless from and with respect to any claims, actions, liabilities, losses, expenses, damages and costs (including, without limitation, actual attorneys' fees) that may at any time be incurred by us or them arising out of or in connection with this Agreement or any Advertising Products or services you request, including, without limitation, any claims, suits or proceedings for defamation or libel, violation of right of privacy or publicity, criminal investigations, infringement of intellectual property, false or deceptive advertising or sales practices and any virus, contaminating or destructive features.

**17. Telephone Conversations.** All telephone conversations between you and us about your advertising may be recorded and you hereby consent to such monitoring and recordation.

**18. Applicable Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts entered into and performed in New York by residents thereof. Any action or proceeding brought by you under or relating to this Agreement shall be brought in a state or federal court located in the City of New York, State of New York, and you hereby irrevocably submit to the personal jurisdiction of and irrevocably consent to venue in such courts for purposes of any such action or proceeding. Any claim against us arising from this Agreement shall be adjudicated on an individual basis, and shall not be consolidated in any proceeding with any claim or controversy by any other party.

**19. Entire Agreement.** This Agreement constitutes the entire agreement between you and us with respect to the subject matter of this Agreement and supersedes all prior written and all prior or contemporaneous oral communications regarding such subject matter. Accordingly, you should not rely on any representations or warranties that are not expressly set forth in this Agreement. If any provision or provisions of this Agreement shall be held to be invalid, illegal, unenforceable or in conflict with the law of any jurisdiction, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired. Except as provided in Section 1, this Agreement may not be modified except by writing signed by you and us; provided, however, we may change these Ts&Cs from time to time, and such revised terms and conditions will be effective with respect to any Advertising Products ordered after written notice of such revised terms to you or, if earlier, posting of such revised terms and conditions on our Web site.

5 of 5

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

AMANDA HERMAN d/b/a CREATING WELLNESS CHIROPRACTIC CENTER, (See Attachment A)

**DEFENDANTS**

YELLOWPAGES.COM, LLC 10 JAN 26 PM 1:51

**(b)** County of Residence of First Listed Plaintiff   Minnesota
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Frank J. Janecek, Jr., Coughlin Stoia, et al., 655 West Broadway, Suite 1900, San Diego, CA 92101  619/231-1058

Attorneys (If Known)

'10 CV 0195 JAH    JMA

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 465 Other Immigration Actions | | |

(TORTS - PERSONAL INJURY second column) ☐ 362 Personal Injury - Med Malpractice; ☐ 365 Personal Injury - Product Liability; ☐ 368 Asbestos Personal Injury Product Liability; **PERSONAL PROPERTY** ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability

(PRISONER PETITIONS) ☐ 510 Motions to Vacate Sentence **Habeas Corpus:** ☐ 530 General; ☐ 535 Death Penalty; ☐ 540 Mandamus & Other; ☐ 550 Civil Rights; ☐ 555 Prison Condition

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332(d) (the Class Action Fairness Act)

Brief description of cause:
COMPLAINT FOR VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE         DOCKET NUMBER

DATE
01/26/2010

SIGNATURE OF ATTORNEY OF RECORD
FRANK J. JANECEK, JR.

**FOR OFFICE USE ONLY**

RECEIPT #  9534   AMOUNT  $350   APPLYING IFP   JUDGE   MAG. JUDGE

ATTACHMENT A

CYNTHIA GIBSON d/b/a TELEPHONE JACKS, LISA FEELEY d/b/a ALL BAY
LOCKSMITH and JEFFREY P. ORDWAY d/b/a EARTHWERKS UNLIMITED, Individually
and on Behalf of All Others Similarly Situated,

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS009534
Cashier ID: mbain
Transaction Date: 01/26/2010
Payer Name: COUGHLIN STOIA GELLER RUDMAN A
--------------------------------
CIVIL FILING FEE
 For: HERMAN V YELLOWPAGES.COM
 Case/Party: D-CAS-3-10-CV-000195-001
 Amount:        $350.00
--------------------------------
CHECK
 Check/Money Order Num: 71491
 Amt Tendered:  $350.00
--------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```