# EXHIBIT A

**LYNCH LAW FIRM, P.C.**
Paul I. Perkins, Esq.
paulperkins@lynchlawyers.com
45 Eisenhower Drive, 3d Floor
Paramus, NJ 07652
Tel: (800) 656-9529
Fax:(888) 271-9726

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
Peter S. Pearlman, Esq.
psp@njlawfirm.com
Park 80 Plaza West – One
Saddle Brook, NJ 07650
Tel: (201) 845-9600
Fax: (201) 845-9423
*Attorneys for the Plaintiff and the Class*

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY
### NEWARK VICINAGE

| | |
|---|---|
| AL KOWALSKI d/b/a KOWALSKI PLUMBING, and MICHELLE WINICK d/b/a MICHELLE WINICK DESIGN, MICHAEL GIDRO, individually, and on behalf of all others similarly situated, | **CIVIL ACTION** **No. 09-2382 (PGS) – (ES)** |
| Plaintiffs, | |
| -vs- | **FIRST AMENDED COMPLAINT** |
| YELLOWPAGES.COM, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Al Kowalski d/b/a Kowalski Plumbing ("Kowalski") maintaining his principal place of business at 71 Central Avenue, Rochelle Park, NJ 07662 and Michelle Winick d/b/a Michelle Winick Design ("Winick") maintaining her principal place of business at 96 Main Street, Little Falls, NJ 07424 and Michael Gidro ("Gidro") d/b/a Law Offices of Michael Gidro maintaining his principal place of business at 1420 Queen Anne Road, Teaneck, NJ 07666 (collectively "Plaintiffs"), individually, and on behalf of themselves, and all others similarly situated, by and through counsel, complain of the defendant, Yellowpages.com, LLC ("Defendant") as follows.

## I. SUMMARY OF COMPLAINT

1.      This is a class action lawsuit against Yellowpages.com arising out of its deceptive and fraudulent business practices inflicted upon the Plaintiffs and a class ("the Class") consisting of all persons or entities in the State of New Jersey that allegedly contracted with Defendant for advertising services from and after May 1, 2005.  The members of the Class are referred to as the "Class Members."

2.      According to Defendant's website, it operates an online advertising service and is a:

> . . . wholly owned subsidiary of AT&T. . . . [Yellowpages.com] is uniquely able to offer searchable directory listings. . . . . [Yellowpages.com is an] online source for comprehensive national and local business information. The [Yellowpages.com] distribution network provides exposure to more than 100 million monthly consumer business searches. Consumers can locate merchants, search White Pages directories, research products and services, obtain maps and directions, and plan entertainment, leisure and travel activities.

Available at www.yellowpages.com/about; last visited October 29, 2009.

3.      Defendant is in the business of soliciting advertising from individual and business consumers and displaying that advertising on the internet for the general public to search and providing services to its customers, including the Class Members by driving internet traffic to their Yellowpages.com ad and/or website. Among other things, Yellowpages.com follows the same format as the Yellow Pages telephone directories that are distributed throughout the United States, except that the advertising appears on the internet. Yellowpages.com can be searched by a member of the general public on a nationwide or geographic specific basis.

4.      Class Members are solicited by Defendant in two basic modes:  in person by a salesperson who comes to the Class Member's residence or business ("Premise Sales"); or, on the phone by a telephone solicitor on behalf of Yellowpages.com ("Telephone Sales").

5.      Notwithstanding the method of solicitation, the prospective Class Members are subjected to the same misrepresentations, omissions and deceptive methods of sale. The approach uniformly utilized by the Defendant's Salespeople (the "Salesperson" or "Salespeople") is contained in a scripted sales presentation (the "Scripted Presentation"). As the misconduct alleged is the same regardless of, and the facts are unaffected by, the mode of solicitation, this Complaint, in general, does not distinguish between Premise Sales and Telephone Sales.

6.      Defendant's Salespeople offer two types of services:

   i.   Defendant represents that it provides the number one online yellow pages search engine and thus, any Class Member who purchases a listing within the Yellowpages.com site automatically receives a high amount of exposure. Moreover, the Salespeople represent that Yellowpages.com has developed

"partnerships" with major online search engines like Google.com, Yahoo.com, MSN.com, and others and, as a result, Class Members will be featured prominently in the results of searches run on those search engines. Defendant's Salespeople represent further that because of the "partnerships," it is cheaper to advertise with Yellowpages.com than directly with those major search engines.

ii. Yellowpages.com also features several types of advertising products in which the Class Members can also enroll, including, but not limited to:

a. The YPClicks! Program or Yellowpages.com Guaranteed Clicks Program. This is a program wherein Class Members are guaranteed to receive a certain number of Clicks[1] on their Yellowpages.com ad or website during a specific period of time. For example, a Class Member might sign up for 1200 Clicks over the period of a year.

b. The Click to Call Program. This is a program wherein the Class Member is charged a fee only when someone calls from a special phone number listed on the Class Member's ad. Like the YPClicks! Program, the Class Member is guaranteed a certain number of calls within a specific time period.

c. The Purchase of a Tile Position. This program assures the Class Member his or her ad will be featured in a box advertisement (a

---

[1] A "Click" is when a member of the general public, searching the internet, Clicks on a link or logo that takes that person to a specific site on the internet. In this case, the logo or link takes the person to the Class Member's Yellowpages.com ad or website.

"Tile") at the top of list of results displayed when a member of the public searches the Yellowpages.com site only for goods and services in the Class Members' designated geographic area.

7. In selling these programs to the Class Members, Yellowpages.com engages in misleading, fraudulent and unconscionable business practices, including, but not limited to the following:

i. The Salespeople state that by advertising in Yellowpages.com the Class Member will benefit from featured prominence in major online search engines. As discussed below, the Class Members' ads are not featured as represented by the Salespeople and Defendant has no reasonable basis to believe they will be.

ii. The Class Members are not provided with the Terms and Conditions of the sales contract until after they have either signed an order form or recorded their oral assent to purchase over the phone. Yellowpages.com uses this alleged assent to assert that the Class Member is bound to a contract (the "Alleged Assent") even though the Terms and Conditions subsequently disclosed to Class Members differ materially from what they are shown and/or told.

8. As part of the Yellowpages.com sales training, all Salespeople must memorize the Scripted Presentation and employ a particular methodology when selling Yellowpages.com products. The Scripted Presentation and other methods utilized by the Salespeople are inherently misleading, fraudulent and deceptive; consequently, upon conclusion of the Salesperson's presentation, Class Members believe they are going to receive particular benefits

on certain terms when there is no reasonable basis for the Salesperson to assert that the benefits will be achieved and the terms are materially different than what is represented. In fact, both the outcome and terms differ materially from what is represented. A Class Member who realizes s/he is not getting the services represented by the Salesperson is unable to cancel the contract with Yellowpages.com. When the Salesperson and manager are unable to deflect a Class Member's complaints and the Class Member declines to pay, s/he is subjected to an aggressive collections process to enforce payment. The common mantra of the collections department is that everyone must pay (sooner rather than later) or their credit will be damaged. Utilizing this approach, Yellowpages.com has experienced significant growth in the last three (3) years.

## II. JURISDICTION AND VENUE

9.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(d) (the Class Action Fairness Act).

10.     This Court has jurisdiction over Defendant because Defendant conducts a significant amount of business in and with the citizens of the State of New Jersey.

11.     Venue is proper in this Court because at all times relevant, the practices complained of herein were directed to and/or occurred in this judicial district and because Defendants have received substantial compensation as a result thereof in this district.

## III. BACKGROUND AND NATURE OF THE DECEPTIVE PRACTICE

**Brief History and Rapid Growth of Yellowpages.com**

12.     In November of 2004, SBC and BellSouth entered into a partnership to create a joint venture, to acquire the online directory publisher then known as www.Yellowpages.com, Inc. SBC and BellSouth then combined the SBC site, the Bellsouth directory site and the Yellowpages.com site that was purchased to create the present Yellowpages.com website.

13.     In April of 2005, Defendant announced a program wherein consumers would be guaranteed a certain number of Clicks to their website or ad for a given period of time: "[t]he new search engine product eliminates the need for businesses to learn and navigate multiple search engines, search methods and submission standards to advertise strategically on the Internet. It also reduces risk by enabling advertisers to purchase a specified number of Clicks for a flat fee."[2]  At the time of this announcement, Defendant was offering two services to the public: 1) a listing service on Yellowpages.com; and, 2) "strategic" listings within search engines on the internet.

14.     In early 2006, Defendant assembled a team of sales professionals from the telecom industry and crafted the Scripted Presentation.

15.     The first city in which this Scripted Presentation was tested was Philadelphia, Pennsylvania. It proved to be quite successful in generating revenue.  In late Summer of 2006, the sales team was split and sent to New York and Baltimore in order to capitalize on the success experienced in Philadelphia.

---

[2]   Press Release, dated April 28, 2005, available at http://www.att.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21656, last visited October 29, 2009.

16.     In December of 2006, AT&T and BellSouth were merged to create the present AT&T. As part of this process, Defendant became a wholly owned subsidiary of AT&T.

17.     The model that had been conceived in Philadelphia also proved successful in securing business in New York and Baltimore, and a training center was set up just outside Philadelphia to train the Yellowpages.com salespeople in the Scripted Presentation.

**Training the Salespeople**

18.     The Salespeople are highly trained and are indoctrinated by the Yellowpages.com sales trainers to hard-sell Yellowpages.com products.

19.     The Salespeople attend sales training facilities where they receive a two week intensive ad sales course.   Salespeople are scrutinized on every aspect of the Sales Presentation. They are evaluated as to: 1) the approach taken with the prospective Class Member (the customer); 2) the  ability to do discovery and fact-finding with the prospective Class Member; 3) the  actual presentation and recommendation; 4) how the Salesperson performed in closing the deal; and 5) how the Salesperson handles Class Member objections. The extensive training ensures the Salespeople do not deviate from the Scripted Presentation.

20.     Every Salesperson must memorize the Scripted Presentation in order to receive a sales position with Yellowpages.com. They are given additional tools to sell the Yellowpages.com advertising products in the form of anecdotes, stories and mottos.

21.     When the Salesperson completes the required training s/he returns to the local office to begin selling ads.

22.     The Salespeople earn their commissions upon what Yellowpages.com determines to be the consummation of the sale to the Class Member. The commission is not

dependent upon whether the Class Member pays for the service but rather the Salesperson's ability to close the sale. As such, the Salesperson is incentivized to do anything s/he can to close the deal and get the Class Member to sign on the proverbial dotted line.

23.     The Salespeople have sales quotas they must meet to retain their jobs.  Upon information and belief, the present attrition rate for Salespeople is over 50%.

**The Actual Sales Presentation**

24.     The sales presentation is governed by the Scripted Presentation.

25.     The Scripted Presentation includes the following:

i.   Initially, the Salesperson greets the customer and states:

"Good Morning, [Class Member]. I want to thank you for taking the time to meet with me today . . . when we spoke on the phone you indicated that you were looking to grow your business and that <u>guaranteed</u> traffic to your website could benefit you and help  you to meet your business goals."

(Emphasis added) (the language regarding an actual meeting is modified for a telephone sale). Thus, the theme that Yellowpages.com offers guarantees in conjunctions with its advertising products is introduced at the inception.

ii.   Next, the Salesperson states: "I have worked with many others [people in Class Member's business plumbers, interior designers, lawyers, etc.] in the past, and have helped them to meet their business goals." The Salesperson is told to say this whether or not s/he has had any experience selling Yellowpages.com products to individuals or entities within the Class Member's particular line of business.

iii. The Salesperson then asks questions about the Class Member's business – Defendant calls this the Needs Assessment Analysis (the "Needs Assessment." The questions include:

    a. "How did you get involved in [Class Member's] business?";

    b. "How long have you been in business?";

    c. "Your ad says [What Class Member's ad says] . . .";

    d. "Which side [of Class Member's Business is the Class Member] looking to grow?";

    e. "What other type of work do you do?";

    f. "What is the average job worth?" (This is meant to elicit the gross revenue per job performed by the Class Member);

    g. "How much work do you do in a week?";

    h. "How much more work could you do in a week?";

    i. "How far will you travel?" – or "Where do you pull your clients from?";

    j. "If 10 people locally searching online for [Class Member's Business] saw your website [or ad], how many do you think would do business with you?"

iv. This Needs Analysis is later utilized by the Salesperson to sell the Yellowpages.com products. At this point, the Salesperson confirms to the Class Member all of the information the Class Member has told him/her.

v. The Class Member is then told "[Yellowpages.com has] partnerships with most of the major search engines such as Google, Yahoo, Dogpile and many

more . . . . We offer services to build traffic to your website on both searches." The phrase "both searches" refers to the searches generated by the general public on the major search engines like Yahoo or Google and the searches performed on Yellowpages.com website.

vi. The Salesperson then represents: "Yellowpages.com is the #1 online yellow pages in the Country. We connect buyers with sellers by [enabling members of the general public to search] a specific category in a geographic area."

vii. The Salesperson then shows the Class Member a spreadsheet that is represented to show how many searches there were on Yellowpages.com for the Class Member's products or services in the Class Member's geographic area. This data is generated from an internal system at Yellowpages.com called Samurai. However, that representation is false and the data is inherently misleading because Samurai derives its data not from Yellowpages.com alone, but also includes searches conducted on major online search engines like Google and Yahoo. Thus, the amount of traffic which is represented to come from the Yellowpages.com website is materially overstated.

viii. The Salesperson uses this data to convince the Class Member that by purchasing a prominent position or a position at the top of the Yellowpages.com heading the Class Member will receive significant exposure.

ix. The Salesperson then attempts to sell a guaranteed Clicks package to the Class Member, "[w]e offer a guaranteed number of Clicks to your website

per month on Google, Yahoo, Dogpile and many other search engines . . . ." As discussed above, the YPClicks! or Yellowpages.com Guaranteed Clicks states that the Class Member will receive a guaranteed number of Clicks on his or her ad or website within a specific period of time (usually a year). Yellowpages.com has a corollary program called the "Guaranteed Click to Call Program" wherein a Class Member is guaranteed a certain number of phone calls and only pays for the calls that the Class Member receives. The Salesperson uses the same Scripted Presentation to sell the Guaranteed Click to Call Program as is used for the YPClicks! Program.

x. The Class Member is assured that Yellowpages.com can "build traffic to [the Class Member's] website when someone is searching in their local area for the services you offer." Because it is obviously so important, the idea that the Class Member will receive Clicks from "local" and "targeted" traffic is stressed over and over by the Salesperson. That concept is false, however, since, in reality, a significant number of the Clicks received do not come from the local or targeted area and there is no reason for Defendant to believe they will.

xi. The Class Member then is subjected to hard sell techniques to agree to buy one of the programs Defendant offers. The Salesperson states, "[w]hen people go to the internet looking for the services you offer, Yellowpages.com is going to make sure you are represented based on your needs. . . . we are going to make sure you are one of the Premier [Class Member's business] in [Class Member's area] . . . . We are going to place

you at the top of the [Class Member's category] heading with a Tile. . . We are also going to make you one of the top 6 listings under each heading with a priority local listing."

xii. The Salesperson again stresses, that Clicks will be local and qualified, "When people are searching for your services on Google, Yahoo, Dogpile, Metacrawler, WebCrawler, Alta Vista and all the web, we are going to offer locally targeted, qualified traffic to your website. We are going to guarantee [number of Clicks] to [Class Member's website] in the next 12 months." (Emphasis added).

xiii. If the Class Member seems unsure, the Salesperson will perform a "Return on Investment" analysis (the "ROI Analysis") as part of the Scripted Presentation.

xiv. In the ROI Analysis, the Salesperson takes the information obtained in the Needs Analysis and utilizes it to estimate gross revenue the Class Member purportedly will derive by purchasing Yellowpages.com advertising products.

xv. The ROI Analysis is often utilized in the context of the YPClicks! or Guaranteed Clicks Program and the Guaranteed Click to Call Program and is presented in this manner: First, the number of Clicks the Salesperson is attempting to sell on an annual basis to the Class Member is divided by 12 – this gives the Class Member an average number of Clicks per month; so if a Salesperson is attempting to sell a package containing 2400 Clicks per year,

the Salesperson will tell the Class Member the average number of Clicks will be around 200 a month.

xvi.  Then the Salesperson applies what is referred to as the average Click to convert ratio to the monthly average Clicks. This ratio is based on the Scripted questions "if 10 people locally searching online for [Class Members' business or profession] saw your website, how many do you think would do business with you?" The answer given by the Class Member becomes the Click to convert ratio for that particular Class Member. In other words, if the Class Member responds that 2 people out of 10 would do business with him/her if they Clicked on his/her ad or website, the Salesperson will use a 20% Click to convert ratio. There is no legitimate basis for that ratio, however, and, indeed, even phrasing the question in that fashion is materially misleading since it presumes an average Click to convert ratio of at least one in ten when in fact the average rate is only a tiny fraction of that, and Defendant knows that to be the case.

xvii. Armed with what is already a materially false premise, the Salesperson then estimates the actual number of people that purportedly will do business with the prospective Class Member. So if the average number of Clicks per month is 200 and the Class Member supposedly can convert 20% to new business, the Salesperson  reasons the Class Member will have 40 new customers a month.

xviii. The Salesperson then multiplies the purported number of new customers by the equally unsupported gross revenue generated per job (the amount

each job purportedly "is worth"). So if the Class Member has speculated the average job, sale, or client was worth $1000, the Salesperson states, "is it fair to say that the Click package could bring you a return on investment of [$40,000] a month?"

xix.   The Salesperson then attempts to sell a Class Member a package that costs something less than the amount arrived at through the monthly ROI Analysis.

xx. This approach to sales is illusory, misleading, and deceptive. The Salesperson has constructed in the mind of the Class Member a knowingly false expectation of what the Class Member will receive in monthly revenue as a result of advertising with Yellowpages.com.

**The Yellowpages.com Products**

26.    The Salespeople represent that Yellowpages.com is the number one online yellow pages search engine and this "new search engine product <u>eliminates the need for businesses to learn and navigate multiple search engines, search methods, and submission standards to advertise strategically on the Internet</u>"[3] (emphasis added). Thus, the Class Member is told that if listed within the Yellowpages.com site, s/he automatically receives the benefit of a listing in a website that is heavily searched by the general public looking for goods and services. Moreover, the Defendant has developed "partnerships" with major online search engines like Google.com, Yahoo.com, and MSN.com, etc. and, as a result, Yellowpages.com "makes sure" that when a member of the general public is searching major internet search

---

[3] Press Release by AT&T, dated April 28, 2005, available at <u>http://www.att.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21656</u>; last visited October 29, 2009.

engines for goods and services similar to that of the Class Member in the Class Member's geographic area, the Class Member's ad will be featured. In addition, the Salesperson states that, as a result of the "partnerships," the Class Members actually receive lower prices for being featured in those major online searches than they would if they were to advertise directly with those search engines. The Salespeople stress that Yellowpages.com has the technology to ensure that the Class Member's ad or website will appear in local and targeted searches.

      27.    Yellowpages.com features several types of advertising products in which the Class Members can enroll, including, but not limited to:

          i.    <u>The YPClicks! Program.</u> The YPClicks! program represents that a Class Member will receive a requisite amount of "Clicks" within a period of one year. The Class Member pays for this service on a monthly basis. If the Class Member does not receive the number of Clicks for which s/he has contracted, the Salesperson tells the Class Member his or her contract will be extended until s/he receives the requisite number of Clicks. However, Defendant does not extend the contract free of charge and the Class Member must continue paying the regular monthly charge. Thus providing the class member the "benefit" of being able to pay once again for something s/he did not get the first time s/he paid for it in the hope s/he may get it the second. The Salesperson stresses that the Clicks will come from "local" and "targeted" traffic since, obviously, a Click on the website of a plumber in Cleveland, Ohio by a consumer in Phoenix, Arizona is hardly useful.

ii. <u>The Click to Call Program.</u> The premise of the Click to Call program is similar to that of the YPClicks! program. In this plan, the Class Member pays only when someone calls to a special phone number listed on the Yellowpages.com ad. As in the YPClicks! Program, the Salesperson tells the Class Member the phone calls will come from "local" and "targeted" traffic. The contracts for this program also are computed on an annual basis with fees charged on a per call basis. Unfortunately for the Class Member, if s/he receives a phone call, via his or her Yellowpages.com special phone number and that call has nothing to do with purchasing products or services from the Class Member or if the call is made from someone out of the Class Member's geographic area, the Class Member is still responsible for paying for that phone call.

iii. <u>The Purchase of a Tile Position.</u> This program purportedly allows the Class Member's ad to be featured at the top of the list of results displayed when a member of the public searches the Yellowpages.com site only for goods and services in the Class Members' geographic area (the top billing is referred to as a "Tile Position").

iv. <u>Bells and Whistles.</u> Although not part of the Scripted Presentation, Class Members who do not purchase Tile Positions are told uniformly that to be featured prominently on the

Yellowpages.com website, they must purchase other "bells and whistles" as they are referred to by the Salespeople. Some of those items include: A) displays of the Class Member's business logo; B) a package that includes links to the Class Member's website; and, C) other distinguishing items such as directions, testimonials, etc.

28.     The misleading Scripted Presentation in tandem with unconscionable and deceptive business practices in the sale and implementation of the product has earned Yellowpages.com substantial revenues at the expense of the Class Members.

## V. THE DECEPTIVE PRACTICE EXPOSED

### The Faulty Search Engine Product and the Internet Search Engine Irrelevancy

29.     Defendant's representations that by advertising with Yellowpages.com, the Class Member will receive premium placement in the "sponsored" listings on major search engines, like Google and Yahoo is false and misleading.

30.     The Salespeople stress that Defendant's search engine product will eliminate the need for the Class Member to learn and navigate multiple search engines, search methods and submission standards to advertise strategically on the Internet. As such, the Class Member is led to believe Yellowpages.com will ensure that the Class Member's ad or website will be featured in searches performed by members of the public that are local to the Class Member and that the search within which the Class Member is found will be relevant to the Class Member's business.   The Salesperson states further that Yellowpages.com has developed "partnerships" with the major internet search engines and, as such, the Class Member will receive the opportunity to advertise with the major internet search engines, but that it is actually cheaper for the Class Member to advertise with Yellowpages.com.

31.     Most major internet search providers like Google use an "auction" process whereby a member of the public seeking to appear in searches, in the "sponsored" section or be featured prominently can actually bid on search words (i.e. "attorney," "plumber" or "interior design"). A member of the public bids on specific "ad words" by setting a price that the person is willing to pay to appear in a sponsored listing position. A sponsored listing position on Google or Yahoo appears as an ad above and/or to the right of the regular search results (also called the organic search results). They are highlighted so that the public may find them more

easily. The Internet search engine industry is a dynamic atmosphere. As such, the words upon which the public bid can vary in price and value on a daily basis.

32.     The words upon which a member of the public must bid will change on a constant basis and will need consistent attention and care to remain relevant and appear in the "sponsored" listings section on Google, Yahoo, etc. or appear in prominent places. Therefore, certain words and combinations of words will become more or less relevant (and, therefore, costly) depending on how many people are bidding on the particular words, how often those bids are being made, and how many times the general public searches for these particular ad words. As such, the value of ad words can change and alter on an almost daily if not hourly basis (for example, some words or word combinations may have little value (or relevancy) until a particular time or event like "September 11." Defendant professes that it will keep pace with this dynamic atmosphere on a constant basis and provide the Class Member a customized solution.

33.     In reality, this does not happen. Yellowpages.com lacks the requisite staff or the staff is unable to deliver on the promises made by Defendant.  Thus, the representations made by the Salespeople as to Defendant's ability to perform this part of the Agreement are false and misleading.

34.     In addition and contrary to what the Class Member is told as part of the Scripted Presentation, there is and can be no assurance the Class Member's ad:

      i.    will be featured prominently in searches (in some cases the Class Member's ad may be rotated in conjunction with other Yellowpages.com customer adds in the prominent positions, thus substantially reducing the Class Members exposure);

    ii.  will appear in the proper geographic area;

    iii. will appears in the proper category; or,

    iv. will appear in searches in the categories requested;

35.    To the extent the Class Member needs technical support (*i.e.* for the Search Engine Product) or to help with their website or ad, there is little, if any, technical support and Defendant has a practice of putting ads and websites together in a rushed and hurried manner and the Class Member is often unable to make changes, corrections or edits. In short, Defendant lacks the capacity or the will to deliver on its representations that the Class Member's ad will appear in the relevant strategic positions within major online search engines.

**The Search Engine Product – Yellowpages.com Internal Searches/Tile Positions**

36.    At the beginning of the presentation, the Salesperson shows the Class Member a spreadsheet that is represented to demonstrate the number of searches conducted by the general public on Yellowpages.com, for a particular product or service offered by the Class Member within the Class Member's geographic area on a monthly basis.

37.    In fact the number of searches on the spreadsheet does not come from Yellowpages.com alone, but from other major search engines as well. As a result, the representation that the number of searches shown on the spreadsheet is demonstrative of the results which can be expected by a Class Member advertising on Yellowpages.com is false and untrue.

38.    As such, and in conjunction with the Scripted Presentation, the Class Member is given a false expectation of the outcome that will be achieved. The Yellowpages.com Salespeople use inflated and misleading search data in order to convince the Class Member

s/he or it will receive unrealistic returns as a result of his or her investment into the advertising services of Yellowpages.com

39.     Despite Defendant's representation to the contrary, Yellowpages.com is not a major online search engine. It is not listed in the top search engines by internet analysts see, for example, http://searchenginewatch.com/2156221, (last visited October 29, 2009). Thus, the expectation created by the Salesperson that Yellowpages.com is a major online search engine is false.

40.     The Class Member is told if s/he purchases certain extra "Bells and Whistles," s/he will be assured of premium placement within Yellowpages.com. Such statements are false and misleading, as people conducting online searches often do not read beyond the first two pages of the search results, if any significant number of people in the Class Member's profession and geographic location buy the same "bells and whistles", the Class Member cannot be assured of – and almost certainly will not receive – premium placement on most searches.

41.     In the Scripted Presentation, the Class Member is told there are a limited number of Tile Positions for each profession in each geographic area and if his or her ad appears in one of the tile positions, the Class Member is assured of more traffic on his or her website. The Class Member is told that purchasing a tile position will ensure the Class Member is "one of the premiere [Class Members' business] in the [Class Members area]" and that such a purchase will ensure the Class Member a "top six" position.

42.     However, the Class Member often does not appear in a Tile Position, or in the top six positions despite the purchase of a Tile Position.

**The Guaranteed Clicks Program/Click To Call Program**

43.     Salespeople tell Class Members that by buying the YPClicks! Program, the Class Member is receiving "Clicks" from "locally targeted, qualified traffic to [the Class Member's] website." However, Clicks received by the Class Member are often neither local nor targeted. Thus, the representation of local and targeted traffic is false.

44.     The Salespeople omit to tell Class Members that a significant number of the Clicks (or phone calls in the Click to Call plan) will come from random and completely irrelevant sources and cannot reasonably be expected to result in business to the Class Member. Accordingly, the Class Member is mislead into believing that all Clicks or phone calls will come from relevant sources seeking the Class Members' products or services, but that is not the case.

45.     The Class Member learns, too late, that: whether it is Clicks or calls, s/he rarely, if ever, receives the amount of business upon which the salesperson had built their expectations based upon the Scripted Presentation and the ROI Analysis; the Clicks, searches and calls to the Class Member are frequently not relevant to the Class Member (and certainly much less relevant than represented by the Salesperson); and the majority of phone calls received by Class Members are people calling to request employment, people calling from outside of the service area of the Class Member, or people calling to sell services, supplies or products to the Class Member.

46.     Frequently, the Class Member's ad appears on sites where the placement makes the link to the Class Member's ad or webpage irrelevant or highly unlikely to generate business for the Class Member.

**The ROI Analysis Fraud**

47.     As part of the Scripted Presentation, the Class Member is asked, "If 10 people locally searching online for [Class Member's Business], how many do you think would do business with you." Sometimes the Salespeople will alter this question and ask "If 20 people. . . ." Based upon the Class Member's answer, the Salesperson will compute the estimated return stated by the Class Member on a percentage basis.

48.     The Salesperson then estimates the amount of new customers that the Class Member can expect to receive. This can be done in several ways:

    i.  If the Class Member is considering the Guaranteed Clicks program, the Salesperson will multiply the average Clicks per month by the percentage the Class Member has estimated (e.g., if a Class Member says s/he can convert 1 out 10 Clicks to new customers, and the Class Member is looking to purchase a 1200 Clicks package –100 a month – the Salesperson will tell the Class Member s/he can expect 10 new customers a month (10% x 100 Clicks). The Salesperson then computes the number of new customers the Class Member can expect by the average revenue generated by the Class Member's average job and computes the additional revenue the Class Member will receive.

    ii. If the Class Member is considering the Click to Call package, the Salesperson will employ a similar analysis and estimate how many phone calls a month the Class Member will receive. This is computed by the Salesperson multiplying the number of searches purportedly generated by the Samurai system for the Class Member's product or service in the Class

Member's geographic area by the percentage of calls the Class Member estimates s/he could convert, the product being the number of new customers the Class Member will generate. The Salesperson then multiplies the number of new customers the Class Member purportedly can expect by the average revenue estimated per job and then tells the Class Member how much more money a month the Class Member will make.

iii. If a Class Member is not purchasing the YPClicks! Program or the Click to Call program and only wants to utilize the Search Engine Product, a different formula is used. In all events, however, the data utilized by the Salesperson from the Samurai System is not accurate and creates a false expectation of a return in the mind of the Class Member, because that data is retrieved from a number of internet search engines and not merely Yellowpages.com as represented.  Thus, when a Salesperson represents that a Class Member can expect to receive a particular response to an advertisement in Yellowpages.com based upon the data from the Samurai system, that is a misrepresentation, since that system measures responses to a number of major search engines collectively and not merely to Yellowpages.com.

49.    Notwithstanding the methodology used to compute new customers by the Salespeople, the ROI Analysis is false and misleading for the following reasons, among others:

i. The statistical suppositions are based upon a false premises. For example, where the Class Member is asked, "If 10 people locally searching online for [Class Member's Business], how many do you think would do business with you" there is no answer that the Class Member can reasonably be expected

to give that will not end up giving the Class Member an unrealistically high expectation of business. This is because even if a Class Member responds that s/he could convert 1 out of 10 (a 10% conversion rate) – that number is already 10 times the national average. The national average for the "Click to conversion rate" for a website or ad is approximately 1%. Accordingly, unless the Class Member chooses a fraction of one—not one of the options given him or her—s/he is led to believe Defendant is going to increase business ten times what reasonably can be expected. Thus, the question is designed to create a false expectation on the part of the Class Member.

ii. Where a Class Member purchases only the Search Engine Product, s/he will have an unrealistic expectation of new customers as the Class Member is led to believe there are more searches for that Class Member's product or service in the Class Member's area than in fact there are because of the misrepresentation that the number of searches represented in the statistics given came from that area. The Class Member thus pays to be listed at the top of the search results, believing there are many more people searching that area for the Class Member's product than, in fact, there are.

50. As a result, the Class Member is given an unrealistic expectation of the amount of business that the Class Member will receive by advertising with Yellowpages.com.

**The Terms and Conditions Are Not Reviewed by the Class Member
Prior to Allegedly Assenting to the Contract**

51. The Class Member is not provided with the Terms and Conditions that accompany the sales contract until after the Class Member hears the Scripted Presentation and signs an order form or orally agrees over the phone to purchase advertising services from Yellowpages.com (the "Alleged Assent").

52.     After the Class Member gives the Alleged Assent, Defendant sends two documents are sent to the Class Member: (i) the Contract For Internet Yellow Pages.com Advertising (the "Order"); and (ii) the Terms and Conditions For Internet Advertising. In some cases, the Class Member will actually sign the Order form in the presence of the Salesperson, but the Class Member is not presented with the Terms and Conditions of that Order at that time. While Defendant contends both documents form part of a binding contract, the Class Member is not able to review the Terms and Conditions until after s/he is tricked into entering into what Defendant asserts is a binding agreement.

53.     The Order is usually is presented to the Class Member in electronic format. It contains items specific to the transaction such as the date, Salesperson, and the products ordered by the Class Member.

54.     In addition, the Order states:

> "This contract consists of and is governed by this Insertion Order pages [unreadable] hereto and in the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference. By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge that Yellowpages.com's reliance upon your acceptance of them; however the version applicable to this contract shall be the latest dated version as of the date of your signature. You agree that you give authority to bind the individual or company purchasing this advertising in all respect to this contract and the incorporated terms and conditions."

(Emphasis added) – (the "Signature Required Clause").

55.     This clause is not shown to the Class Member before the Order is executed. If the Class Member has been solicited by a Telephone Sales representative the Class Member does not receive anything in writing until after s/he has recorded an Alleged Assent to what Yellowpages.com describes as the consummation of the transaction. If the sales presentation is

done by a Premise Salesperson, the Class Member signs a small screen (akin to what one signs for a UPS or FedEx delivery) or Clicks "OK" on the Salesperson's PDA. At no point does the Class Member have the ability to review the Terms and Conditions prior to giving what Defendant later asserts imposes as the Class Member's assent to the contract.

56.     The Order given to Kowalski is attached hereto is Exhibit "A."

57.     The Terms and Conditions, a copy of which is attached to Exhibit "B" contain the following material terms:

    i.     The section entitled "Scope" (the "Scope Clause") states that as between the Terms and Conditions and the Order, the Order controls.

    ii.     The Terms and Conditions contain material terms as to acceptance, automatic renewal, and termination:

> The term of the Agreement commences on the date of execution by the Plaintiff "(either in writing or by electronic signature including recorded oral acceptance of this Agreement of an Order presented by us and shall (subject to our right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances specified in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order for the initial Term specified in the Order. Unless otherwise provided in the Order and except as provided below in [unreadable] T&Cs, upon expiration of the Initial Term, <u>the term of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least thirty days before expiration of the initial term</u> . . . [u]nless otherwise provided in the Order, either you or we may terminate the Renewal Term, with or without cause. . . [n]either of us may terminate this Agreement during the initial term [first year] . . . [i]f you choose to have our Advertising Products removed from any site and/or our services discontinued prior to the end of the initial Term or Renewal Term . . . you shall notify us in writing and the unpaid balance for the entire Initial Term or Renewal Term, as the case may be, will become immediately due and owing.

(Emphasis added).

    iii. The Rates and Payments section contains material terms with respect to Yellowpages.com's ability to alter pricing, the billing cycle, the rates for

renewal, the right to collect attorneys' fees, and late fees. The clause also provides Yellowpages.com can bill a Class Member "for advertising products for which no rate is specified in the order" at the "standard rate" (although there is no statement of what a standard rate is and how it is computed);

iv. Unless the Class Member terminates the agreement at the end of the initial term, Yellowpages.com can renew it at its "standard rates" (although, again, the Terms and Conditions neither defines what a standard rate is nor provides any calculus upon which one determine that rate);

v. If payment is not received by the due date, Defendant can suspend all products being serviced on behalf of the Class Member;

vi. Defendant reserves to itself the right to charge late fees at a "standard rate" or the maximum rate permitted by law (again, no explanation is given of the standard rate);

vii. The Class Member is made responsible for any attorneys' fees and costs Defendant incurs in collecting any unpaid amounts;

viii. The section entitled "Custom Domain Registration/Ownership of Work Product" contains previously unrevealed material terms as to the ownership of the information within the Class Member's ad or website:

ix. Where the Class Member has ordered advertising products that include hosting or operation of a website – and where the Class Member does not already own the domain name that the website will host – Yellowpages.com will purchase the website on behalf of the Class Member or the Class

Member may transfer to the Yellowpages.com the domain name onto the Yellowpages.com's server.

 x. Yellowpages.com may disable any hosted websites if payment is missed, and it will not release the domain name until the Class Member has paid all of Yellowpages.com bills;

 xi. If Yellowpages.com purchases the domain name on behalf of the Class Member, Yellowpages.com, and not the Class Member is said to own the domain name (although in practice, even where Yellowpages.com does not purchase the domain name, Yellowpages.com has retained ownership of the domain);

 xii. If the Class Member does not provide transfer instructions to Defendant upon the termination of the Agreement, Yellowpages.com retains the right to allow the domain name registration to lapse or allow Defendant to retain ownership; and

 xiii. The Class Member is said to consent to the recording of all telephone conversations.

 58. The Order requires the Class Member provide a written signature before the Terms and Conditions take effect. The Order requires that payment in full be received prior to the fulfillment of the products listed therein.

 59. The Class Member does not learn the actual monetary consideration required by Defendant until the Class Member receives a fax purporting to state that a contract is already in place.

60.     The Class Member never receives a written statement explaining precisely where the ads will appear.

**The Conclusion of the Transaction**

61.     Consistently throughout this experience, the Class Member will be given one set of expectations prior to the Alleged Assent to the Order, but learns, too late, that: (i) Defendant cannot and/or will not--and in fact does not--deliver upon the representations made by the Salesperson; and (ii) the Terms and Conditions received by the Class Member vary materially from what the Class Member was shown, told and expected.

62.     When the Class Member objects to paying for what s/he is not getting, s/he is turned over to the collections department which:

      i.   does not have the ability or authority to resolve the Class Member's complaint;

      ii.   does not have the authority to rescind contracts; and,

      iii.  is instructed to tell Class Members that they must pay or their credit will be ruined.

63.     If payment is not made, the Class Member's account is sent to a law firm for further collection procedures. From start to finish the Class Member is deceived by fraudulent sales practices, is relegated to a contract governed by Terms and Conditions of which the Class Member had no knowledge; learns that the representations made were false and that the lack of customer service and technical support makes the very foundations upon the purported contract

stood misleading; has not received what was represented; and ultimately is turned over to an unrelenting collections department whose mantra is "destroy credit"; and finally, is sued.

## VI.  TRANSACTIONS OF THE NAME PLAINTIFFS

**Plaintiff Michelle Winick d/b/a Michelle Winick Design**

64.     Winick is an interior designer. In August of 2009, she was contacted by Craig De Vito ("De Vito"), a Yellowpages.com Premise Sales representative, who made an appointment to visit Winick in her studio.

65.     In accordance with the Scripted Presentation, De Vito, asked Winick, among other things, how she became involved in interior design, how long she had been involved in interior design, how many interior design jobs she performed in a week; what part of her business did she want to grow? How far did she travel to do interior design jobs; how much she wanted to grow her business over the next year.

66.     De Vito showed Winick a Samurai system spreadsheet which he represented showed the number of searches conducted by the general public on the Yellowpages.com website for interior designers.

67.     De Vito asked Winick, "If 10 people locally were searching online for an interior designer, how many do you think would do business with you." Winick estimated approximately 10%. Based upon the information generated through the Scripted Presentation, De Vito summed up Winick's "needs," and told her about the partnerships Yellowpages.com purportedly has with major search engines like Google, Yahoo, MSN, and the like. When Winick stressed that placement within these search engines was her highest priority, De Vito

assured her she would be featured prominently in online search results and the general public online searching for an interior designer in her area would be directed to her website.

68.    In accordance with the Scripted Presentation, De Vito assured Winick that because of Defendant's partnership with major search engines, Yellowpages.com could manage the Google and other major online internet search engine advertising and it actually would cost Winick less than if she advertised directly with Google or one of the other search engines. Winick was assured she would receive "strategic" advertising within the major search engines.

69.    Winick made it clear her interest was in the Search Engine Product. She was told that as part of the service, she would have an ad on Yellowpages.com which also would direct people to her website.

70.    She was told that Yellowpages.com would work with her to craft an ad on the Yellowpages.com website that would suit her needs and be attractive to the public.

71.    Based upon Defendant's representations, Winick signed an Order on De Vito's laptop. The Order that Winick signed did not contain any reference to the Terms and Conditions. It simply contained a spreadsheet containing information about her Order.

72.    Winick paid Defendant for the services for which she was billed.

73.    Winick learned her ad on Yellowpages.com did not contain the wording she wanted and she was told, too late, there was little, if any, customer service to help set up the ad in accordance with her specifications.

74.    When Winick searched for her business on the internet, she found it did not appear anywhere. Winick's calls of complaint to Defendant, often were not returned, and when they were the information provided was no more than a dodge Finally, De Vito told her "I am

sorry you got the impression that buying a listing on Yellowpages.com would ensure presence on the search engines."

75.     Previously Winick had been managing her own advertising campaign on the internet. When she began to utilize the services of Yellowpages.com, internet generated inquiries plummeted. Once Winick recommenced her own advertising internet generated inquiries returned to the pre-Yellowpages.com levels. Winick did not get what was represented to her or what she paid for.

**Plaintiff Al Kowalski d/b/a Kowalski Plumbing**

76.     Kowalski owns and operates a general plumbing business.

77.     On October 31, 2008, Kowalski contacted Defendant for the purpose of learning more about advertising on the internet with YellowPages.com. Plaintiff was directed to speak to a telephone sales representative, Royce Brown ("Brown"). Kowalski told Brown he would like to learn more about advertising opportunities with Yellowpages.com.

78.     In response Kowalski encountered a high pressure sales pitch. He was told he needed to advertise with Yellowpages.com immediately because the rates were going to be going up and he had to place his order for service immediately to get the current rates.

79.     Brown went through the Scripted Presentation with Kowalski asking about Kowalski's needs, how much each job was worth, etc. When Kowalski asked what the cost would be, in which areas on the internet his ads would appear, and how prominent his ads would be in certain search engines, he was assured he would receive prominent advertising in areas having to do with plumbing contractors, heating contractors and specialties, and water heaters (the "Appearance Categories").

80.     Kowalski asked exactly where these ads for the Appearance Categories could be found, but received little detailed information. Instead, Brown pushed Kowalski to lock in his advertising rate.

81.     When Kowalski asked Brown for the exact monthly cost Kowalski would incur for the website services and listing in the Appearance Categories, Brown answered he was unable to give the exact price but that it would appear in an agreement that would be sent to Kowalski.

82.     In reply, Kowalski stated he would wait to receive the agreement and then contact Yellowpages.com if he wanted to purchase services.

83.     Brown then stated he would need to record Kowalski's assent to the terms and conditions of their agreement to lock in the best rate and send the agreement to Kowalski.

84.     When Kowalski said he wanted to look at the agreement, Brown assured him this was procedural and Kowalski would have the ability to look at all of the terms of the deal.

85.     Ultimately, Kowalski agreed to a recorded conversation; however, after the recording was started and Brown stated Kowalski was agreeing to all of the terms and conditions they had discussed, Kowalski responded that he had not agreed to any terms or conditions.

86.     It appeared to Kowalski that Brown then ceased recording him, after which Brown stated the only way they could provide the documents with the information Kowalski was seeking was for Kowalski to agree to what Brown was setting forth. Brown assured Kowalski again that Kowalski would receive everything in writing and would be able to look it over after receiving it.

87.     It then appeared to Kowalski the recording was restarted, and Brown resumed his earlier questions. Brown stated that Kowalski would be receiving the agreement—presumably for review and approval--within twenty-four (24) hours.

88.     Brown never asked Kowalski for payment, and Kowalski believed the payment information would be contained in the documents Brown was sending.

89.     At approximately 1:35 p.m., on October 31, 2008, Kowalski received the Order and the Terms and Conditions. Plaintiff never signed the Order and never previously saw or discussed the Terms and Conditions.

90.     Kowalski never returned the Order or the Terms and Conditions.

91.     Further, the Terms and Conditions are in small print and not easily readable.

92.     On the following Monday, November 3, 2009, Kowalski informed Yellowpages.com he did not wish to pursue any relationship with it. He also made several calls and sent a fax to Brown stating the same information.

93.     When he spoke to Yellowpages.com, Kowalski was told he could not cancel his order as the contract was already in force and in effect with his verbal recorded consent.

94.     Shortly thereafter, and without Kowalski's permission, Yellowpages.com posted his advertising information online and sent his first month's bill on November 22, 2008, and a second bill on December 22, 2008, stating his account was past due. Kowalski's subsequent calls to Yellowpages.com have been ignored.

95.     Kowalski has been threatened by Defendant's representatives with adverse credit reporting, and Yellowpages.com has advised Kowalski it is going to commence a collection action against him.

**Statement Of Facts Of Michael R. Gidro, Esq.**

96.     Gidro is an attorney practicing in Teaneck, New Jersey.  He specializes in the area of bankruptcy law.

97.     On or about September 15, 2008, Gidro received a phone call from Yellowpages.com and eventually met with Cheryl D'Elia ("D'Elia") a sales representative of Yellowpages.com at Gidro's place of business to discuss an ad campaign.

98.     In accordance with the Scripted Presentation, D'Elia asked, among other things, within which industries and geographic areas that Mr. Gidro wanted to appear. Gidro replied that it was his objective to obtain clients seeking a bankruptcy attorney in Bergen County, New Jersey.

99.     D'Elia showed Gidro a Samurai system spreadsheet which D'Elia represented exhibited the number of searches conducted by the general public on the Yellowpages.com website for various categories of attorneys.

100.     D'Elia also represented that Defendant had partnerships with major online search engines and that by advertising on Yellowpages.com, Gidro also would appear on those major search engines as well.

101.     D'Elia also presented the YPClicks program to Gidro, stressing that Gidro would be receiving "local" and "targeted" traffic to his website.

102.     After the presentation, Gidro and D'Elia agreed on a budget that would be $467.00 per month.

103.     Gidro had signed up for the guaranteed Clicks program and was to receive, on average, 30 Clicks a month from local and targeted traffic. D'Elia stated that Yellowpages.com also would be responsible for designing, publishing and maintaining Gidro's website.

104.   After the website and Clicks program were up and running, Gidro contacted D'Elia and explained that he was not receiving the guaranteed thirty (30) Clicks a month, and was not experiencing the increase in business as had been represented by D'Elia during their meeting. In October 2008, Gidro spoke with D'Elia  and Gidro was assured that results would be forthcoming and that he needed to be patient.

105.   The situation did not improve. When Gidro continued to call he was continually transferred between D'Elia and other representatives of Defendant who recited a cacophony of excuses for why the Yellowpages.com ad campaign was not working as represented and suggested Gidro sign up for more services and spend more money with Defendant as a way to resolve the problem. Gidro stated he felt that everything had been misrepresented to him and he did not understand why he had to pay more money for something he had been told would work at the price upon which he had agreed.

106.   Surprisingly, Defendant also provided reports to Gidro that represented he was receiving the amount of Clicks required in his contract. The reports were not  true.  Gidro received no revenue as a result of advertising with Yellowpages.com.

107.   In an effort to investigate matters himself, Gidro did a search on Google, where he was told he would appear, typing "Bankruptcy Attorney Bergen County," the designation he had told D'Elia he wanted; he did not find himself listed  in the search results.

108.   Defendant also provided Gidro a document referred to as a scoreboard report, which delineates, on a monthly basis, the number of Clicks (or, if the Class Member has purchased a guaranteed call program the number of phone calls) a Class Member has received.

109.   D'Elia represented and Defendant contracted that Gidro would receive, on average, thirty (30) clicks a month. Gidro's scoreboard report showed that he only received:

     i.   5 Clicks for the month of September 2008;

    ii.   10 Clicks for the month of October 2008;

   iii.   2 Clicks for the month of December 2008;

   iv.   10 Clicks for the month of January 2009.

110.    On February 7, 2009, Gidro received a different report from Defendant that showed that a portion of the Clicks Gidro had received came from links within searches that were completely unrelated to what Gidro had requested. The data showed that consumers had been sent to Gidro's site by Clicking on "criminal defense" or "criminal law" links. Therefore, even the Clicks that Gidro received were not targeted as he had requested and were useless to him.

111.    Eventually, Gidro learned that while he appeared in a Yellowpages.com search, he could not be found in searches on any major search engine. If Gidro had known that he would only appear on Yellowpages.com, he would not have bought the service. Indeed, this was contrary to Defendant's scripted representation that Yellowpages.com had "partnerships" that would allow Gidro's ad to appear in prominent positions in major internet searches.

112.    Despite paying Defendant's bills, Gidro never received the requisite amount of phone calls pursuant to the contract.

113.    Gidro tried to terminate the contract at numerous occasions prior to the contract's stated termination date. Upon the termination date, Gidro tried to cancel his service with Yellowpages.com again, despite the fact that the contract had ended, Yellowpages.com has continued to charge Gidro's credit card.

## VII.   CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action on behalf of a class (the "Class") consisting of all persons or entities in the State of New Jersey that allegedly contracted with Yellowpages.com for advertising services from and after May 1, 2005.  Excluded from the Class are Defendant, and any person and any entity which controls or is controlled by or is under common control with Defendant.

115.    Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(2) for injunctive and equitable relief and (b)(3) for damages.

116.    The Class is composed of thousands of persons dispersed throughout the State of New Jersey, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

117.    The Class is ascertainable, is cohesive and maintains a sufficient community of interest, since the rights of each member of the Class were violated in a similar fashion based upon, among other things, Defendants' use of a uniform script and presentation and misrepresentations and omissions common to all Class members. Further, the equitable relief sought will be common to the Class.

118.    The victimized consumers can be identified in the databases maintained by Defendant.  More specifically, Defendant maintains databases that would contain the following information: (1) the name of each consumer "enrolled" in a Yellowpages.com advertising program via a written contract or order; and (2) the address of each such individual.

119.    Thus the Class Members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

120. Plaintiffs will fairly and adequately protect the members of the Class as plaintiffs have retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

121. A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, the damages suffered by individual Class Members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation. The expense and burden posed by such individual litigation makes it impossible for the Class members to individually redress the wrong done to them; neither would such an individual case be adequate to ensure that such practices cease to harm others. There will be no difficulty in the management of this action as a class action.

122. Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

    i.  whether there is a valid contract between Defendant and the Class Members where the Order and/or Terms and Conditions are not provided to the Class Members until after they purportedly have given their assent to the Order;

    ii.  if a contract exists, whether Defendant's contract constitutes a breach of that contract;

    iii. whether the Script and Scripted Presentation contain material misrepresentations or omissions;

    iv. whether Yellowpages.com has a right to collect these alleged debts of the Class Members;

v. whether Yellowpages.com has a strategic partnership with major search engines that enables Yellowpages.com to employ strategic advertising as represented in the Scripted Presentation;

vi. whether Yellowpages.com actually performs the technical functions as represented by the it and whether the functions performed are in accordance with the industry standards;

vii. whether Defendant's conduct constitutes an unconscionable commercial practice; and

viii. whether Defendant's conduct violates the New Jersey Consumer Fraud Act.

123. The Common questions predominate over any questions which may affect individual members of the Class.

124. In addition, Yellowpages.com has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I – VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. 56:8-1 ET. SEQ. ("NJCFA")

125.    All of the allegations of the previous paragraphs are incorporated herein.

126.    The conduct of Defendant as aforesaid constitutes unconscionable commercial practices as defined in the NJCFA in connection with Defendant's solicitation and performance of its agreements with the Class Members.  The unconscionable commercial practices include, but are not limited to the use of deception, false promise, misrepresentations, and the knowing suppression and concealment of material facts with the intent that the Class Members rely upon such concealment.

127.    Without limiting what has been stated previously, Defendant has made misrepresentations and or omitted material facts including the following: (i) Defendant has misrepresented that is has entered into partnerships with major on-line search engines which will result in advertisements placed by Class Members receiving premium placement on those sites and/or will render it less expensive for Class Members to advertise on those search engines through Defendant than by doing so directly; (ii) Defendant has misrepresented that Yellowpages.com is a major search engine; (iii) Defendant has misrepresented that the purchase of a Tile Position will assure the Class Member his/her advertisement will be featured at or near the top of the list of results when a consumer conducts an internet search; (iv) Defendant has misrepresented that it can and will arrange the Class Members' advertising and websites in such a way and provide such exposure so as to assure that Clicks on the website will come from potential customers in a relevant geographic area; (v) Defendant's representation as to searches on the Yellowpages.com website is materially overstated since the data used to support that represents searches not only on Yellowpages.com, but on other major search engines as well; (vi) Defendant phrases questions to Class Members in such a way as to yield  materially misleading results and uses those materially misleading results to support

unjustifiable and incorrect expectations on the part of the Class Members; (vii) Defendant has omitted to state it lacks the technology or customer support to have a reasonable basis to assert that the Class Member's website will appear in visible, relevant, local, and targeted searches and be displayed prominently therein; and, (viii) Defendant requires the Class Member execute Orders when Defendant knows the Orders, even if read, omit the material information contained in the Terms and Conditions.

128.    Defendant's unconscionable commercial practices include, in addition to the misrepresentations and omissions: (i) purportedly entering into agreements with Class Members which omit material terms, thereafter adding those material terms in the form of Terms and Conditions, declaring to the Class Members they are bound by those terms, and taking action to enforce the purported agreements; and (ii) refusing to permit rescission when Defendant knows the Class member has entered into the contract based upon misrepresentation and omissions and/or that Defendant has failed to or is incapable of performing under the agreement; and, (iii) using presentations which Defendant knows contain unsubstantiated assumptions and asking the Class Members to make projections based on those assumptions.

129.    The Class Members have suffered an ascertainable loss as a proximate result of violations of the NJCFA in the following manners, among others: Class Members have been induced and/or coerced into paying for advertising services which (i) was procured through fraudulent means and/ or (ii) they are alleged to have ordered though those orders were procured through fraudulent means; and/(b) those who have not paid for the service are threatened with or have suffered adverse credit reporting, collection actions and legal actions.

## COUNT II
## BREACH OF CONTRACT

130.    All of the allegations of the previous paragraphs are incorporated herein.

131.    If the Court finds a contract was formed, Defendant has breached the Contract by failing to provide the services and revenues represented in the Scripted Presentation; and failing to perform the requisite customer and technical service  required for the fulfillment of the representations made  by Defendant; and, failing to perform in good faith and in a fair manner in the facilitation of the Class Member's contract

132.    The Class Members have been damaged as a proximate result of Defendant's breaches of contract

### III.    PRAYER FOR RELIEF

Wherefore, plaintiffs demand judgment against Defendant on behalf of themselves and the Class as follows:

I.      An order certifying that this action may be maintained as a class action;

II.     Compensatory damages in an amount to be proven at trial;

III.    Equitable and injunctive relief as permitted by law or equity, including the rescission of all contracts that fall within the purview of the Class Member's complaint

IV.     Equitable relief in the form of an injunction preventing Yellowpages.com deceptive practice to continue into the future;

V.      Awarding the Class Members treble the amount of their damages pursuant to N.J.Stat.Ann. 56:8-19;

VI.     Awarding the Class Members reasonable counsel fees, filing fees, cost of investigation, and costs of this lawsuit, pursuant to N.J.Stat.Ann. 56:8-19;

VII.    Pre and post-judgment interest; and

VIII.   Such other and further relief as the court may deem necessary or appropriate.

## IV.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Date:   November 6, 2009
        Paramus, New Jersey

By:   **s/Paul I. Perkins**
      Paul I. Perkins, Esq.
      **LYNCH LAW FIRM, P.C.**
      45 Eisenhower Drive
      Paramus, NJ  07652
      (800) 656-9529
      (888) 271-9726 (fax)
      paulperkins@lynchlawyers.com

Date:   November 6, 2009
        Saddle Brook, New Jersey

By:   **s/Peter S. Pearlman**
      Peter S. Pearlman, Esq.
      **COHN LIFLAND PEARLMAN**
      **HERRMANN & KNOPF LLP**
      Park 80 Plaza West – One
      Saddle Brook, NJ 07663
      (201) 845-9600
      (201) 845-9423 (fax)
      psp@njlawfirm.com

# EXHIBIT B

**LYNCH LAW FIRM, P.C.**
45 Eisenhower Drive, 3d Floor
Paramus, NJ 07652
Tel: (800) 656-9529
Fax:(888) 271-9726
*Attorneys for the Plaintiff and the Class*
Additional Counsel on Signature Page

SUPERIOR COURT BERGEN COUNTY
FILED

APR 7 - 2009

DEPUTY CLERK

RECEIVED
APR 07 2009
SUPERIOR COURT OF NEW JERSEY
COUNTY OF BERGEN
FINANCE DIVISION

| | |
|---|---|
| AL KOWALSKI, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>-vs-<br><br>YELLOWPAGES.COM, LLC, AT&T INC., and their Predecessors, Successors, and/or Assigns, and JOHN DOES 1 – 10 (being those officers, employees, directors, or other individuals who are responsible for, or participated in the conduct forming the basis of the Plaintiffs' claims) and CORPORATE ROES 1 – 10 (being entities, corporations, or other companies not herein named who are responsible for, or participated in the conduct forming the basis of the Plaintiffs' claims),<br><br>     Defendants. | NEW JERSEY SUPERIOR COURT,<br>LAW DIVISION: BERGEN COUNTY<br><br>DOCKET No.: L·3316-09<br><br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**

# TABLE OF CONTENTS

I.      INTRODUCTION...................................................................2

II.     NATURE AND SUMMARY OF THE ACTION.............................................3

III.    JURISDICTION AND VENUE.......................................................6

IV.     PARTIES.....................................................................7

V.      BACKGROUND AND NATURE OF THE DECEPTIVE PRACTICE.....................8

VI.     CLASS ACTION ALLEGATIONS...................................................18

VII.    ASCERTANABLE LOSS ANALYSIS................................................21

VIII.   COUNT I: JUDICIAL DECLARATION.............................................22

IX.     COUNT II: VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT.............24

X.      COUNT III: UNJUST ENRICHMENT..............................................28

XI.     COUNT IV: CLASS ACTION DECLARATION........................................29

XII.    PRAYER FOR RELIEF.........................................................30

XIII.   JURY TRIAL DEMAND.........................................................31

XIV.    TRIAL COUNSEL DESIGNATION.................................................31

XV.     CERTIFICATION OF NO OTHER ACTIONS.........................................31

XVI.    COUNSEL SIGNATURE PAGE....................................................32

1

## I.    INTRODUCTION

This action concerns deceptive and fraudulent business practices perpetrated by YELLOWPAGES.COM ("Yellow Pages") upon consumers and business consumers throughout the United States. Yellow Pages is an online advertising service and a "wholly owned subsidiary of AT&T. . . . [Yellow Pages] is uniquely able to offer searchable directory listings. . . . . [Yellow Pages is an] online source for comprehensive national and local business information. The [Yellow Pages] distribution network provides exposure to more than 100 million monthly consumer business searches. Consumers can locate merchants, search White Pages directories, research products and services, obtain maps and directions, and plan entertainment, leisure and travel activities."[1] Yellow Pages is similar to the Yellow Pages book that is still distributed throughout the United States but advertising appears on the internet. Yellow Pages' business is soliciting advertising from consumers and business consumers. Yellow Pages represents to customers that their ads will appear on certain areas of the internet and will receive prominence in certain internet searches. As stated below, the methodology employed by Yellow Pages to siphon advertising revenue from Consumers is deceptive and misleading resulting in consumers being forced to pay for advertising they either didn't want or were misled as to the nature, duration and/or prominence of the advertising.

---

[1] Cite is *available at*: http://www.yellowpages.com/about. Last visited March 1, 2009.

## II.    NATURE AND SUMMARY OF THE ACTION

1.    This class action complaint sets forth facts that show that Yellow Pages has derived a methodology of the solicitation of consumers and business consumers for advertising that is akin to the age old basic principals of extortion. Yellow Pages' method violates basic principals of New Jersey's Consumer Fraud Act as well as the basic tenements of every consumer protection statute throughout the United States. Yellow Pages disregard for the principals and equity of good faith and fair dealing that is inherent within every bargained for exchange is appalling and must be stopped immediately.

2.    Specifically, Yellow Pages has derived a scheme where a sales representative will discuss certain opportunities available to the consumer/business consumer (hereinafter referred to singularly as "Consumer"). If a Consumer expresses an interest in advertising with Yellow Pages, then the representative will give the consumer a tacit and cursory overview of where the Consumer's ad might appear and what the monthly cost could be. Most importantly, the representative will ask the Consumer's permission to record the conversation between the representative and the Consumer.

3.    The recorded conversation asks the Consumer to state that the Consumer agrees to all of the terms and conditions that had been set forth by the representative (the "Oral Representation"). For the conversation to continue, the Consumer must state their assent to the terms and conditions and any other items set forth by the representative. However, the representative has never gone through all of the terms and conditions of the agreement between the Consumer and the representative.

4.    Sometime shortly thereafter, a contract entitled, "Contract for Internet Yellow Pages.com Advertising" will be sent via fax or email to the Consumer. The Consumer's name is

3

listed on the signature line. The contract is a three page document – two of the pages are entitled "Terms and Conditions for Internet Advertising". These two pages of terms is in all small print and states, most interestingly, that the term of the Contract commenced upon the oral acquiescence of the Consumer while the Consumer was speaking with the representative.

5.  When a consumer refuses to sign the Contract and does not wish to proceed with the advertising with Yellow Pages, the Consumer is informed that they are already under Contract with Yellow Pages and cannot now void the Contract. Yellow Pages grounds this premise on their reliance on the Oral Representation of the Consumer.

6.  The aforegoing scenario is violative of the law for several reasons:

    a.  The Consumer is not privy to many material terms that suddenly appear in the documents that are sent to the Consumer but never stated to the Consumer on the phone:

        i.  The Consumer never agreed to an actual price term, the consumer does not learn the actual consideration required by Yellow Pages until the consumer receives the fax purporting to state that a Contract is already in place;

        ii. The Consumer NEVER receives any actual written statement of where the ads will appear – simple headings are included, but this does not suffice for specificity of what exactly the consumer is paying for;

4

        iii. The Consumer receives a two page terms and conditions document with many material terms that are not discussed by the sales representative (this is discussed in detail below).

    b. In consideration of the above, there is no contract formed between Yellow Pages and the Consumer. Yellow Pages assertion of an agreement between the parties is in contravention of the law as there is no meeting of the minds on many of the essential and material terms and conditions asserted by Yellow Pages. Thus Yellow Pages threat of collection and legal action to coerce the Consumer into accepting the agreement is tantamount to fraud, extortion and a deceptive business practice.

7.   Therefore, Plaintiff brings this class action on behalf of others similarly situated who are victims of the deception and fraud at the hands of the Defendants.

EXHIBIT B - PAGE 6

## III. JURISIDICTION AND VENUE

8.  Jurisdiction over the Defendants is proper under New Jersey Jurisprudence under the United States Constitution, New Jersey State Constitution, Article VI, and *Gendler & Co. v. Telecom Equipment Corp.*, 508 A.2d 1127 (N.J. 1986) (permitting exercise of long-arm jurisdiction over non-resident defendant to the full extent permitted by due process of law); *Avdel Corp. v. Mecure*, 277 A.2d 207 (N.J. 1971) (observing that New Jersey's long-arm jurisdiction extends to the "outermost limits permitted by the United States Constitution").

9.  Venue is proper as Plaintiff, as the class representative, is a resident of Rochelle Park, in the County of Bergen, in the State of New Jersey.

10. Venue is also proper in this court because a substantial portion of the transactions complained of occurred in this county and the products at issue were advertised, promoted, sold, and distributed in this county. Defendant has received substantial compensation from the sales of these products in this county and by doing business has had effects in this county.

11. Defendants transact business and have availed themselves of the forum of the State of New Jersey and Bergen County; thus, Jurisdiction and Venue are proper wherein brought in the State of New Jersey, County of Bergen.

## IV.    PARTIES

12.    Plaintiff provides plumbing services throughout the state of New Jersey. Plaintiff's principal place of business is 71 Central Avenue, Rochelle Park, New Jersey. Plaintiff also resides in Bergen County.

13.    Defendant, Yellow Pages.com LLC, was incorporated in the State of Delaware and is a New Jersey foreign limited liability company that offers internet advertising services. Yellow Pages' headquarters is at 611 N. Brand Boulevard, Glendale, CA 91203 and is a wholly owned subsidiary of AT&T Inc.

14.    Defendant AT&T, Inc., was incorporated in the State of Delaware. Defendant AT&T owns Defendant Yellow Pages. AT&T Inc.'s headquarters is 208 South Akard Street, Dallas, Texas 75202.

EXHIBIT B - PAGE 8

## V.    BACKGROUND AND NATURE OF THE DECEPTIVE PRACTICE

**The Initial Contact Between Plaintiff and Yellow Pages**

15.    On October 31, 2008, Al Kowalski contacted Yellow Pages.com for the purpose of learning more about advertising on the internet with the Yellow Pages.

16.    Plaintiff was then directed to speak to a Yellow Pages sales representative. In this case, Plaintiff spoke with Mr. Royce Brown (the "Representative" or "Mr. Brown").

17.    Plaintiff conveyed to Mr. Brown that he would like to learn more about advertising opportunities with Yellow Pages. Plaintiff anticipated that he would get some information, think over the matter and call Yellow Pages in the future should he chose to advertise with them.

18.    What Plaintiff encountered was a high pressure sales pitch. Plaintiff was told that he needed to advertise with Yellow Pages immediately because the rates were going to be going up and that this was the best time for Plaintiff to place his order for service.

19.    Plaintiff inquired of Mr. Brown what the cost would be and which areas on the internet would the Plaintiff's ads appear; in addition, the Plaintiff requested information with respect to how prominent his ads would be in certain search engines.

20.    Plaintiff was assured by Mr. Brown that he would receive prominent advertising in certain areas of the internet having to do with the following categories: 1) Plumbing Contractors; 2) Heating Contractors and Specialties; and, 3) Water Heaters (the "Appearance Categories").

21.    In addition, Mr. Brown told the Plaintiff that Yellow Pages could provide a website hosting services as well.

22. Plaintiff inquired as to exactly where these ads could be found for the Appearance Categories, but received little detailed information from Mr. Brown. Instead, Mr. Brown pushed the Plaintiff to lock in his advertising rate.

23. Plaintiff, feeling uneasy about the transaction, requested that Mr. Brown quote to him the exact monthly cost that Plaintiff would incur for the website services and listing in the Appearance Categories. Mr. Brown responded that he was unable to give him the exact price and that the exact price would appear in an agreement that would be sent to the Plaintiff.

24. Plaintiff stated that he would wait to receive the agreement and then contact Yellow Pages if he wanted to purchase services.

**The Recorded Conversation**

25. Mr. Brown stated that he would need to record the Plaintiff's assent to the terms and conditions of their agreement for Plaintiff to lock in the best rate and for Mr. Brown to send the agreement to the Plaintiff.

26. Plaintiff stated to Mr. Brown that he did not provide Plaintiff terms and conditions and that he wanted to look at the agreement.

27. Mr. Brown assured Plaintiff that this was procedural and that Plaintiff would still have the ability to look at the terms and conditions.

28. Consequently, the Plaintiff agreed to the recorded conversation; however, after the recording was started and Mr. Brown stated that Plaintiff was agreeing to all of the terms and conditions that they had discussed, the Plaintiff became uncomfortable responded again that he was uncomfortable with what Mr. Brown was saying and that he had not just agreed to any terms and conditions.

29. It appeared to the Plaintiff that Mr. Brown then ceased recording him and said that the only way they could complete the transaction was if Plaintiff agreed to everything that Mr. Brown was setting forth during the recording of the conversation. Mr. Brown assured the Plaintiff that the Plaintiff would receive everything in writing and would be able to look it over after receiving it.

30. Then it seemed to the Plaintiff that the recording was restarted by Mr. Brown and Mr. Brown resumed his earlier questions. Plaintiff answered Mr. Brown's questions.

31. Mr. Brown then stated that Plaintiff would be receiving the agreement within twenty-four (24) hours of the Plaintiff and Mr. Brown's conversation.

32. Mr. Brown never asked Plaintiff for payment – as such, Plaintiff thought that payment options would be contained in the documents that Mr. Brown was sending.

**The Written Contract Arrives**

33. At approximately 1:35 p.m., on October 31, 2008, Plaintiff received two documents:

   a. Contract for Internet Yellow Pages.com Advertising (the "Contract");

   b. Terms and Conditions for Internet Advertising (the "Terms and Conditions").

34. The Contract contained the following relevant statements and/or provisions:

   a. The Contract was dated October 31, 2008;

   b. The Contract listed the sales representative as Royce Brown;

   c. The Sales Manager was listed as Christina Griffin;

   d. There was a box called "billing preference" that stated:

      i. **"Payment in full is required _prior_ to fulfillment of the products in this Order".**

   e. There was a box marked "Director Approval" that was blank.

10

f. There was a box marked "Sales Mgr Approval" that was blank.

g. The aforementioned Appearance Categories of 1) Plumbing Contractors; 2) Heating Contractors and Specialties; and, 3) Water Heaters were listed and were designated to be within the geographic area of Bergen NJ Metro.

    i. The information of the exact places where Plaintiff's add was to be placed was **not** within the description.

h. The actual prices were listed:

    i. Plaintiff was to pay a monthly fee of $49 for the website;

    ii. Plaintiff was to pay a monthly fee of $309 for the advertising listing;

    iii. As such, Plaintiff's cost for one year was $4,296.

i. In the Notes section, the following is written: "Hi Al, Here is the agreement for your records."

j. Below the Notes section, in very small tiny print (obfuscated by the poor facsimile quality) is the following statement:

> This contract consists of and is governed by this Insertion Order pages [unreadable] hereto and in the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference. **By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING,** (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge that Yellowpages.com's reliance upon your acceptance of them; however the version applicable to this contract shall be the latest dated version as of the date of your signature. You agree that you authority to bind the individual or company purchasing this advertising in all respect to this contract and the incorporated terms and conditions.

(hereinafter referred to sometimes as the "**Signature Required Clause**")

11

35. Plaintiff never signed the document referenced above at §34(j).

36. Plaintiff never returned the document reference above at §34(j) to Defendant Yellow Pages. As such, Defendant Yellow Pages could not rely on Plaintiff's signature as proff the Plaintiff had "represent[ed] to Yellowpages.com: (1) that [he had] received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING".

37. The Contract (also referred to by Yellow Pages as "Order") is attached hereto as **EXHIBIT "A"**.

38. In addition, the Plaintiff received a two-page document called "Terms and Conditions for Internet Advertising". All of the terms are in very small print and the quality is obfuscated by the facsimile transmission.

39. The Terms and Conditions contained the following relevant clauses or statements:

   a. #1 Scope – states that **between the Terms and Conditions and the Order (the Contract) that the Order (Contract) controls**. In other words, to the extent that that the Contract and the Terms and Conditions conflict, the Contract controls (hereinafter referred to as the **"Scope Clause").**

   b. #2 Term – states that:

   > the term of the Agreement commences on the date of execution by the Plaintiff "**(either in writing or by electronic signature including recorded oral acceptance of this Agreement** of an Order presented by us and shall (subject to our right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances specified in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order for the initial Term specified in the Order. Unless otherwise provided in the Order and except as provided below in [unreadable] T&Cs, upon expiration of the Initial Term, **the term**

12

of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least thirty days before expiration of the initial term . . . [u]nless otherwise provided in the Order, either you or we may terminate the Renewal Term, with or without cause. . . [n]either of us may terminate this Agreement during the initial term [first year] . . . [i]f you choose to have our Advertising Products removed from any site and/or our services discontinued prior to the end of the initial Term or Renewal Term . . . you shall notify us in writing and the unpaid balance for the entire Initial Term or Renewal Term, as the case may be, will become immediately due and owing.

c.  #4 Rates and Payments provides, in summary:

   i.  The billing cycle is every thirty (30) days;

   ii.  Yellow Pages can bill a consumer "for advertising products for which no rate is specified in the order" – in other words, Yellow Pages can bill their common "standard rate" if the Order/Contract does not specify a price (although there is no statement of what a standard rate is);

   iii.  Unless the consumer terminates the Agreement at the end of the initial term, then Yellow Pages renew the Consumer's contract at their "standard rates" – although the Terms and Conditions neither defines what a standard rate is nor does it provide any calculus upon which one could derive some sort of reasonable basis for a standard rate;

   iv.  If payment is not received by the due date, then Yellow Pages can suspend all Products being serviced on behalf of the consumer;

13

v. Yellow Pages allegedly reserves itself the right to charge late fees that will accrue, again, at a "standard rate" or the maximum rate permitted by law

vi. Yellow Pages purportedly make the consumer responsible for any attorneys fees and costs that a Yellow Pages incurs in collecting any unpaid amounts;

d. #6 Custom Domain Registration/Ownership of Work Product

i. Where the consumer has ordered advertising products that include hosting or operation of a website – and where the consumer does not already own the domain name that the website will host – Yellow Pages will purchase the website on behalf of the consumer or the consumer may transfer to the Yellow Pages the domain name onto Yellow Pages' server.

ii. After transfer of the domain name, Yellow Pages states that it may disable any hosted websites if payment is missed and that it will not release the domain name until the consumer has paid all of Yellow Pages' bills;

iii. Yellow Pages states that if it purchases the domain name on behalf of the Consumer, then Yellow Pages owns the domain name and not the Consumer;

iv. If the consumer does not provide transfer instructions to Yellow Pages upon the termination of the Agreement, then

14

EXHIBIT B - PAGE 15

Yellow Pages retains the right to allow the domain name

registration to lapse or allow Yellow Pages to retain ownership.

   e.  #17  Telephone Conversations

      i.  All telephone conversations may be recorded and the consumer

        consents to such.

40.   The Terms and Conditions are attached hereto as **EXHIBIT "B"**.

41.   As stated above, the Plaintiff never signed the contract and never returned a signed document to Yellow Pages.

42.   As stated above, Plaintiff contacted Yellow Pages for the first time on October 31, 2008.

43.   Plaintiff received the Contract and Terms and Conditions from Yellow Pages on Friday, October 31, 2008.

44.   On the following Monday, November 3, 2009, Plaintiff contacted Yellow Pages to inform Yellow Pages that he did not wish to pursue any relationship with Yellow Pages in the future. Plaintiff made several calls and also sent a fax to Royce Brown stating the same.

45.   Plaintiff was told, when he spoke to Yellow Pages, that he could not cancel his order as the contract was already in force and in effect with Plaintiff's verbal recorded consent. Plaintiff was told this by Ted Becker who was a general sales manager in the sales division at Yellow Pages.

46.   Shortly thereafter and completely without the Plaintiff's permission, Yellow Pages posted the Plaintiff's advertising information online and subsequently sent Plaintiff his first month's bill on November 22, 2008, and a second bill on December 22, 2008, stating that

Plaintiff's account was past due. All of Plaintiff's other calls to Yellow Pages have been ignored.

47.  Plaintiff has subsequently been threatened by representatives of Yellow Pages with adverse reporting on his credit report and Yellow Pages has stated they are going to commence a collection action against the Plaintiff in order to pressure the Plaintiff to make a payment to Yellow Pages.

48.  Yellow Pages has stated that there is an enforceable contract between the Plaintiff and Yellow Pages. This is an inaccurate assessment of the legal relationships for two reasons:

    a.  First, Plaintiff and Yellow Pages never had a meeting of the minds on all of the essential terms of the contract while the Plaintiff and Mr. Brown were on the phone;

        i.  Even when Plaintiff received the Terms and Conditions from Yellow Pages, Plaintiff did not sign the accompanying contract order; in addition, Plaintiff never made any assenting representation to Yellow Pages upon which they could rely.

        ii.  The Terms and Conditions clearly state that, "in the event of any conflict between the terms of the Order [referred to as the Contract herein] and of these Terms and Conditions, the Order [referred to as the Contract herein] controls." The Contract/Order clearly states, "By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING . . . (3) that

16

you acknowledge that Yellowpages.com's reliance upon your acceptance of them."

1. As Plaintiff never signed the Contract/Order Plaintiff neither assented to the Terms and Conditions nor is Yellow Pages able to rely upon the Plaintiff's acquisence.

2. The purported right of Yellow Pages to rely upon the "recorded oral acceptance" of the Plaintiff is clearly contravened by the Contract/Order's requirement of the Plaintiff's signature."

   a. Ted Becker's statement (the general manager of Yellow Pages), is inaccurate that the Contract was binding upon Plaintiff because of his oral consent.

49. As such, it is obvious that this a deceptive scheme designed to trap consumers into purchasing services from Yellow Pages and then extract money from them under an alleged oral recorded assent that is void as a matter of law (i.e., there is no meeting of the minds and the Contract/Order contravenes the oral acceptance premise).

50. Where a consumer wishes to cancel the contract or wishes to not be included they are threatened with collection actions and adverse information to be recorded on their credit report.

17

## VI. CLASS ACTION ALLEGATIONS

51.  All of the previous allegations are incorporated herein.

52.  Plaintiff brings this action as a class action, on behalf of itself and all others similarly situated, pursuant to New Jersey Court Rule 4:32. The classes that plaintiff seeks to certify is:

a.  **"The Nonpayment Class"**:

> i.  All individuals from the beginning of the class period until the present that received a Contract/Order and Terms and Conditions from Yellow Pages that contained substantively identical Scope and Signature Required Clauses[2] as the Plaintiff and did not sign the Contract/Order and who:
>
>> 1.  Have received adverse credit reporting on their credit report; and/or,
>>
>> 2.  Are being pursued for payment by Yellow Pages; and/or,
>>
>> 3.  Have paid money to Yellow Pages for services.

b.  **"The Payment Class"**:

> i.  All individuals from the beginning of the class period until the present that recorded their assent to Yellow Pages Terms and Conditions before they actually received the Yellow Pages' document entitled Terms and Conditions and who:
>
>> 1.  Have received adverse credit reporting on their credit report; and/or,
>>
>> 2.  Are being pursued for payment by Yellow Pages; and/or,
>>
>> 3.  Have paid money to Yellow Pages for services.

---

[2] See Pages 10-12 infra.

18

c. The members of each of the classes above will be referred to generally as **"Class Members"**.

53. The class is composed of thousands of persons and entities in New Jersey and worldwide. The prosecution of separate actions by individual members of this class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants' Yellow Pages and AT&T Inc.

54. In addition, Defendants' Yellow Pages and AT&T Inc. have acted and refused to act on grounds applicable generally to the class members, making final relief with respect to the class as a whole appropriate.

55. As a victim of the Defendants' artifice to defraud, plaintiff is asserting claims that are typical of the claims of the class, and plaintiff will fairly and adequately represent and protect the interests of the class in that it has no interests antagonistic to those of the other members of the class. Plaintiff has retained counsels who are competent and experienced in the prosecution of class action litigation.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impracticable for the class members individually to seek redress for the wrongful conduct alleged here. If class treatment of these claims were not available, defendant would likely continue defrauding the general public, extorting and threatening the general populace with negative credit reporting, collection and legal actions, or would otherwise escape liability for their wrongdoing as challenged in this litigation--liability created as a result of

defendant's own efforts to profit at the expense of the general public. Each of the members of the class will have to obtain an equitable outcome that will insure that they fraudulent transaction is rescinded and all collection/legal efforts are ceased. In addition, those that have been forced to pay money as a result of the Defendant's actions, should have their money returned.

57.  Common questions of law and fact exist as to all members of the class. The mechanism employed by the Defendant Yellow Pages to defraud the general population is identical. The facts for every class member will be identical in nature. After a recorded conversation, Yellow Pages would send the Class members a Contract/Order and accompanying Terms and Conditions. As such, the facts are common and similar enough to support a Class Action.

58.  In addition, the question of whether or not the Contracts are binding will be identical for every member of the class:

   a. The legal question of whether or not the Contract/Order and Terms and Conditions that contain the Scope and Signature Required clauses are binding upon one who does not sign the Contract/Order is identical;

   b. The legal question of whether or not there was a meeting of the minds on the essential terms of the contract between the Class Members and Yellow Pages will be identical for every class member.

59.  Thus, common questions predominate over any questions which may affect individual members of the class.

60.  The names and addresses of class members are available from defendant or their agents. Notice can be provided to these owners by a combination of mail and published notice.

20

## VII.   ASCERTAINABLE LOSS ANALYSIS

61.   All of the previous allegations are incorporated herein.

62.   The Class Members have suffered an "ascertainable loss" as required by law in the
following manner:

a.   Class Members that have not paid Yellow Pages, but are the subject of or
being threatened with adverse credit reporting, collection or legal action, the
ascertainable loss, in conjunction with the *Cox v. Sears Roebuck & Co.*,
analysis (138 N.J. 2, 22-24 (1994)) – is the estimate of costs for which the
Defendants are attempting to hold the Plaintiff's responsible. As such,
Plaintiff Class Members will ask for injunctive relief prohibiting Yellow
Pages from enforcing the Contract/Order and Terms and Conditions not only
retroactively for the Class Members but also prospectively for all future
Consumers who may become victims.

b.   Class Members that have paid Yellow Pages as a result of Yellow Page's
fraudulent practices have suffered an ascertainable loss in the amount of their
payments for services founded upon non-enforceable contracts – the manner
in which they were coerced into their contracts is fraudulent, malicious, and
has no place in a sophisticated market place. As such, Plaintiff Class Members
will request the rescission of contracts of which they are presently bound and
the return of all of their monies paid as a result of the illegal agreement.

c.   As with every action, Plaintiff reserves the right to amend this section as new
allegations and claims become known to the Class Members through
discovery.

21

## VIII. COUNT I - JUDICIAL DECLARATION

63. All of the previous allegations are incorporated herein.

64. As it is evident that the Contract/Order and Terms of Conditions set forth above constitute an Agreement that is void as a matter of law.

    a. The Contract/Order and Terms of Conditions that contained the Scope Clause and the Signature Required Clause and were not signed by a Class Member are void as a matter of law for reasons set forth above but summarized here:

        i. The Scope clause says that "between the Terms and Conditions and the Order (the Contract) that the Order (Contract) controls." This clause was contained in paragraph 1 of the Terms and Conditions. The Signature Required Clause, contained within the controlling document, the Order (herein referred to as the Contract) states that "By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge that Yellowpages.com's reliance upon your acceptance of them . . . ."

        ii. For Class Members that did not sign the Order/Contract – there was no binding contract despite Yellow Pages declaration that the Contract is valid upon the recorded oral assent of the Class

22

Members. The Terms and Conditions wherein the oral consent
is allegedly ratified and stated to be a valid form of acceptance
is superseded by the terms of the Order/Contract that require
the Class Member's signature.[3]

b. For the Payment Class Members who have paid Yellow Pages as a result of
their fraudulent conduct, it is evident that the agreements are unenforceable as
they are victims of the artifice to defraud as are the Nonpayment Class
Members.

    i. When the Payment Class Members orally agreed to the Terms
and Conditions through the recording with Yellow Pages
representative, they did not have the benefit of the knowledge
of all of the essential terms that would be contained in the
Terms and Conditions that they would receive;

    ii. As the Payment Class Members have made payments pursuant
to a document that is void as a matter of law, all payments
made to Yellow Pages should be returned to the Class.

WHEREFORE, the Class Members state that a declaratory judgment is both necessary and
proper to set forth and determine the rights, obligations, and liabilities that exist among the Class
Members and the Defendants (i.e. a Judicial Declaration is needed to void the alleged agreement
between the Class and Yellow Pages as a matter of law).

---

[3] Also contained in the Contract/Order is a statement that says, "[p]ayment in full is required prior to fulfillment of
the products in this Order". As such, Yellow Pages is estopped from asserting reliance on a Class Members' actions
where they did not received payment. See **EXHIBIT "A"**.

## IX.  COUNT II – VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT

65.  All of the previous allegations are incorporated herein.

66.  As stated above in detail, the Defendants have employed an artifice to defraud and then extort advertising revenue from the Class Members.

    a.  Defendants trapped Class Members into a recordation wherein they allegedly agreed to certain terms and conditions without the terms and conditions being disclosed to the Class Member;

    b.  Defendants stated to Class Members that they would receive terms and conditions for review at a later date or said nothing at all about what the terms and conditions would be;

    c.  Where Class Members sought to rescind or alter the alleged Contract/Order in any manner, the Defendants would not allow any rescission alleging that the Class Member had already recorded his consent to the terms and conditions – this action was unlawful for two reasons:

        i.  First, class members received Yellow Pages documents (purporting to be the Contract/Order and the Terms and Conditions) and the Scope Clause and the Signature Required Clause (pgs. 10-12, infra.) were included such that the Scope Clause states that the Contract/Order governs the Class Members' acceptance and the Contract/Order contained the Signature Required Clause that required, obviously, the Class Members' Signature.  As such, the statement that the recordation of the Class Member's oral acquiescence sufficed as adequate acceptance is misleading and false.

24

1. When Yellow Pages stated that the Class Member was bound by the oral acceptance and this was a misrepresentation – in addition they omitted to tell the Class Member that the documents they would received would require their signature to complete the agreement or that they were not telling them all of the essential terms upon which Yellow Pages sought to enforce a contract;

2. Yellow Pages intended that the Class Member rely upon the misrepresentations and omissions.

3. Plaintiff and Class Members relied upon the Defendant's misrepresentation of the legal contractual relations between the Plaintiff and Defendant.

   a. This analysis by Yellow Pages was incorrect for two reasons:

      i. First, the Scope Clause and the Signature Required Clause require the Class Member's written consent to the terms and conditions – where a Class Member did not sign the Contract/Order there is not an enforceable agreement;

      ii. Second, even where a class member agreed orally to certain terms and conditions, those terms and conditions expressed to the Class Members did not contain all of the essential terms of a Contract and, until the Contract/Order was signed by the Class Member – there was no enforceable agreement.

25

        iii. Finally, even where a Class Member signed the Contract/Order – the Contract should be rescinded as Class Members signed the Contract/Order not in order to purchase services from Yellow Pages but to avoid adverse credit reporting and legal and collection actions – Class Members were coerced into signing because they were told that a legal agreement existed based upon the Class Members' alleged oral acquiescence to the terms and conditions of the Contract.

4. Plaintiff and Class Members have been damaged by the Defendant's misrepresentation in the following manners:

      a. Class Members have been coerced into paying for advertising services they either did not want or wanted in another form or fashion;

      b. Plaintiff and Class Members who have not paid for the service are now being threatened or have suffered adverse credit reporting, collection actions and legal actions;

      c. Class Members may have suffered both of aforegoing damage scenarios. As stated in the aforegoing, Class Members, under auspices of the *Cox* analysis have suffered an ascertainable loss.

ii. As such, it is obvious that Defendants are engaging in a deceptive business

practice and such a deceptive practice is a violation of New Jersey law under

N.J.S.A. 56:8-1 et seq.

## X. COUNT III – UNJUST ENRICHMENT

67. All of the previous allegations are incorporated herein.

68. As enumerated above, Defendants have defrauded the Class Members through the pretense of omission and misrepresentation in order to extract financial gain from the Plaintiff Class Members.

69. One Class proposed for certification, is made up of Class Members that have paid Defendant Yellow Pages under duress, fraud and/or under false pretenses.

70. Defendants have received substantial amounts of money from the Payment Class Members, but the requisition of such remuneration is as a result of an illegal and void at law contract.

71. As such, the Defendants have been unjustly enriched at the expense of the Payment Class Members.

## XI.   COUNT IV – CLASS ACTION DECLARATION

72.   All of the previous allegations are incorporated herein.

73.   As stated above, Plaintiff has proposed two classes of members to be approved by the Court (i.e. the Nonpayment Class and the Payment Class).

    a.   **"The Nonpayment Class"**:

        i.   All individuals from the beginning of the class period until the present that received a Contract/Order and Terms and Conditions from Yellow Pages that contained substantively identical Scope and Signature Required Clauses as the Plaintiff and did not sign the Contract/Order and who:

            1.   Have received adverse credit reporting on their credit report; and/or,

            2.   Are being pursued for payment by Yellow Pages; and/or,

            3.   Have paid money to Yellow Pages for services.

    b.   **"The Payment Class"**:

        i.   All individuals from the beginning of the class period until the present that recorded their assent to Yellow Pages Terms and Conditions before they actually received the Yellow Pages' document entitled Terms and Conditions and who:

            1.   Have received adverse credit reporting on their credit report; and/or,

            2.   Are being pursued for payment by Yellow Pages; and/or,

            3.   Have paid money to Yellow Pages for services.

29

## XII.  PRAYER FOR RELIEF

Plaintiff, on behalf of itself and on behalf of the members of the class defined in this complaint, requests judgment and relief as follows:

I.  An order certifying that this action may be maintained as a class action;

II.  Compensatory damages in an amount to be proven at trial;

III.  Equitable and injunctive relief as permitted by law or equity, including the rescission of all contracts that fall within the purview of the Class Member's complaint

IV.  Equitable relief in the form of an injunction preventing Yellow Pages deceptive practice to continue into the future;

V.  A judgment imposing a constructive trust upon the Plaintiff's assets;

VI.  An Order requiring Defendants to place assets or post a bond in an equal amount to the value of the assets upon which the Trust is placed;

VII.  Against the Defendants awarding the Class Members treble the amount of their damages pursuant to N.J.S.A. 56:8-19;

VIII.  Against the Defendants awarding the Class Members reasonable counsel fees, filing fees, cost of investigation, and costs of this lawsuit, pursuant to N.J.S.A. 56:8-19;

IX.  An order awarding plaintiff reasonable attorneys' fees, costs and expenses incurred in connection with this suit (on non-New Jersey Consumer Fraud Act Claims).

X.  Pre- and post-judgment interest; and

XI.  Such other and further relief as the court may deem necessary or appropriate.

30

## XIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

## XIV.  DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Paul I. Perkins is designated as trial counsel.

## XV.  CERTIFICATION OF NO OTHER ACTIONS

Pursuant to Rule 4:5-1, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the Court an amended certification if there is a change in the facts stated in this original certification.

## XVII. COUNSEL SIGNATURE PAGE

Date: ___4-7-09___          By: _____
     Paramus, New Jersey              Paul I. Perkins, Esq.
                                      **LYNCH LAW FIRM, P.C.**
                                      45 Eisenhower Drive
                                      Paramus, NJ 07652
                                      (800) 656-9529
                                      (888) 271-9726
                                      paulperkins@lynchlawyers.com

32

YELLOWPAGES.COM

**Contract for Internet YellowPages.com Advertising**

Page ___ of ___

| Billing Information | | Sales Office Information | |
|---|---|---|---|
| Customer ID | | Contract Date | 10/31/2008 |
| Company Name | Kowalski Plumbing & Heating | Sales Representative | Royce Brown |
| Billing Name | Kowalski Plumbing & Heating | Sales/Seller ID | 10568T20 |
| Billing Address | 71 Central Ave | Sales Manager | Christina Griffin |
| City, State, Zip | Rochelle Park    NJ    07662 | Sales Manager ID | 11667104 |
| Contact Name | Al Kowalski | Sales Office | Pleasanton |
| Contact Phone # | 201-843-7799 | Sales Office Phone # | (703) 344-0909 |
| E-mail | kowalskiplumbing@gmail.com | Sales Rep E-mail | rbrown@yellowpages.com |
| Billing Preference | Invoice          Approval Attached | Contract Type | New |
| Check Box if Applicable | Payment in full is required prior to fulfillment of the products in this order | Sales Lead Origin | Prospect |
| Card Number | | Director Approval | |
| Card Type | Exp:  Month  /  Year | Sales Mgr Approval | |
| Name on Card | | Receive Date/Time | |

| Item: | Term | AF Code | Geography | Heading/Category | Discount Code | Monthly Rate |
|---|---|---|---|---|---|---|
| | | | | 3 page website | | $49 |
| YPW 3 | 12 months | | | Plumbing Contractors | | $309 |
| TILE B | 12 months | BERMZ | Bergen NJ Metro | Heating Contractors & Specialties | | |
| | | | | Water Heaters | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | Monthly Amount | $ | 358.00 |
| | | | | Additional Items (products page) | $ | |
| | | | | Total Monthly | $ | 358.00 |
| | | | | TOTAL Annual | $4,296.00 | |
| | | | | Balance Due | | |

**Notes:**

Hi Al,  Here is the agreement for your records.

This contract consists of and is governed by this Insertion Order, any additional Insertion Order pages attached hereto and the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference. By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge Yellowpages.com's reliance upon your acceptance of them. (An additional copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING may be accessed through www.yellowpages.com; however, the version of Applicable to this contract shall be the latest dated version as of the date of your signature.) You agree that you have authority to bind the individual or company purchasing this advertising in all respects to this contract and the incorporated terms and conditions.

I acknowledge that I have full authority to sign for and bind the party identified as "Customer" to this contract.

| Customer Name | Al Kowalski | Signature _____ | Time _____ |
|---|---|---|---|

Updated 10/17/2008

EXHIBIT B - PAGE 35

## TERMS AND CONDITIONS FOR INTERNET ADVERTISING

1. **Scope.** This is a contract (referred to herein as the "Agreement") between YELLOWPAGES.COM LLC (hereinafter referred to as "us", "we" and "our") and the customer ("you" and "your") identified on the final page of this document (the "Order") for us to fulfill your order for our Advertising Products identified on the Order. These Terms and Conditions for Internet Advertising (these "Ts&Cs"). Except as otherwise expressly provided in these Ts&Cs, in the event of any conflict between the terms of the Order and these Ts&Cs, the Order shall control.

2. **Term.** The term of this Agreement commences on the date of execution by you (either in writing or by electronic signature, including recorded oral) acceptance of this Agreement or an Order prepared by us and shall (subject to our right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances described in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order for the Initial Term specified in the Order. Unless otherwise provided in the Order and except as provided below in these Ts&Cs, upon expiration of the Initial Term, the term of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least ten (10) days prior to such term. Each such Ts&Cs being referred to herein as this Agreement. This Term will be subject to the then-current Terms and Conditions, pricing and other terms for Internet Advertising then in effect. Unless otherwise provided in the Order, either your or we may terminate this Agreement on any time upon notice to you if you breach this Agreement. If you choose to terminate the Initial Term shall terminate pursuant to this Agreement during the Initial Term, provided that we may terminate this Agreement at any time for any reason or no reason and without cause, upon thirty days' prior written notice to the other. Neither of us may terminate this Agreement during the Initial Term or Renewal Term, as the case may be, you shall breach this Agreement. If you choose to remove your Advertising Products removed from any title and/or our services discontinued prior to the end of the Initial Term or Renewal Term will become immediately due and owing. notify us in writing and the unpaid balance for the entire Initial Term or Renewal Term will become immediately due and owing.

3. **Third Parties.** You represent and acknowledge that you are entering into this Agreement to obtain the Advertising Products for your own benefit and not for the benefit of any third party, including, but not limited to, any of your shareholders, partners, owners, employees, agents or affiliates. Moreover, each of our distribution or fulfillment vendors or Internet search engines on which we place your advertising (each, a "Distribution Site") is an intended third-party beneficiary of your obligations hereunder that relate to Advertising Products and may independently enforce such obligation directly against you.

4. **Rates and Payment.** Unless otherwise provided in the Order, we will bill you during our first applicable billing cycle after we fulfill your order for Advertising Products, and will continue to bill you during each applicable billing cycle thereafter during the term of this Agreement. The billing cycle will be thirty (30) days unless otherwise provided in the Order. We will bill you for Advertising Products for which no rate is specified in the Order at our standard rates for such Advertising Products at the time that we provide such Advertising Products. Any rates specified in the Order will apply only during the Initial Term only. Unless you or we terminate this Agreement at the end of the Initial Term, you will be invoiced for each billing cycle of the Renewal Term at our standard rates during such billing cycle for such Advertising Products. Such standard rates may be higher than the rates set forth on the Order. Payments are due on the date specified on the Invoice or, if no payment date is specified, then thirty days after the date of the Invoice. Your rates (removal, or (in the case of Advertising Products placed on Distribution Sites) cause to be removed, your Advertising Products and suspend our services hereunder if payment is not received by the due date. Your prompt payment, suspend our services hereunder if payment is not received by the due date. Your prompt payment of any invoice that may be presented, and the replacement of Advertising Product. You acknowledge that no prompt payment, suspend our services hereunder if payment is not received by the due date, will be a condition to our resumption of services and the replacement of Advertising Product. You acknowledge that no Products, or to resume services or replace or cause replacement of Advertising Products, will be a condition to our resumption of services and the replacement of Advertising Product. We may charge late payment fees on the aggregate amount that we fulfill your order. We may charge late payment fees on that amount up to the maximum amount permitted under applicable law. You agree to pay any attorneys' fees and costs that we incur in collecting any unpaid amount. You will pay any rates, and standard rates at, if lower, the maximum rate permitted under applicable law. You agree to pay any attorneys' fees and costs that we incur in collecting any unpaid amount. You will pay any rates, or other local, state, federal, foreign or other taxes or governmental fees arising out of or in connection with this Agreement, other taxes based upon our net income.

5. **Denial of Credit.** If your application for business credit is denied, you have the right to a written statement of the specific reasons for the denial. To obtain this statement, you must contact us within 60 days from the date you are notified of our decision and we will send you a written statement of reasons for the denial within 30 days of receiving your request for the statement. Notice. The Federal Equal Credit Opportunity. Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is Federal Trade Commission, Equal Credit Opportunity, Washington, DC 20580.

6. **Custom Domain Registration/Ownership of Web Product.** If the Advertising Product you have ordered involves the hosting or operation of a Web site, the Universal Resource Locator ("URL") therefore must be registered in your name with a domain registrar of our choosing as we may manage the domain while you host or operate the Web site. If you do not have a URL, we will procure a URL and will pay the applicable domain name registration fees to the registrar and maintain ownership. We cannot guarantee that any URL's and/or domain names you request for your Web site will be available for your use. If none of your requested URLs are available, you will contact you and request alternatives. If you already own the registration for the desired URL, you must transfer the URL to us with a domain registrar of our choosing. If we are unable to procure a URL and/or domain name on your behalf. If you cannot be transferred or you fail to undertake the action we request to cause the transfer, then in our discretion, we may (but are not obligated to) cause the domain to be divided, in our sole discretion. We will invoke you for all fees termination of this Agreement or in the event you are in breach of this Agreement, you shall have the right (but not the obligation) to notify us in writing within thirty (30) days after termination or expiration of this Agreement that payable in connection with the transfer to you of any URL registered in our name that is related to your Web site. If you notify us in writing within thirty (30) days after termination or expiration of this Agreement that you desire such transfer. We will then promptly transfer such URL to you if you timely pay such invoice. If you fail to notify us that you desire such transfer within such period of time, or if you pay such invoice, then you waive all rights in and with respect to such URL, and you acknowledge that we may allow the registration for such URL to lapse, may retain and use such URL, or may transfer such URL to a third party, without restriction.

7. **Performance Based Advertising Products.** We or our vendor will fulfill your performance based Advertising Product including, but not limited to, YPclicks or YPSalist. For YPSearch, Internet search engines determined by us, which may include affiliated or syndicated search engine network partners, will provide text advertising or services or other websites. We or our vendor will continue to fulfill your Advertising Product for the contracted number of clicks. You agree that all placements on search engines and exclusively be deemed to have been approved by you. We or our vendor will continue to fulfill your Advertising Product as provided in our sole discretion or your calls, search or other actions (an "Action") or verify your budget is exhausted. If the applicable number of Actions has not been delivered at required Actions having been credited by us in our sole discretion of your budget has been budget has not been exhausted during the Initial Term, we will continue to fulfill your Advertising Product at our additional charge until the applicable number of Actions has been delivered or otherwise during the term of the Agreement. We exhausted. Although we will invoice you at twelve measures for the contract amount, we do not guarantee that the Actions will be fulfilled within the timeframe or otherwise during the term of the Agreement. We cannot provide you with (1) the nature of the search engines and/or search engine networks to which your advertisements will be submitted under (2) the URL, and IP address from which clicks or other Actions are made. Our only obligation is that the number of Actions identified in the Order will be provided. We do not guarantee that any click (1) will be from potential customers for you and/or (2) will be of any benefit or value to you. You acknowledge that the clicks may be from adult sites, from adult-oriented URLs, from sites potentially offensive to you, the result of prohibited or improper purposes, and the result of robots, devices. You agree that such reports and the robots and other automated or mechanical means. We will send or make available periodic reports from us or Distribution Sites regarding the number of Actions delivered. You agree that such reports and the robots and other automated or mechanical means. We will send or make available periodic reports from us or Distribution Sites regarding the number of Actions delivered. You agree that such reports and the counts contained therein shall be the conclusive, definitive measurements of our performance, and that they shall determine your related obligations for all purposes of this Agreement. Notwithstanding anything to the contrary in Section 2 of these usage restrictions from any source whatsoever shall be accepted by us or have any applicability to our obligations or your rights under this Agreement. If you cancel your performance based Advertising Ts&Cs, upon fulfillment of your performance based Advertising Product, we will invoice you for the remaining months of the Initial Term or the amount of any remaining budget as an early Product or change your Web site or otherwise impair our ability to complete the Actions, we will invoice you in full for your remaining Product or change your Web site or otherwise impair our ability to complete the Actions, we will invoice you in full for additional Actions to be delivered. termination charge. We have no liability for any Actions you dispute. However, in our sole discretion, we may issue you a credit for additional Actions to be delivered.

8. **Prohibitions, Content and Intellectual Property Rights.** The transmission of any unsolicited commercial email messages through our services is strictly prohibited without the prior consent of the recipient. You acknowledge that neither we nor the Distribution Sites generate the content upon a site where your Advertising Product or by be fulfilled and that neither we nor the Distribution Sites are responsible for such content. You acknowledge that it is not possible to avoid placing your advertisements on sites where that display such content, have adult-oriented domain names, or that are primarily interested in generating sales. You acknowledge that it is not possible to avoid placing your advertisements on sites that it is not possible to do and in that event have any liability to you of any kind or nature as a result of any such placement that may acknowledge that it is not possible to avoid such placements, and that we shall in no event have any liability to you of any kind or nature as a result of any such placement that may be offensive to you. We or any Distribution Site may refuse, remove and/or terminate Advertising Products and our services due to any content of or any Distribution Site's sole discretion; provided a Distribution Site or another party to liability, (b) includes obscene, profane, sexual, violent or other inappropriate content, or (c) is otherwise unacceptable in our or the Distribution Site's sole discretion; provided that we have no obligation to review your advertisements and materials and will have no liability related to the content thereof. If this occurs, you will remain responsible for payment of all amounts to be invoiced for the then current term and will not be entitled to any refund or abatement or any extension of the term of this Agreement. Furthermore, you are making the following representations and you will use and each Distribution Site are relying upon them that (a) that you are authorized to advertise and display the requested features, product or service, (b) you are a business, not a consumer, (c) that the content of any advertisement and (d) that you have the right to use and not misusing, (d) not you are in compliance with all laws and licensing requirements relating to any interest in the goods or services displayed on or your advertisement, and (e) that you have the right to use and not misusing, (d) not you are in compliance with all laws and licensing requirements relating to any interest in the goods or services displayed on or your advertisement, and (e) that you have the right to use and publish any requested name, address, trade name, trademark, service mark, graphics, text and/or other content or material, (b) you are functionally in writing of any time that you requested or request that any of those are applicable laws, license agreements and other obligations, without limiting any of our other rights or remedies, you agree to notify us immediately in writing of any time that you have made or that any such representations or that any of those are applicable laws, license agreements and other obligations, without limiting any of our other rights or remedies, you agree to notify us immediately in writing of any time that you have made or that any such representations or that any representation that are not and become in the content. We assume sole responsibility for the protection of the copyrights, trademarks, service marks, service marks or any content or material you provide to us or display a name, trademark, service mark partially for us or which you are authorized to use or display. If we receive notice or documentation demonstrating that another person or entity contends that right to use or display a name, trademark, service mark or other content, we may relay or discontinue the Advertising Products and our services without liability in any such item that you furnish or any independently Products we create for you, whether in whole or in part. You further acknowledge that such work that we create from your content, you acknowledge that we own such Advertising Products and that neither you nor any other party has copyright display, publicly perform and otherwise use any trademark, service mark, graphics, text or other content you provide to us in connection with our performance of our obligations under this Agreement. Upon copyrightable construction you might have made to the advertising. You further acknowledge that we retain all right, title and interest, including the copyright, in such Advertising Products and orders for you, whether such copyrightable construction you might have made to the advertising. You further acknowledge that we retain all right, title and interest, including the copyright, in such Advertising Products and orders for you, whether intend for such advertising to constitute a joint work. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon and intend for such advertising to constitute a joint work. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon publicly display, publicly perform and otherwise use any trademark, service mark, graphics, text or other content you provide to us in connection with our performances of our obligations under this Agreement. Upon termination of this Agreement, we are not obligated to return any of these works to you. As to Advertising Products that we create for you which you are furnished any copyrightable contribution you might have made to termination of this Agreement, we are not obligated to return any of these works to you. As to Advertising Products that we create for you which you are furnished any copyrightable contribution you might have made to the Advertising Products and our services without liability to you. As to such items that you have resolved that dispute with the other party to your satisfaction. As to any copyrightable contribution you might have made to the Advertising Products and our services without liability to you and to such work that we create on our and/or assign to us all rights in and to any Products and that neither you nor any other party has copyright in the right, title and interest, including the copyright, in such Advertising Products. We retain all right, title and interest, including the copyright, in such Advertising Products. We retain all right, title or in part, and any derivative work that we create from your content, you acknowledge that we own such Advertising Products and that neither you nor any other party has copyright in the right, title and interest, including the copyright, in such Advertising Products. We retain all right, title and interest, including the copyright, in such Advertising Products. work. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon, publicly display, publicly perform and otherwise use any trademark, service mark, graphics, text or other content you provide to us in connection with our performance of our obligations under this Agreement. Upon termination of this Agreement, we are not obligated to return any of these works to you.

Updated 10/17/2006

EXHIBIT B - PAGE 37

9. Design of Our Sites, Advertising Products, Statistics and Interruption of Our Services. [...]

10. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED IN THE ORDER, NEITHER WE NOR ANY DISTRIBUTION SITE MAKES ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES TO YOU OF ANY KIND, EITHER EXPRESSED OR IMPLIED (INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NONINFRINGEMENT OR OTHER WARRANTIES ARISING BY USAGE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE), REGARDING THE FUNCTIONALITY, PERFORMANCE OR RESULTS OF THE ADVERTISEMENTS OR ADVERTISING PRODUCTS, LINKED SITES, ANY SITE WE MAY CREATE FOR YOU, OR OTHERWISE UNDER OR RELATED TO THIS AGREEMENT.

11. Assignment. [...]

12. Notices. [...]

13. Liability. NEITHER WE NOR ANY DISTRIBUTION SITE NOR ANY OF OUR OTHER VENDORS SHALL HAVE ANY LIABILITY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE ADVERTISING PRODUCTS FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOSS OF PROFIT, LOSS OF INCOME OR REVENUE, LOSS OF GOODWILL, THE REJECTION OR REMOVAL OF ANY ADVERTISING CONTENT, ANY DELAY IN DISPLAYING OR OUR FAILURE TO DISPLAY CONTENT, OR OUR FAILURE TO PERFORM SERVICES, WITHOUT LIMITING THE PROVISIONS OF SECTION 13, IN NO EVENT SHALL OUR LIABILITY ARISE. [...]

14. Exclusive Remedies. [...]

15. Force Majeure. [...]

16. Indemnification. [...]

17. Telephone Conversations. [...]

18. Applicable Law. [...]

19. Entire Agreement. [...]

Updated 10/17/2008

```
BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK      NJ 07601-7680
                                        TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (201) 527-2600
COURT HOURS

                        DATE:  APRIL 14, 2009
                        RE:    KOWALSKI VS YELLOWPAGES COM LLC
                        DOCKET: BER L -003316 09

    THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

    DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.

    THE MANAGING JUDGE ASSIGNED IS:  HON JONATHAN N. HARRIS

    IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      006
AT:  (201) 527-2600.

    IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
    PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                        ATTENTION:

                                ATT: PAUL I. PERKINS
                                LYNCH LAW FIRM
                                45 EISENHOWER DRIVE
                                PARAMUS          NJ 07652

JUBEE5
```

# EXHIBIT C



Secretary of State

**Administration     Elections     Business Programs     Political Reform     Archives     Registries     Other Services**

## Business Entity Detail

Data is updated weekly and is current as of Friday, August 13, 2010. It is not a complete or certified record of the entity.

| | |
|---|---|
| Entity Name: | YELLOWPAGES.COM LLC |
| Entity Number: | 200428610128 |
| Date Filed: | 10/05/2004 |
| Status: | ACTIVE |
| Jurisdiction: | DELAWARE |
| Entity Address: | 611 N BRAND BLVD 5TH FL |
| Entity City, State, Zip: | GLENDALE CA 91203 |
| Agent for Service of Process: | CT CORPORATION SYSTEM (C0168406) |
| Agent Address: | * |
| Agent City, State, Zip: | * |

* Indicates the information is not contained in the California Secretary of State's database.

* **Note:** If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report.

- For information on checking or reserving a name, refer to **Name Availability**.
- For information on ordering certificates, copies of documents and/or status reports or to request a more extensive search, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Field Descriptions and Status Definitions**.

**Modify Search    New Search    Printer Friendly    Back to Search Results**

Privacy Statement | Free Document Readers

Copyright © 2010   California Secretary of State

### Secretary of State

**Business Entities (BE)**

Online Services
- **Business Search**
- **Disclosure Search**
- **E-File Statements**
- **Mail Processing Times**

**Main Page**

**Service Options**

**Name Availability**

**Forms, Samples & Fees**

**Annual/Biennial Statements**

**Filing Tips**

**Information Requests**
(certificates, copies & status reports)

**Service of Process**

**FAQs**

**Contact Information**

Resources
- **Business Resources**
- **Tax Information**
- **Starting A Business**
- **International Business Relations Program**

**Customer Alert**
(misleading business solicitations)

EXHIBIT C - PAGE 1

http://kepler.sos.ca.gov/cbs.aspx